## UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF TENNESSEE

| | | |
|---|---|---|
| IN RE: | * | |
| NEOPHARMA, INC., | * | CASE NO.: 2:20-bk-52015-SDR |
| | * | Chapter 11 |
| Debtor; | * | |
| _____ | * | |
| | * | |
| IN RE: | * | |
| NEOPHARMA TENNESSEE LLC, | * | |
| | * | CASE NO.: 2:20-bk-52016-SDR |
| Debtor. | * | Jointly Administered |

## MOTION BY DEBTORS TO (A) APPROVE THE SALE OF SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES AND OTHER INTERESTS, (B) APPROVE THE ASSUMPTION AND ASSIGNMENT OF FACILITY LEASE AND TAX AGREEMENT AND (C) AUTHORIZING REJECTION OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES

Neopharma Inc ("Neopharma") and Neopharma Tennessee, LLC ("Neopharma Tennessee") (Neopharma and Neopharma Tennessee sometimes collectively hereinafter the "Debtors") hereby move this Court for approval of the sale of substantially all of the Debtors' assets, pursuant to the terms of the Asset Purchase Agreement, dated as of December 16, 2020, (the "APA"), by and among the Debtors and American Antibiotics Initiative, Inc. ("AAII"), a copy of which is attached hereto as **Exhibit A**, and the assumption and assignment of certain contracts with such sale and assignment to be free and clear of liens pursuant to Section 363(f) of the *Bankruptcy Code*. The Debtors further request the Court to authorize the rejection of certain executory contracts and unexpired leases as more particularly described herein. As grounds for this Motion, the Debtors state as follows:

## INTRODUCTION

1.      The Debtors filed voluntary cases under chapter 11 of title 11 of the United States Code 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code") on December 22, 2020 (the "Petition Date") and are acting as debtors-in-possession of the assets pursuant to 11 U.S.C. § 1107 and 1108.  No creditors' committee, trustee or examiner has been appointed in this case at this time.

2.      By Orders filed December 30, 2020, the Court granted the Debtors' motions for joint administration of these bankruptcy cases.

3.      Neopharma owns and operates or has owned and operated various assets that comprises a pharmaceutical manufacturing, processing, testing, warehousing, packaging and distribution business located in Bristol, Tennessee (the "Pharmaceutical Business").   The Pharmaceutical Business includes the manufacture of plastic bottles that are utilized to bottle the pharmaceutical products manufactured by Neopharma.

4.      Neopharma further owns various drug applications issued by the United States Food and Drug Administration (the "FDA"). The drug applications include NDAs (new drug applications) for Amoxil; ANDAs (abbreviated new drug applications) for Amoxil; INDs (investigational new drug applications) for Augmentin; NDAs for Augmentin; ANDAs for Amoxil and ANDAs for Tripacks (collectively the "Pharmaceutical Products").   Neopharma produces and markets the Pharmaceutical Products that it manufactures under certain trademarks related thereto.

5.      Neopharma Tennessee owns and/or leases certain real property and improvements thereon including (a) an antibiotic manufacturing facility located at 201 Industrial Drive, Bristol, Tennessee (the "Bristol Facility"); (b) a plastic processing facility located at 605 5th Street, Bristol, Tennessee; and (c) certain vacant land located at 4th Street, Bristol, Tennessee. The Bristol Facility is a dedicated penicillin USA FDF (Finished Dose Form or "secondary

2

manufacturing") facility.  The Bristol Facility had no 483 citations from the last FDA inspection in December of 2019.

## HISTORY OF BRISTOL FACILITY AND ITS BUSINESS OPERATIONS

6.      In 1971, Beecham Group, a Great Britain company, purchased SE Massengill located in Bristol, Tennessee for Beecham Group's US operations.

7.      The Bristol Facility was originally constructed in 1978 for occupancy by Beecham Group.  Beecham Group produced penicillin in suspension, capsules and tablets.  The Bristol Facility more than doubled in size over the years with expansions in 1983, 1988, 1989 and a large expansion in 2003, which included state of the art lab space.  Currently, the improvements that comprise the Bristol Facility consist of a 367,538 square foot building that is a manufacturing and packaging facility located on a 41.80+/- acre site.

8.      In 1990, Beecham Group merged with SmithKline forming SmithKlineBeecham.  In 2002, Glaxo Welcome merged with SmithKlineBeecham forming GlaxoSmithKline ("GSK").  GSK operated the Bristol Facility until March of 2011.

9.      In 2011, the Pharmaceutical Business for the US market was acquired by Dr. Reddy's Laboratories, Inc. from GSK.  As part of that transaction, the real property and improvements were acquired by and titled in the name of Dr. Reddy's Laboratories Tennessee, LLC (Dr. Reddy's Laboratories, Inc. and Dr. Reddy's Laboratories Tennessee, LLC sometimes collectively hereinafter "Dr. Reddy").  The real property consists of the approximate 41.84 acre tract improved by the 367,538 square foot antibiotic manufacturing facility with the address of 201 Industrial Drive, Bristol, Tennessee; a 1.418 acre tract (improved by a plastic processing facility) with the address of 605 5th Street, Bristol, Tennessee; and a .236 acre tract (unimproved) with the address of 4th Street, Bristol, Tennessee (sometimes the foregoing tracts of real property and

improvements thereon collectively hereinafter the "Real Property").    The plant, equipment, furniture, fixtures, leasehold improvements and other personal property used in the Pharmaceutical Business and located at the Bristol Facility were also acquired by Dr. Reddy Tennessee, LLC.

10.    In order to facilitate the transaction between GSK and Dr. Reddy, the Industrial Development Board of the City of Bristol (the "IDB") granted Dr. Reddy's Laboratories Tennessee, LLC certain payment-in-lieu of ad valorem ("PILOT") benefits, and issued to Dr. Reddy Laboratories Tennessee, LLC an Industrial Development Revenue Bond in the amount of $14,000,000.  The IDB and Dr. Reddy's Laboratories Tennessee, LLC also entered into a lease agreement dated January 1, 2012 (the "Dr. Reddy Lease").

11.    Prior to Dr. Reddy's acquisition, production at the Bristol Facility had decreased significantly, with a workforce reduction from over 500 employees to less than 50 employees. This decline was primarily attributable to GSK's previous branded antibiotic products being subject to competition by unbranded generic antibiotics in the US when certain patents were invalidated in May 2002.  Rather than compete with unbranded generic antibiotics, GSK elected to exit the US market.  Dr. Reddy was an experienced producer of generic antibiotics, primarily from its operations located in India and, therefore, was a viable candidate to purchase the Pharmaceutical Business and continue the operations at the Bristol Facility.

12.    In 2016, Dr. Reddy lost its supply contract with GSK for active pharmaceutical ingredients ("API").  API components are the components in drug formulations that provide the medical efficacy to patients for all drugs including antibiotics (inactive drug components are also included in the formulation for other purposes, such as flavor or glidant).  This essentially disabled Dr. Reddy from producing antibiotics from the Bristol Facility as significant technical change projects were necessary in order to qualify other API suppliers in each formulation via productions of sample stability batches for submission to FDA for approval.   Due to delays in finding

4

replacement API suppliers and the project time that would be involved in obtaining FDA approval for each intended supplier, Dr. Reddy's sales from the Bristol Facility dramatically decreased. As a result, Dr. Reddy decided to sell the business.

13.     In late September of 2018, Neopharma acquired from Dr. Reddy's Laboratories, Inc. (a) certain assets related to the company's pharmaceutical products marketed under the AMOXIL®, AUGMENTIN®, AUGMENTIN® ES 600 and AUGMENTIN® XR™ trademarks (licensed to Dr. Reddy's Laboratories, Inc. by GSK), and (b) the membership interests of Dr. Reddy's Laboratories Tennessee, LLC, for a purchase price of $4,000,000.  On October 1, 2018, Dr. Reddy's Laboratories, LLC name was changed to "Neopharma Tennessee LLC".  As a result of these transactions, (a) Neopharma Tennessee became the owner of the Real Property and the owner of the tangible personal property located at the Bristol Facility, including the tangible personal property located at the plastics processing facility, and (b) Neopharma was the owner of the drug applications.

14.     In order to induce Neopharma to complete its acquisition of the Dr. Reddy assets including the membership interest of Dr. Reddy's Laboratories Tennessee, LLC and to continue to operate at the Bristol Facility, the IDB agreed to terminate the Dr. Reddy Lease and the PILOT program associated therewith and acquire from and then lease back to Neopharma Tennessee a warehouse building of approximately 91,000 square feet located at the Bristol Facility (the "Warehouse Building").  Under this arrangement between the IDB and Neopharma, the Warehouse Building would receive the PILOT benefits that were previously received by Dr. Reddy's Laboratories Tennessee, LLC for a period of ten years beginning on September 28, 2018 and ending on December 31, 2028.  During the first thirty-six (36) months of this new PILOT period, Neopharma was only required to make annual payments in lieu of taxes on the Warehouse Building of $10.00 to Sullivan County, Tennessee and $10.00 to the City of Bristol, Tennessee, respectively.

15.     On September 28, 2018, the IDB and Neopharma Tennessee entered into a Facility Lease Agreement dated September 28, 2018 (the "Facility Lease"), a copy of which is attached as **Exhibit B**.  IDB and Neopharma Tennessee also entered into a Tax Agreement dated September 28, 2018 (the "Tax Agreement"), a copy of which is attached as **Exhibit C**.

16.     Under the Facility Lease, the IDB acquired the Warehouse Building in consideration of a $14,000,000 Industrial Development Revenue Note, Series A (Neopharma Project) (the "Note") and in turn leased back the Warehouse Building to Neopharma Tennessee. This transaction was to a large degree a legal fiction in that no money changed hands and was structured such that any rental payments due from Neopharma Tennessee to the IDB under the Facility Lease were offset by payments due from the IDB to Neopharma Tennessee under the Note.  Under the Tax Agreement, Neopharma Tennessee's property tax obligation to Sullivan County, Tennessee and the City of Bristol, Tennessee was limited to $10.00 per year for the first 36 months of the lease term.

17.     By Quitclaim Deed dated November 19, 2018, the IDB conveyed to Neopharma Tennessee the Warehouse Building but did not convey the underlying 41.804 acres of real property.  A copy of this Quitclaim Deed is attached as **Exhibit D**.  Immediately thereafter on November 19, 2018, Neopharma Tennessee conveyed by Quitclaim Deed, a copy of which is attached as **Exhibit E**, the Warehouse Building to the IDB, but did not convey the underlying 41.804 acres of real property.  The parties then placed of record a Memorandum of Facility Lease, a copy of which is attached as **Exhibit F.**  The Debtors aver that the intent of these transactions was for the Warehouse Building to be titled in the name of the IDB but leased back to Neopharma Tennessee pursuant to the terms of the Facility Lease and the underlying land including the remainder of the 41.804 tract to remain titled in Neopharma Tennessee. In 2018 and 2019, Neopharma paid the property taxes on the 41.804 acre tract, but no property taxes were assessed

by either the City of Bristol, Tennessee or Sullivan County, Tennessee on the Warehouse Building.

18.     At the time of the 2018 acquisition by Neopharma, all the issued and outstanding stock of Neopharma was owned by Neopharma International Holding, Ltd. ("Neopharma International").  Neopharma International is a company incorporated under the laws of the Dubai International Finance Center, Dubai – UAE.  The owner of person in control of Neopharma International was Dr. B. R. Shetty.  At the time, Dr. Shetty's principal residence was located in the UAE.

19.     During the period 2018, 2019 and the first five months of 2020, Neopharma was primarily funded by Neopharma International and Neopharma, LLC.  Neopharma, LLC was a company organized under the laws of the UAE and which owned pharmaceutical facilities in Japan and other parts of the world.  In March 2020 Neopharma received $575,000 from BRS Capital.  For May of 2020, Neopharma was primarily funded by the proceeds of the payroll protection program (PPP) loan or grant made available by the Coronavirus Aid, Relief and Economic Security (CARES) Act.

20.     By July of 2020, various financial and legal matters were experienced worldwide by Dr. B.R. Shetty, Neopharma International and Neopharma, LLC and they were independently or collectively no longer in a position to fund Neopharma or provide working capital to the Bristol Facility. In July 2020, Neopharma received a $250,000 loan from Peta Pharma Inc.

21.     On July 24, 2020, Canadian Pharma International, Ltd, a United Kingdom company ("CPIL"), acquired all of the issued and outstanding stock of Neopharma International, and thereby became the sole shareholder of Neopharma.  A copy of the Stock Purchase Agreement and Irrevocable Stock Power evidencing this transaction are attached as **Exhibit G**.

7

22.    On July 27, 2020, CPIL, in its capacity as sole shareholder of Neopharma, removed Neopharma' existing directors and appointed Tanner Soliman and Dominic Traynor as the company's directors.

23.    On July 30, 2020, Mallikarjlune R. Desireddy, the then CEO on Neopharma, was terminated for cause.  During Mr. Desireddy's management and stewardship, Neopharma incurred losses of approximately $700,000 per month.

24.    Due to inadequate funding that resulted in the inability to pay employee wages and benefits which in turn meant that Neopharma was unable to comply with applicable regulations for manufacturing, the site leadership team at the Bristol Facility made the decision to cease its manufacturing operations on August 10, 2020.  This decision was made only after all site personnel had signed and sent a letter to Dr. Shetty but received no recognition of receipt or response.

25.    After CPIL took control of Neopharma and its operations and together with the Bristol facilities former site director and quality director, CPIL discovered a number of irregularities in the previous management of the company at the corporate level, including acts of apparent misfeasance and malfeasance.  This task was made more difficult due to Mr. Desireddy's removal of the company records, including financial records, and CPIL and site staff being denied access to key data basis and bank accounts of the company.  These records or access to them were necessary to keep Bristol Facility along with the previously distributed drugs FDA compliant. Examples of the misfeasance and/or malfeasance discovered by CPIL and site staff to date include:

a.    Multiple ERISA violations including the non-payment of employer contributions to employee 401k contributions and non-payment of employee contributions to their elective health and other benefit plans.

8

b.      PPP application and disbursement improprieties.

c.      Payments from the company's bank account to Optimus Pharma, LLC which has the same address as Mr. Desireddy's New Jersey residence.

d.      Irregularities in IRS filings.

e.      Apparent personal use of company credit cards and company reimbursement to Mr. Desireddy and others for personal expenses.

f.      FDA compliance issues at the corporate level.

g.      Irregularities regarding the source and use of incoming wire transfers.

h.      Transfer of significant amounts from Neopharma's Key Bank and Chase bank accounts without supporting documentation or access to supporting documents for the transfer.

26.      In late August of 2020, CPIL, through its authorized agent, commenced negotiations with Constitutional Antibiotics, Inc. ("CAB") for it to acquire the assets of Neopharma and Neopharma Tennessee through a joint venture comprised of CPIL and CAB.  CAB, a Delaware corporation, was formed by certain former principals of King Pharmaceuticals, Inc. for the purpose of entering into the joint venture with CPIL.  King Pharmaceuticals was a company that was located and formerly operated in Bristol, Tennessee and whose principals had substantial experience in the pharmaceutical industry.  CPIL and CAB concluded that the best means by which to acquire the assets of Neopharma and Neopharma Tennessee and to continue the pharmaceutical Business in Bristol, Tennessee was through a chapter 11 bankruptcy proceeding and a sale under section 363 of the *Bankruptcy Code*.

27.     CAB and CPIL executed a non- binding term sheet setting forth the terms of this joint venture, but ultimately could not agree on a definitive agreement for CAB to acquire the assets of Neopharma and Neopharma Tennessee.  Negotiations between these two companies then ceased. Certain principals of CPIL and others then formed AAII to proceed with the acquisition under the terms of the APA.  None of the founders or principals of AAII are associated with CAB.

28.     The Bristol Facility is a world class antibiotic manufacturing facility with good legacy regulatory compliance standing and production volume capability to supply the United States market with reliable, high quality and low cost penicillin class antibiotics.  If the transaction as proposed in the APA is consummated, AAII has the ability to bring a reliable quality antibiotic supply back to the United States and preserve a number of jobs that are important to the Bristol, Tennessee community and the Tri-Cities Region.

## THE ASSET PURCHASE AGREEMENT

29.     The APA contemplates that substantially all the Debtors' assets will be sold and transferred to AAII.  The APA more particularly describes the assets to be sold as all of the Debtors' right, title and interest in and to the Purchased Assets, as defined in Section 1.1 of the APA, and which is summarized as follows:

a.     The Intangible Rights (as defined in the APA).

b.     The Pharmaceutical Products (as defined in the APA) including Neopharma's drug authorizations and the documents referenced in the regulatory chronology for each NDA, each ANDA and each IND (as defined in the APA).

c.      Neopharma's interest in any confidentiality agreements, non-disclosure agreements, and non-compete agreements relating to the assignment of ideas and inventions to Neopharma by its current or past employees.

d.      The name "Neopharma", "Neopharma Tennessee LLC" and any logos or marks associated therewith.

e.      All Governmental Authorizations (as defined in the APA) granted by any Governmental Agency (as defined in the APA) in connection with the operations of the Pharmaceutical Business, the Intangible Rights and the Real Property.

f.      The Real Property and the improvements thereon, including fixtures and leasehold improvements.

g.      All the fixed and tangible assets owned by the Debtors and used in the Pharmaceutical Business.

h.      All inventory located on, warehoused or stored at the Property.

i.      Neopharma Tennessee's rights as tenant under the Facility Lease.

j.      All security deposits related to utility or security services.

k.      All tangible assets of the Debtors, other than the Excluded Assets (as defined in the APA).

30.      The Purchase Price for the Purchased Assets in the APA is $2,000,000.00, of which $100,000 (the "Holdback Amount") shall be deposited in escrow pursuant to the terms of the APA and the Escrow Agreement.   The Holdback Amount secures the indemnification obligations of the Debtors under Section 10.2 of the APA.   In addition to the cash consideration, AAII will pay for and/or provide the services necessary for Neopharma to comply with post-

marketing regulations under 21 C.F.R. § 314.80 and 21 C.R.F § 314.81 through the final expiration date (April 30, 2023) for distributed batches under Neopharma that remain in the supply chain.

31.    Under Section 3.1 of the APA, the Closing shall occur as soon as practicable following the satisfaction or waiver of all conditions set forth in the APA including the Court's approval of the proposed sale.

32.    Under Section 12.2 of the APA, the Court's order authorizing and approving the sale of the Purchased Assets as contemplated by the APA (the "Sale Order") is to include the following findings:

    a.    That notice of the sale of the Purchased Assets was proper and sufficient;

    b.    That the sale of the Purchased Assets is approved pursuant to Section 363(b) of the *Bankruptcy Code*;

    c.    That the Debtors are authorized to execute, deliver and perform under the APA and the Escrow Agreement;

    d.    That Neopharma Tennessee assumes the Facility Lease and the Tax Agreement[1] and assigns it to AAII;

    e.    That the sale of the Purchased Assets will be free and clear of all liens pursuant to Section 363(f) of the *Bankruptcy Code*;

---

[1]    The Tax Agreement was not originally referenced in the APA as there was not a copy available at the time the APA was signed.  However, upon having the opportunity to fully review the terms of the Facility Lease and the Tax Agreement, the Debtors believe that it is in their best interest to assume and assign the Facility Lease and Tax Agreement.  If necessary, the APA will be amended to reflect this change of terms.

f.      That AAII is a good faith purchaser under Section 363(m) of the *Bankruptcy Code* and not a successor to the Debtors;

g.      That AAII be granted the protections set forth in Section 363(m) of the *Bankruptcy Code*; and

h.      That the Purchase Price represents the highest and best offer for the Purchased Assets.

33.     Under Section 12.5 of the APA and if the Court approves the sale of the Purchased Assets to a party other than AAII, then AAII will be entitled to a break up fee of $250,000.  This motion seeks approval of the $250,000 break up fee as an administrative expense under Sections 503 and 507 of the *Bankruptcy Code*.

## THE FACILITY LEASE

34.     The Facility Lease provides for the lease by the IDB to Neopharma Tennessee of the Warehouse Building.

35.     The Facility Lease commenced on September 28, 2018 and is to terminate on December 31, 2028 (the "Term").

36.     The Facility Lease provides that throughout the Term, the Warehouse Building shall be owned by the IDB and leased to Neopharma Tennessee pursuant to the terms thereof.

37.     The Warehouse Building is unencumbered, except with respect to the Facility Lease and the permitted encumbrances that are referenced therein.

38.     The IDB has not declared a default or event of default under the Facility Lease.

39.     Notwithstanding the IDB's remedies upon default or an event of default under the

Facility Lease, Section 10.2(e) provides:

> Notwithstanding the foregoing provisions of this Section, until final action pursuant to this Section shall have taken which would preclude any of the foregoing actions, the Company may (i) pay all accrued unpaid Rental Payments (exclusive of such Rental Payments accrued solely by virtue of acceleration thereof as provided in Section 10.2(a)(i) hereof), in which event, this Lease shall be fully reinstated as if an Event of Default has not occurred and otherwise fully cure all Events of Default, and/or (ii) exercise any option granted pursuant to Article XI hereof.

40.     Section 11.2 of the Facility Lease states:

> <u>Option to Purchase the Warehouse Facility Prior to Payment or Forgiveness of all of the Facility Loan</u>.    Subject to compliance with Section 11.5, the Company shall have, and is hereby granted, the option to purchase the Warehouse Facility prior to the full payment or forgiveness of the Facility Loan at the time of any prepayment of such portion of the Rental Payments pursuant to the provision of Section 5.4 hereof as the Lender may require, in writing, provided that if all of the Additional Rental Payments under Section 5.1(b) have not been paid in full, the Company shall also pay such amounts.    The purchase price payable by the Company in the event of its purchase pursuant to this Section shall be a sum equal to One Hundred Dollars ($100) and the Company shall give the Issuer at least ten (10) days notice of any purchase pursuant to this Section.

41.     Section 9.1(a) of the Facility Lease states:

> (a) This Lease may be assigned (including the granting of a leasehold deed of trust) and the Warehouse facility subleased, as a whole or in part, by the Company without the necessity of obtaining the consent of the Issuer, but subject to the terms of the Tax Agreement, subject, however, to each of the following conditions:
>
> > (i)     the assignee or sublessee shall assume the obligations of the Company hereunder to the extent of the interest assigned or subleased;
> >
> > (ii) the Company shall, within thirty (30) days after the delivery thereof, furnish or cause to be furnished to the issuer a true and complete copy of each assignment,

14

assumption of obligation or sublease, as the case may be; and

(iii)    the Lender shall have consented to such assignment, assumption of obligation or sublease.

42.    Based on the foregoing provisions, the interests of Neopharma Tennessee under the Facility Lease are freely assignable.  If Neopharma Tennessee is in default under the Facility Lease by virtue of its bankruptcy filing, the default can be cured and the Facility Lease reinstated by payment of past due rent, none of which is owed, or Neopharma Tennessee could exercise its option to purchase the Warehouse Property.

## THE TAX AGREEMENT

43.    On September 28, 2018, the IDB and Neopharma Tennessee are also entered into the Tax Agreement.

44.    The Tax Agreement provides in part that the sum of $10.00 in property taxes is due to Sullivan County, Tennessee and the sum of $10.00 in property taxes is due the City of Bristol, Tennessee during the first 36 months of the Term or through the 2021 tax year.

45.    With respect to assignability, the Tax Agreement provides:

Assignment.    Notwithstanding any provisions of this Agreement or the Facility Lease to the contrary, the Company shall not assign this Agreement and/or Facility Lease without first receiving the prior written consent of the Issuer, which consent shall not be unreasonably withheld provided the successor to the Company is expected to meet the Jobs Expectation and pay at least comparable wages to the Company.

## THE ESCROW AGREEMENT

46.    Pursuant to Section 2.1 of the APA, the Holdback Amount will be deposited in escrow pursuant to the terms of the Escrow Agreement.

47.     The parties have agreed in principle to the terms of the Escrow Agreement, a copy of which is attached to the APA.  It is anticipated that the Escrow Agreement will be fully executed at Closing.

48.     The parties to the Escrow Agreement are the Debtors, AAII and Hunter, Smith & Davis, LLP, as Escrow Agent.

49.     The Escrow Agreement provides that at the Closing, the Holdback Amount will be deposited in escrow to fund any breach of contract or any indemnity claim made by AAII under the APA.

50.     Under the Escrow Agreement, the Holdback Amount is to be deposited in an intertest bearing account by the Escrow Agent pending disbursement by the joint written instructions of the Debtors and AAII or in accordance with the terms of the Escrow Agreement.

51.     It is anticipated that the Holdback Amount will be administered as part of the Debtors' bankruptcy estates.

## **LEGAL STANDARDS**

### A.     **Sale of Assets Under Section 363(b) of Bankruptcy Code.**

52.     Section 363(b)(1) of the *Bankruptcy Code* provides, in pertinent part, that the "trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate."  11 U.S.C. § 363(b)(1).  To obtain court approval to sell property under § 363(b), the debtor must show a "sound business purpose" for the proposed action. Stephens Indus, Inc. v. McClung, 789 F.2d 386, 390 (6th Cir. 1986); see also Comm. Of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.), 722 F.2d 1063, 1071 (2d Cir. 1983).  The "sound business purpose" test commonly considers four factors:

  a.  a sound business reason or emergency justifies a pre-confirmation sale;

  b.  adequate and reasonable notice of the sale was provided to interested parties;

  c.  the sale has been proposed in good faith; and

  d.  the purchase price is fair and reasonable.

See In re Barnhill's Buffet, Inc., No. 07-08948, 2008 Bankr. LEXIS 2864, at *7 (Bankr. M.D. Tenn. Feb. 28, 2008) (citing In re Titusville Country Club, 128 B.R. 396, 399 (Bankr. W.D. Pa. 1991)).

53.  Further, under *Fed. R. Bank. P.* 6004(f)(1), sales of property or property rights outside the ordinary course of business may be by private sale or public auction.

54.  After CAB indicated an unwillingness to resume further negotiations toward a definitive agreement, the Debtors consulted with other interested investors and subsequently signed the APA containing the terms of the proposed sale transaction. The Purchase Price will be sufficient to pay administrative expenses and priority claims of the two bankruptcy estates. The Debtors also estimate that the purchase price proceeds will generate sufficient cash to enable a dividend to be paid to unsecured creditors. The sale of the Purchased Assets will also help insure the employment of approximately 45 persons with the potential of some 75-100 persons later. The Debtors further believe that the APA represents the highest and best offer for the Purchased Assets. AAII's willingness to support Neopharma's compliance with FDA post-marketing regulatory requirements for distributed drug batches in the supply chain through expiration is of extreme importance and of substantial value. This willingness on the part of AAII is especially important to the United States during a time of elevated drug supply need as a result of the global COVID-19 pandemic as patients are compromised or weakened, and some of the morbidity is due to secondary bacterial infections. The alternative would have been to (unnecessarily) recall these drug product batches from the market at greater additional costs to Neopharma. When distributed, the drug product batches currently in the supply chain complied

with all specifications and were produced in compliance with all current Good Manufacturing Practices, so a recall would only be necessary if the post-marketing monitoring cannot be completed or in the unlikely event that a non-compliance is found during stability testing or pharmacovigilance monitoring.

55.    In order to further confirm that the APA is the best offer available for the Purchased Assets, notice of this Motion will be provided to all creditors of the Debtors and parties in interest. All creditors and parties of interest will have the opportunity to object this proposed sale of the Purchased Assets on any appropriate grounds.

**B.    Sale Free and Clear of Liens Under § 363(f) of the Bankruptcy Code.**

56.    A sale of assets must satisfy the provisions of Section 363(f) of the <u>Bankruptcy Code</u> for title to be passed to the buyer free and clear of liens, claims, encumbrances, and interests.  Section 363(f) of the <u>Bankruptcy Code</u> provides:

> The trustee may sell property under subsection (b) or (c) of this section free and clear of any interest in such property of an entity other than the estate, only if—
>
> 1.    applicable non-bankruptcy law permits sale of such property free and clear of such interest;
>
> 2.    such entity consents;
>
> 3.    such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;
>
> 4.    such interest is in *bona fide* dispute; or
>
> 5.    such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f).

57.    There is one creditor that asserts or may assert a security interest in the Purchased Assets.  On July 8, 2020, Neopharma made a promissory note to Peta Pharma, Inc. in the amount

of $250,000 (the "Note"). The proceeds of the Note were thereafter advanced to Neopharma. On August 3, 2020, Peta Pharma, Inc. and Neopharma entered into a security agreement in which Neopharma purported to grant a security interest in certain of its assets to secure the Note (the "Security Agreement"). The assets described in the Security Agreement are contracts, contract rights, copyrights, equipment, general intangibles, goods, inventory, marks, obligations, patents, proceeds and receivables. The Security Agreement is signed by Mr. Disireddy on behalf of Neopharma. However, on July 30, 2020, Mr. Desireddy was terminated for cause and on August 3, 2020 when the Security Agreement was signed, he was no longer an officer of the company, nor was he authorized to grant a security interest in the Neopharma assets described in the Security Agreement. Mr. Disireddy was further not authorized to sign the Security Agreement on behalf of Neopharma. In addition, Neopharma's Board of Directors did not authorize Neopharma's granting of any security interest in any of its assets or its entry into the Security Agreement. The Debtors, therefore, contend that the Security Agreement is unenforceable on the grounds that it was unauthorized. Alternatively, the Debtors contend that certain of the assets described in the Security Agreement in which Neopharma purported to grant a security interest were not owned by Neopharma and, thus, no security interest attached to those assets. In addition, Peta Pharma, Inc. failed to properly perfect any valid security interest that was conveyed by the Security Agreement.

58.    The validity of any security interest held by Peta Pharma, Inc. in any of the Purchased Assets is in *bona fide* dispute, thereby providing the statutory basis under 11 U.S.C. § 363(f)(4) to approve the proposed sale to AAII, free and clear of liens and encumbrances. Alternatively, the Debtors contend that the Purchase Price of $2,000,000 represents the highest and best price for the Purchased Assets (together with AAII's commitment to complete the post-marketing regulatory requirements for Neopharma) and applicable non bankruptcy law would permit the sale of such assets free and clear of the interests of Peta Pharma, Inc. In the further alternative, Peta Pharma, Inc. could be compelled in a legal or equitable proceeding to accept a

money satisfaction of its claimed security interest.  These circumstances present alternate statutory basis under 11 U.S.C. §§ (f)(1) or (f)(5) for the Court to authorize the sale of the Purchased Assets, free and clear of liens and encumbrances. With respect to the Facility Lease and the Tax Agreement, Neopharma Tennessee anticipates that the IDB will consent to their assignment to AAII.

59.    Thus, the sale of the Purchased Assets and the assignment of the Facility Lease and Tax Agreement free and clear of liens, claims, encumbrances, and interests, including rights or claims based on any successor or transferee liability, with any such liens attached to the proceeds of the sale of the Purchased Assets, will satisfy the statutory prerequisites of § 363(f) of the Bankruptcy Code.  Accordingly, the Purchased Assets should be transferred to AAII free and clear of all liens, claims, encumbrances, and interests, with such liens, claims, encumbrances, and interests to be transferred to and attach to the proceeds of such sale.

**C.    Good Faith Buyer Under § 363(m) of the Bankruptcy Code.**

60.    AAII has been and is acting in good faith and is entitled to the protections of a good faith purchaser under § 363(m) of the *Bankruptcy Code*.

61.    Section 363(m) provides:

> The reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease of property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal.

11 U.S.C. § 363(m).

62.    The terms and provisions of the APA were negotiated by the Debtors and AAII over a substantial period of time, at arm's length, without collusion, and in good faith.  The APA

represents substantial value to the Debtors and provides fair consideration for the Purchased Assets.

63.    Accordingly, AAII is acting in good faith and entitled to the protections afforded under § 363(m) of the *Bankruptcy Code.*

**D.    Assignment and Assumption of Facility Lease and Tax Agreement Under § 365 of the Bankruptcy Code.**

64.    Section 365(a) of the *Bankruptcy Code* provides "the trustee [or debtor in possession], subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor."  11 U.S.C. § 365(a).  Section 365(f) of the *Bankruptcy Code* provides:

> (1)  Except as provided in subsections (b) and (c) of this section, notwithstanding a provision in an executory contract or unexpired lease of the debtor, or in applicable law, that prohibits, restricts, or conditions the assignment of such contract or lease, the trustee may assign such contract or lease under paragraph (2) of this subsection.
>
> (2)   The trustee may assign an executory contract or unexpired lease of the debtor only if—
>
> > (A) the trustee assumes such contract or lease in accordance with the provisions of this section; and
> >
> > (B) adequate assurance of future performance by the assignee of such contract or lease is provided, whether or not there has been a default in such contract or lease.

65.    Neopharma Tennessee seeks authority to assume the Facility Lease and the Tax Agreement and assign same to AAII.  Neopharma Tennessee avers that there is no monetary default under either the Facility Lease or the Tax Agreement, but to the extent a default exists, the sum necessary to cure the default is $20.00, which will be paid at Closing or waived by the IDB.  Neopharma Tennessee has the absolute right to assign the Facility Lease and AAII agrees to be bound by the terms of the Tax Agreement, thereby providing adequate assurance of future

performance. Neopharma Tennessee, therefore, has satisfied the statutory requirements of section 365(f) for its assumption of the Facility Lease and Tax Agreement and assignment thereof to AAII.

66.     The Debtor further requests that any stay of any order authorizing the proposed sale of the Purchased Assets and assumption and assignment of the Facility Lease and Tax Agreement as required by *Fed. R. Bank. P.* 6004(h) and *Fed. R. Bank. P.* 6006(d) be waived.

E.     **Rejection of Executory Contracts and Unexpired Leases Under § 365 of the Bankruptcy Code.**

67.     Section 365(a) of the Bankruptcy Code provides that "the trustee [or debtor in possession], subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor."  11 U.S.C. § 365(a).

68.     Pursuant to the terms of the Purchase Agreement, the Debtors are obligated to seek rejection of executory contracts or unexpired leases to which it is a party, except for the Facility Lease.

69.     Except for the Facility Lease and the Tax Agreement, the Debtors seek authority of the Court to reject any executory contracts or unexpired leases to which either Debtor is a party.

70.     If the Court approves the Sale of the Purchased Assets to AAII pursuant to the terms of the APA, the Debtors request approval of the rejection of any executory contracts or unexpired leases to which either Debtor is a party, except for the Facility Lease and the Tax Agreement.

**WHEREFORE**, the Debtor requests that the Court, after notice and hearing: (a) approve and authorize the sale of the Purchased Assets to AAII and authorize the assumption of the

Facility Lease and Tax Agreement and the assignment thereof to AAII, free and clear of liens and encumbrances; (b) authorize the Debtor to reject the executory contracts to which it is a party other than the Facility Lease and the Tax Agreement; (c) authorize the Debtors' execution of the Escrow Agreement; (d) award AAII, if the Court approves the sale of the Purchased Assets to a party other than AAII, a break up fee of $250,000 as an administrative expense of the bankruptcy estate; and (e) grant such further or additional relief as the Court deems proper.

**Respectfully submitted,**

**HUNTER, SMITH & DAVIS, LLP**

By:     _/s/Mark S. Dessauer_____
Mark S. Dessauer, Esq.
TN BPR NO. 010421
Attorney for Debtors
Post Office Box 3740
Kingsport, Tennessee 37664
(423)  378-8840; Fax: (423) 378-8801
dessauer@hsdlaw.com

## **CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on 7th day of January, 2021 the **(1) Motion by Debtors To (A) Approve the Sale of Substantially All of The Debtor's Assets Free and Clear of All Liens, Claims, Encumbrances and Other Interests, (B) The Assignment and Assumption of Facility Lease and Tax Agreement And (C) Authorizing Rejection of Certain Executory Contracts and Unexpired Leases**; **(2) Notice of Hearing;** and **(3) Proposed Order** were filed electronically.  On January 7, 2021, copies of the foregoing were forwarded to the following by operation of the Court's electronic filing system:

> Tiffany DiIorio, Esq.
> Trial Attorney, U.S. Dept of Justice
> Office of United States Trustee

On January 7, 2021, the following parties were served with copies of the foregoing by electronic mail as referenced below.

Agilent Technologies, Inc.
4187 Collection Center Drive
Chicago, IL  60693
Odel_frett@agilent.com

CKD Bio (via e-mail)
8 Chungjeong-ro, Seodaemun-gu
Seoul, Seoul, 03742 Republic of Korea
Hss92234@ksure.or.kr
dkyim@ckdbio.com

Sandoz (via e-mail)
Biochemiestraße 10
Kundl, Tirol, 6250
tanja.hrovatic@sandoz.com

Cardinal Health (via e-mail)
7000 Cardinal Place
Columbus OH 43017
PD.chargebacks@cardinalhealth.com
Robyn.ONeil@cardinalhealth.com

PETA Pharma (via e-mail)
65 Patriot Landing Drive
St. Charles, MO 63303
sesha@nurturenergy.com

BCBS NJ - Horizon BCBS (via e-mail)
3 Penn Plaza
Newark, NJ 07105
gaye_simpson@horizonblue.com

McKesson (via e-mail)
6555 State Hwy 161
Irving TX 75039
ClarusONE:
Russell Square House
10-12 Russell Square, London
WC1B-5EH UK
Ingrid.Knighton@mckesson.com
Varun.Pandey@mckesson.com
AR@clarusonesourcing.com

INMAR (via e-mail)
3845 Grand Lakes Pkwy, Suite 125
Grand Prairie, TX 75050
Diana.evans@inmar.com

BTES (via e-mail)
2470 Volunteer Pkwy
Bristol TN 37620
mbrowder@btes.net

Luttrel (via e-mail)
1816 Volunteer Pkwy
Bristol, TN 37620
ljenks@lstaff.com

ML7 (via e-mail)
800 3rd Ave, #2800
NY, NY 10022
jeffs@ML-Seven.com

The Hartford (via e-mail)
J Smith Lanier & Co.
47 Postal Pkwy
PO Box 71429
Newnan, GA 30271-1429
swalton@jsmithlanier.com

Hobbs & Associates, Inc.
4850 Brookside Court, Site 100
Norfolk, VA 23502
BSmaltz@HobbsAssociates.com

Eurofins Lancaster Laboratories Inc (via e-mail)
2425 New Holland Pike
Lancaster, PA 17601
AdrienneKuhl@eurofinsUS.com

Jekson (via e-mail)
304, Sarkhej Bavla Hwy, Changodar-382213
Ahmedadad, Gujarat, India
mayurmaheshwari@jeksonvision.com

Water Professionals (via e-mail)
McCollum Water Conditioning Inc.
PO Box 57
Blountville, TN 37617
info@waterprofessionals.com

McMaster-Carr
PO Box 740100
Atlanta GA  30374-0100
4payment@correspondence.mcmaster.com

Atmos Energy Corporation (via e-mail)
P.O. Box 630872
Cincinnati, OH 45263-0872
Green.faircloth@atmosenergy.com

Mountain Air Compressor
1508 W State St,
Bristol, TN 37620
Deborah.wilson@mtnaircomp.com

Radiant (via e-mail)
254 Chapman Road, Suite 107
Newark, DE 19702
kcsahu@itradiant.com

IQVIA (via e-mail)
100 IMS Drive
Parsippany, NJ 07054
Susan.ross1@iqvia.com

Court Square (via e-mail)
1350 Main Street, 5th floor
Springfield, MA 01103
odonnell@courtsquaregroup.com

Securitas Inc (via e-mail)
1907 North Roan Street, Suite 204
Johnson City, TN  37601
Mason.powell@securitasinc.com

Verizon
P.O. BOX 408
Newark, NJ 07101-0408
wfmelectronicbankruptcynotifications@verizonwireless.com

On January 7, 2021, all parties listed on the attached Service List were served by mailing a copy of same by United States Mail, postage prepaid as referenced below.

**HUNTER, SMITH & DAVIS, LLP**
*/s/ Mark S. Dessauer*
Mark S. Dessauer