

**SO ORDERED.**
**SIGNED this 18th day of February, 2021**

*Shelley D. Rucker*
Shelley D. Rucker
**CHIEF UNITED STATES BANKRUPTCY JUDGE**

**THIS ORDER HAS BEEN ENTERED ON THE DOCKET.**
**PLEASE SEE DOCKET FOR ENTRY DATE.**

---

## UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF TENNESSEE

| | |
|---|---|
| In re | Case No. 2:20-bk-52015-SDR |
| NEOPHARMA, INC., | Chapter 11 |
| Debtor. | |
| In re | Case No. 2:20-bk-52016-SDR |
| NEOPHARMA TENNESSEE LLC, | |
| Debtor. | Jointly Administered |

**ORDER (I) AUTHORIZING CREDITORS' COMMITTEE AND CHAPTER 11
TRUSTEE TO MARKET DEBTORS' ASSETS FOR SALE, (II) APPROVING THE
BIDDING PROCEDURES, (III) APPROVING THE FORM OF ASSET PURCHASE
AGREEMENT, (IV) APPROVING STALKING HORSE BID AND
CERTAIN BID PROTECTIONS, (V) AUTHORIZING THE COMMITTEE
CHAIRPERSON OR THE COMMITTEE'S DESIGNEE TO EXECUTE TRANSACTION
DOCUMENTS, AND (VI) GRANTING RELATED RELIEF**

Upon the motion (the "Motion")[1] of the official committee of unsecured creditors

(the "Committee") of the above-captioned debtors and debtors in possession (collectively, the

---

[1]     Capitalized terms not defined in this Order are used as defined in the Motion or Bidding
Procedures, as applicable.

"Debtors") for entry of an order (this "Order") (i) authorizing the Committee to market the Debtors' assets for sale, (ii) approving the Bidding Procedures as attached hereto as Exhibit 1, (iii) approving the form of Asset Purchase Agreement, (iv) approving a stalking horse bid and certain bid protections, (v) authorizing the Committee chairperson or the Committee's designee to execute all necessary documents in furtherance of the sale process and (vi) granting certain related relief as set forth herein and the joinder of Gary M. Murphey as the duly appointed chapter 11 trustee to the Debtors (the "Chapter 11 Trustee") filed in support thereof; and this Court having jurisdiction to consider the Motion and the relief requested therein pursuant to 28 U.S.C. §§ 157 and 1334; and consideration of the Motion and the requested relief being a core proceeding pursuant to 28 U.S.C. § 157(b); and venue being proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409; and due and proper notice of the Motion having been provided, and it appearing that no other or further notice need be provided; and this Court having reviewed the Motion; and this Court having held a hearing on the Motion (the "Bidding Procedures Hearing"); and this Court having determined that the legal and factual bases set forth in the Motion, supporting declaration, any testimony, and the record of these chapter 11 cases establish just cause for the relief granted herein; and it appearing that the relief requested in the Motion is in the best interests of the Debtors, their estates, creditors, and all parties in interest; and upon all the proceedings had before this Court; and after due deliberation and sufficient cause appearing therefor,

**IT IS HEREBY FOUND, CONCLUDED AND DETERMINED THAT:**[2]

---

[2] The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014. To the extent that any of the following findings of fact constitute conclusions of law, they are adopted as such. To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

4741294.1

Bidding Procedures.  The Committee and the Chapter 11 Trustee have articulated good and sufficient reasons for authorizing and approving the Bidding Procedures, which are fair, reasonable, and appropriate under the circumstances and designed to maximize the recovery on, and realizable value of, the Assets, as determined by the Committee and the Chapter 11 Trustee in an exercise of their business judgment.

Sale Notice.  The Sale Notice attached hereto as Exhibit 2 is reasonably calculated to provide all interested parties with timely and proper notice of the proposed Sale, including: (i) the date, time, and place of the Auction (if one is held); (ii) the Bidding Procedures and certain dates and deadlines related thereto; (iii) the objection deadline for the Sale and the date, time, and place of the Sale Hearing; (iv) reasonably specific identification of the Assets for sale; (v) instructions for promptly obtaining a copy of the Asset Purchase Agreement; (vi) representations describing the Sale as being free and clear of liens, claims, interests, and other encumbrances, with all such liens, claims, interests, and other encumbrances attaching with the same validity and priority to the sale proceeds subject to customary exceptions for permitted liens; and (vii) notice of the proposed assumption and assignment of the Assigned Contracts and the right, procedures, and deadlines for objecting thereto, and no other or further notice of the Sale shall be required.

Assumption and Assignment Procedures.  The Contract Notice attached hereto as Exhibit 3 is reasonably calculated to provide counterparties to the Assigned Contracts (as defined below) with proper notice of the intended assumption and assignment of their executory contracts, any Cure Amounts (as defined below) and the Assumption and Assignment Procedures (as defined below).

-3-

## NOW, THEREFORE, IT IS HEREBY ORDERED THAT:

1. The Motion is granted to the extent set forth in this Bidding Procedures Order.

2. All objections to the Motion and the relief granted therein, to the extent not resolved as set forth herein or on the record at the Bidding Procedures Hearing, are hereby overruled.

3. The Committee and the Chapter 11 Trustee are hereby authorized and empowered to market the Assets for sale and solicit bids for the Assets in accordance with this Bidding Procedures Order and the Bidding Procedures. The Debtors and their employees and advisors are authorized and directed to promptly comply with all requests and directions by the Committee and the Chapter 11 Trustee in connection with the discharge of their respective authority as set forth herein, including, without limitation, by providing access to all requested due diligence information and access for third parties to tour and inspect the Debtors' facilities.

4. For the avoidance of doubt, the Chapter 11 Trustee is hereby authorized and empowered to enter into, execute, and deliver any and all contracts, agreements, and documents on behalf of the Debtors, debtors-in-possession, and their estates necessary in furtherance of the transactions contemplated by this Bidding Procedures Order.

### SALE TIMELINE

5. <u>Bid Deadline</u>. March 24, 2021, at 5:00 p.m. (prevailing Eastern Time) shall be the deadline by which all Qualified Bids must be **actually received** by the Committee the Chapter 11 Trustee, and their advisors; provided, that the Committee and the Chapter 11 Trustee, in consultation with the Office of the United States Trustee (the "<u>U.S. Trustee</u>"), may extend the Bid Deadline in their reasonable business judgment for all or certain potential bidders without further order of the Court.

-4-

6.      Auction.   The Auction, if any, shall be held on March 26, 2021, commencing at 10:00 a.m. (prevailing Eastern Time). The Auction shall be held in accordance with the Bidding Procedures (i) virtually by videoconference, (ii) only if permitted and advisable in light of the then-current status of the COVID-19 pandemic, at the offices of counsel to the Trustee: Polsinelli, PC, 401 Commerce Street, Suite 900, Nashville, TN 37219, or (iii) on such other date and/or at such other location or by other virtual means as determined by the Committee and the Chapter 11 Trustee in consultation with the U.S. Trustee.  For the avoidance of doubt, the Committee and the Chapter 11 Trustee, after consulting with the U.S. Trustee, may also conduct more than one Auction with respect to non-overlapping material portions of the Debtors' Assets. The Committee shall send written notice of the date, time, and place of the Auction to the Qualified Bidders no later than one (1) business day before such Auction.

7.      Sale Objection Deadline.  Any and all objections to the sale of the Assets and entry of a sale order must (i) be in writing and specify the nature of such objection, (ii) comply with the Bankruptcy Code, Bankruptcy Rules, the Local Rules and all orders of the Court entered in these Chapter 11 Cases, (iii) be filed with the Court (a) no later than March 16, 2021 (the "Sale Objection Deadline"), or (b) with respect to objections solely to the identity of the Successful Bidder(s), including objections to adequate assurance of future performance, March 30, 2021 at noon (ET) (the "Adequate Assurance Objection Deadline"), and (iv) be served on the following parties (collectively, the "Objection Notice Parties"): (a) proposed counsel to the Committee:  Buchalter, P.C., 18400 Von Karman Ave., Suite 800, Irvine, CA 92612, Attn: Jeffrey  K.  Garfinkle  and  Julian  I.  Gurule  (jgarfinkle@buchalter.com  and jgurule@buchalter.com) and Woolf, McClane, Bright, Allen & Carpenter, PLLC, 900 S. Gay Street, Suite 900, Knoxville, TN 37902, Attn:  Gregory C. Logue (glogue@wmbac.com); (b)

-5-

proposed counsel to the Debtors:  Hunter, Smith & Davis LLP, P.O. Box 3740, Kingsport, TN, Attn:  Mark S. Dessauer (dessauer@hsdlaw.com); (c) the Office of the United States Trustee for the Eastern District of Tennessee, 31 East 11th Street, 4th Floor, Chattanooga, TN 37402, Attn: Tiffany DiIorio (Tiffany.Diiorio@usdoj.gov); (e) proposed counsel to the Chapter 11 Trustee: Polsinelli PC, 1201 West Peachtree St. NW, Suite 1100, Atlanta, GA 30309, Attn: David E. Gordon and Caryn E. Wang (dgordon@polsinelli.com and cewang@polsinelli.com); and (f) any Stalking Horse Bidder.  Any party or entity that fails to timely make an objection to the Sale on or before the Sale Objection Deadline or the Adequate Assurance Objection Deadline, as applicable, (a) shall be forever barred, unless otherwise ordered by the Court, from asserting any objection to the Sale, including with respect to the transfer of the assets free and clear of all liens, claims, encumbrances, and other interests, and (b) for purposes of section 363(f)(2) of the Bankruptcy Code, shall be deemed to "consent" to entry of the Sale Order and consummation of the Sale and all transactions related thereto.

8.    <u>Sale Hearing</u>.  The Sale Hearing to consider approval of the Sale of the Assets shall be held on March 31, 2021, at 10:00 a.m. (prevailing Eastern Time); *provided, however*, after consultation with the U.S. Trustee and the Court, that the Sale Hearing may be continued by the Committee and the Chapter 11 Trustee in accordance with the Bidding Procedures, from time to time, without further notice to creditors or parties in interest.  The Committee and the Chapter 11 Trustee shall file their motion to approve the Sale, including the legal and factual bases in support thereof, by no later than February 23, 2021.

9.    The dates and deadlines set forth in this Bidding Procedures Order are subject to modification by the Committee and the Chapter 11 Trustee, in consultation with the U.S. Trustee, in accordance with the Bidding Procedures.

4741294.1

## BIDDING PROCEDURES

10.     <u>Bidding Procedures</u>.  The Bidding Procedures, substantially in the form attached hereto as <u>Exhibit 1</u> are incorporated herein and are hereby approved in their entirety, and the Bidding Procedures shall govern the submission, receipt, and analysis of all Bids relating to any proposed Sale. Any party desiring to submit a Bid shall comply with the Bidding Procedures and this Bidding Procedures Order. The Committee and the Chapter 11 Trustee are authorized to take any and all reasonable actions necessary to implement the Bidding Procedures.

11.     The Asset Purchase Agreement attached hereto as <u>Exhibit 4</u> is hereby approved and shall serve as the baseline asset purchase agreement for all interested bidders for the Debtors' Assets as set forth herein and in the Bidding Procedures.

## NOTICE OF THE AUCTION, SALE AND SALE HEARING

12.     The Sale Notice, substantially in the form attached hereto as <u>Exhibit 2</u>, is hereby approved.  No later than five (5) business days after entry of this Bidding Procedures Order, the Committee and the Chapter 11 Trustee will cause the Sale Notice to be served on the following parties or their respective counsel, if known (collectively, the "<u>Sale Notice Parties</u>"): (i) the U.S. Trustee; (ii) counsel to the Debtors; (iii) all parties known by the Committee or the Chapter 11 Trustee to assert a lien on any of the Assets; (v) all persons known or reasonably believed to have asserted an interest in any of the Assets; (vi) all persons known or reasonably believed to have expressed an interest in acquiring all or a substantial portion of the Assets within the one (1) year prior to the Petition Date; (vii) the Office of the United States Attorney for the Eastern District of Tennessee; (viii) the Office of the Attorney General in each state in which the Debtors operate; (ix) the Office of the Secretary of State in each state in which the Debtors have operated; (x) all taxing authorities having jurisdiction over any of the Assets, including the Internal Revenue Service; (xi) all environmental authorities having jurisdiction

-7-

over any of the Assets, including the Environmental Protection Agency; (xii) the Federal Trade
Commission; (xiii) the United States Attorney General/Antitrust Division of Department of
Justice; (xiv) all non-Debtor parties to any of the Debtors' executory contracts and unexpired
leases; (xv) all of the Debtors' other known creditors and equity security holders as the same
have been disclosed to the Committee or the Chapter 11 Trustee; and (xvi) all parties that have
filed a notice of appearance and demand for service of papers in the Chapter 11 Cases as of the
service date.

13.    In addition, as soon as practicable, after entry of this Bidding Procedures
Order, the Committee and the Chapter 11 Trustee may publish the Sale Notice.  The Committee
and the Chapter 11 Trustee may also publish the Sale Notice in an industry trade publication
selected by the Committee and the Chapter 11 Trustee, in consultation with the U.S. Trustee.

## THE ASSUMPTION AND ASSIGNMENT PROCEDURES

14.    The procedures set forth below regarding the assumption and assignment
of the executory contracts proposed to be assumed pursuant to section 365(b) of the Bankruptcy
Code and assigned to any Successful Bidder(s), as applicable, pursuant to section 365(f) of the
Bankruptcy Code in connection with the Sale (the "Assumption and Assignment Procedures")
are hereby approved to the extent set forth herein.

15.    These Assumption and Assignment Procedures shall govern the
assumption and assignment of all of the Debtors' executory contracts and unexpired leases to be
assumed and assigned in connection with the Sale, subject to the payment of any amounts
necessary to cure any defaults arising under any Assigned Contract (as defined below) (the "Cure
Amount"):

(a)    As soon as reasonably practicable following entry of this Bidding Procedures
Order (the "Contract Notice Deadline"), the Committee and the Chapter 11
Trustee shall file with the Court and serve on each counterparty to an Assumed

-8-

Contract (each, a "Counterparty," and collectively, the "Counterparties") the Contract Notice. The Debtors shall promptly provide the Committee and the Chapter 11 Trustee with all information relating to the Assumed Contracts necessary for the Committee to satisfy its obligations hereunder, including, without limitation, by providing the Committee and the Chapter 11 Trustee with a comprehensive list of all of the Debtors' existing executory contracts, associated cure amounts, and counter-party contact information.

(b)     The Contract Notice shall include, without limitation, the Cure Amount, if any, that the Debtors believe is required to be paid to the applicable Counterparty under section 365(b)(1)(A) and (B) of the Bankruptcy Code for each of the Assumed Contracts.   If a Counterparty objects to (i) the assumption and assignment of the Counterparty's Assumed Contract, (ii) the Cure Amount for its Assumed Contract or (iii) the provision of adequate assurance of future performance, the Counterparty must file with the Court and serve on the Objection Notice Parties a written objection (a "Contract Objection").

(c)     Any Contract Objection shall: (i) be in writing; (ii) comply with the Bankruptcy Code, Bankruptcy Rules, the Local Rules and all orders of the Court entered in these Chapter 11 Cases; (iii) state the basis for such objection; (iv) if such objection is to the Cure Amount, state with specificity what Cure Amount the Counterparty believes is required (in all cases, with appropriate documentation in support thereof); and (v) be filed with the Court and served on the Objection Notice Parties no later than 4:00 p.m. (ET) twenty-one (21) days following service of the Contract Notice (the "Contract Objection Deadline").

(d)     As soon as reasonably practicable after the completion of the Auction, or to the extent an Auction is not necessary, then after the Committee's determination of the Qualifying Bids (in consultation with the U.S. Trustee), the Committee shall file with the Court a notice identifying the Successful Bidder (a "Notice of Successful Bidder"), which shall set forth, among other things, (i) the Successful Bidder and Back-Up Bidder (if any), (ii) the Selected Assumed Contracts, and (iii) the proposed assignee(s) of such Selected Assumed Contracts.

(e)     As soon as reasonably practicable after the completion of the Auction, or to the extent an Auction is not necessary, then after the Committee's and Chapter 11 Trustee's determination of the Qualifying Bids (in consultation with the U.S. Trustee), the Committee and the Chapter 11 Trustee will cause to be served by overnight mail upon each affected Counterparty and its counsel (if known) the Notice of Successful Bidder.

***In the event the Stalking Horse Bidder is not the Successful Bidder, the Counterparties shall file any Contract Objections <u>solely</u> on the basis of adequate assurance of future performance not later than <u>March 30, 2021 at noon (ET)</u>.***

-9-

(f)    At the Sale Hearing, the Committee and the Chapter 11 Trustee will seek Court approval of the Debtors' assumption and assignment to the Successful Bidder, of only those Assumed Contracts that have been selected by the Successful Bidder, to be assumed and assigned (the "Selected Assumed Contracts"). The Committee and the Chapter 11 Trustee reserve any and all rights with respect to any Assumed Contracts that are not ultimately designated as Selected Assumed Contracts.

(g)    If no Contract Objection is timely received with respect to a Selected Assumed Contract: (i) the Counterparty to such Selected Assumed Contract shall be deemed to have consented to the assumption by the Debtors and assignment to the Successful Bidder of the Selected Assumed Contract, and be forever barred from asserting any objection with regard to such assumption and assignment (including, without limitation, with respect to adequate assurance of future performance by the Successful Bidder) unless otherwise ordered by the Court; (ii) any and all defaults under the Selected Assumed Contract and any and all pecuniary losses related thereto shall be deemed cured and compensated pursuant to section 365(b)(1)(A) and (B) of the Bankruptcy Code; and (iii) the Cure Amount for such Selected Assumed Contract shall be controlling, notwithstanding anything to the contrary in such Selected Assumed Contract, or any other related document, and the Counterparty shall be deemed to have consented to the Cure Amount and shall be forever barred, unless otherwise ordered by the Court, from asserting any other claims related to such Selected Assumed Contract against the Debtors and their estates or the Successful Bidder, or the property of any of them, that existed prior to the entry of the Sale Order.

(h)    To the extent that the parties are unable to consensually resolve any Contract Objection prior to the commencement of the Sale Hearing, including, without limitation, any dispute with respect to the cure amount required to be paid to the applicable Counterparty under section 365(b)(1)(A) and (B) of the Bankruptcy Code (any such dispute, a "Cure Dispute"), such Contract Objection will be adjudicated at the Sale Hearing or at such other date and time as may be determined by the Committee and the Chapter 11 Trustee or fixed by the Court; provided, however, that if the Contract Objection relates solely to a Cure Dispute, the Selected Assumed Contract may be assumed by the Debtors and assigned to the Successful Bidder provided that the cure amount that the Counterparty asserts is required to be paid under section 365(b)(1)(A) and (B) of the Bankruptcy Code (or such lower amount as agreed to by the Counterparty) is deposited in a segregated account by the Debtors or the Successful Bidder with proof thereof to the Counterparty, pending the Court's adjudication of the Cure Dispute or the parties' consensual resolution of the Cure Dispute.

(i)    Notwithstanding anything to the contrary herein, if after the Sale Hearing or the entry of the Sale Order additional executory contracts or unexpired leases of the Debtors are determined to be Assumed Contracts, as soon as practicable thereafter, the Committee shall file with the Court and serve, by overnight delivery, on the Counterparties a Contract Notice, and such Counterparties shall file any Contract Objections no later than fourteen (14) days thereafter. If no

-10-

Contract Objection is timely received, the Debtors shall be authorized and directed to assume and assign such Assumed Contracts to the Successful Bidder without further notice to creditors or other parties in interest and without the need for further order of the Court, and such assumption and assignment shall be subject to the terms of the Sale Order.

16.    The Debtors' assumption and assignment of the Assumed Contracts to the Successful Bidder, is subject to this Court's approval and the closing of the Sale. Accordingly, absent this Court's approval and the closing of the Sale, the Assumed Contracts shall not be deemed assumed or assumed and assigned, and shall in all respects be subject to further administration by the Chapter 11 Trustee, on behalf of the Debtors and their estates, under the Bankruptcy Code in connection with the Chapter 11 Cases.

17.    The inclusion of a contract, lease or other agreement on a Contract Notice shall not constitute or be deemed a determination or admission by the Debtors, the Committee, the Chapter 11 Trustee, or the estates or any other party in interest that such contract, lease or other agreement is, in fact, an executory contract or unexpired lease within the meaning of the Bankruptcy Code, and any and all rights of the Debtors, the Committee, the Chapter 11 Trustee, and the estates with respect thereto shall be reserved.

## STALKING HORSE BIDDER AND BID PROTECTIONS

18.    As set forth in the Bidding Procedures, the Chapter 11 Trustee and the Committee are authorized to designate a Stalking Horse Bidder and exercise their business judgment to provide Bid Protections to the Stalking Horse Bidder. The Chapter 11 Trustee is further authorized to enter into a Stalking Horse Agreement and pay the Stalking Horse Bidder the Bid Protections if and to the extent they become due and payable under such Stalking Horse Agreement.

19.    No person or entity, other than the Stalking Horse Bidder, if any, shall be entitled to any expense reimbursement, breakup fee, topping or termination fee, or other similar

4741294.1

fee or payment, and by submitting a Bid, such person or entity is deemed to have waived its right to request or file with this Court any request for expense reimbursement or any other fee of any nature in connection with the Auction and the Sale, whether by virtue of Bankruptcy Code section 503(b) or otherwise.

## RELATED RELIEF

20.     All rights of the Committee and the Chapter 11 Trustee, as they may reasonably determine to be in the best interest of the estates, in consultation with the U.S. Trustee, to modify the Bidding Procedures in good faith, to further the goal of attaining the highest or otherwise best offer for the Assets, or impose, at or prior to selection of the Successful Bidder(s), additional customary terms and conditions on the Sale of the Assets, are reserved to the extent set forth in the Bidding Procedures. The Committee and the Chapter 11 Trustee shall provide reasonable notice of any such modification to any Qualified Bidder, including the Stalking Horse Bidder.

21.     The Committee and the Chapter 11 Trustee are authorized to conduct the Sale without the necessity of complying with any state or local bulk transfer laws or requirements.

22.     The failure to include or reference a particular provision of the Bidding Procedures specifically in this Bidding Procedures Order shall not diminish or impair the effectiveness or enforceability of such a provision.

23.     Nothing in this Bidding Procedures Order or the Bidding Procedures shall require the board of directors, board of managers, or such similar governing body of a Debtor or any of its Debtor or Non-Debtor Affiliates, the Committee, or the Chapter 11 Trustee to take any action, or to refrain from taking any action, with respect to the Bidding Procedures, to the extent

-12-

such board of directors, board of managers, or such similar governing body or the Committee and the Chapter 11 Trustee reasonably determine in good faith, after consultation with their counsel, that taking such action, or refraining from taking such action, as applicable, would be inconsistent with applicable law or its fiduciary obligations under applicable law.

24.    In the event of any inconsistencies between this Bidding Procedures Order and the Motion, this Bidding Procedures Order shall govern in all respects. In the event of any inconsistencies between this Bidding Procedures Order and the Bidding Procedures, the Bidding Procedures shall govern in all respects.

25.    Notwithstanding the possible applicability of Bankruptcy Rule 6004(h), 6006(d), 7052, or 9014, the terms and conditions of this Bidding Procedures Order shall be immediately effective and enforceable upon its entry.

26.    The Committee and the Chapter 11 Trustee are authorized to take all reasonable actions necessary to effectuate the relief granted in this Bidding Procedures Order in accordance with the Motion.

27.    For the avoidance of doubt and notwithstanding anything to the contrary herein, the Committee and the Chapter 11 Trustee shall have joint decision making authority under this Bidding Procedures Order and the Bidding Procedures.

28.    This Court shall retain jurisdiction with respect to all matters arising from or related to the implementation or interpretation of this Bidding Procedures Order, including, but not limited to, any matter, claim or dispute arising from or relating to the Bidding Procedures, the Stalking Horse Agreement (or the Asset Purchase Agreement with the otherwise Successful Bidder(s)), and the implementation of this Bidding Procedures Order.

-13-

###

**APPROVED FOR ENTRY:**

*/s/ Jeffrey K. Garfinkle*
Jeffrey K. Garfinkle, Esq.
(CA BAR NO. 153496; admitted *pro hac vice*)
Julian Gurule, Esq.
(CA BAR NO 252160; admitted *pro hace vice*)
Buchalter
18400 Von Karman Avenue, Suite 800
Irvine, California 92612-0514
Telephone (949) 224-6254
jgarfinkle@buchater.com
jgurule@buchalter.com

and

Gregory C. Logue, Esq.
(TN BAR NO. 012157)
Woolf, McClane, Bright, Allen & Carpenter, PLLC
900 S. Gay Street
Knoxville, TN 37902-1810
Telephone:  (865) 215-1000
glogue@wmbac.com
*Attorneys for the Official Committee of Unsecured Creditors*

*/s/ David E. Gordon*
David E. Gordon, Esq.
Georgia Bar No. 111877 (admitted Pro Hac Vice)
Caryn E. Wang, Esq.
Georgia Bar No. 542093 (admitted Pro Hac Vice)
Polsinelli, PC
1201 West Peachtree Street NW, Suite 1100
Atlanta, GA 30309
Telephone: (404) 253-6005
Facsimile: (404) 745-8403
dgordon@polsinelli.com
cewang@polsinelli.com

and

-14-

Michael Malone, Esq.
(Tenn. Bar No. 031219)
Polsinelli, PC
401 Commerce Street, Suite 900
Nashville, Tennessee 37219
Telephone: (615) 259-1567
Facsimile: (615) 523-1795
mmalone@polsinelli.com

*Proposed Counsel for Gary M. Murphey as Chapter 11 Trustee*


/s/ Tiffany Diiorio
Tiffany Diiorio, Esq.
(FL BAR NO. 0719706)
Trial Attorney
Office of the United States Trustee
800 Market Street, Suite 114
Knoxville, Tennessee 37902
DiIorio, Tiffany (USTP)
Telephone:  (865) 545-4754
Tiffany.Diiorio@usdoj.gov

*Attorneys for the Office of the United States Trustee*


/s/ Maurice K. Guinn
Maurice K. Guinn, Esq.
(BPR# 000366)
Gentry, Tipton & McLemore, P.C.
P.O. Box 1990
Knoxville, Tennessee 37901
Telephone:  (865) 525-5300
MKG@tennlaw.com
*Attorneys for "Neopharma, UAE"*

-15-

**<u>Exhibit 1</u>**

**Bidding Procedures**

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF TENNESSEE

| | |
|---|---|
| In re<br>NEOPHARMA, INC.,<br>Debtor. | Case No. 2:20-bk-52015-SDR<br>Chapter 11 |
| In re<br>NEOPHARMA TENNESSEE LLC,<br>Debtor. | Case No. 2:20-bk-52016-SDR<br><br>Jointly Administered |

## BIDDING PROCEDURES

On December 22, 2020, the above-captioned debtors (collectively, the "Debtors") each filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Eastern District of Tennessee (the "Court"). On January 29, 2021, the Court appointed Gary M. Murphey as the chapter 11 trustee for the Debtors (the "**Chapter 11 Trustee**").

On [_____], 2021, the Court entered an order [D.I. __] (the "Bidding Procedures Order"),[1] which, among other things, authorized the Committee and the Chapter 11 Trustee to solicit bids in accordance with the procedures outlined herein (the "Bidding Procedures") for one or more sales or dispositions (collectively, the "Sale") of all or substantially all of the Debtors' assets (the "Assets") or subgroups thereof.

The Bidding Procedures set forth the process by which the Committee and the Chapter 11 Trustee are authorized to solicit the highest or otherwise better bid for the Debtors' Assets culminating in an auction (the "Auction") if competing Qualified Bids (as defined below) are received. The Sale is contemplated to be implemented pursuant to the terms and conditions of either (a) the Stalking Horse Agreement, as applicable, or (b) such other applicable asset purchase agreement upon the receipt of a Successful Bid (as defined herein) that the Committee and the Chapter 11 Trustee have determined in their business judgment is the best or highest bid in accordance with these Bidding Procedures.

**ANY PARTY INTERESTED IN BIDDING ON THE ASSETS SHOULD CONTACT:**

---

[1]    Capitalized terms not defined herein are used as defined in the Bidding Procedures Order.

Walter Oh
**Managing Director**
**Province, LLC**
**1230 Rosecrans Ave., Suite 405**
**Manhattan Beach, CA 90266**
**Tel: (917) 675-1439**
woh@provincefirm.com

Edward Kim
**Managing Director**
**Province, LLC**
**1230 Rosecrans Ave., Suite 405**
**Manhattan Beach, CA 90266**
**Tel: (646) 509-3490**
ekim@provincefirm.com

### *Summary of Important Dates and Deadlines*

| Date | Deadline |
|---|---|
| **Within 5 business days following entry of the Bidding Procedures Order** | Deadline to mail Sale Notice |
| **As soon as practicable** | Deadline to mail Contract Notice |
| **March 1, 2021** | Stalking Horse Designation Deadline |
| **March 16, 2021** | Sale Objection Deadline |
| **21 days after mailing of Contract Notice** | Contract Objection Deadline |
| **March 24, 2021 at 5:00 p.m. (ET)** | Bid Deadline |
| **March 25, 2021** | Deadline for Committee and Chapter 11 Trustee to Designate Qualifying Bids and Baseline Bid |
| **March 26, 2021 commencing at 10:00 a.m. (ET)** | Auction |
| **As soon as practicable after completion of the Auction** | Deadline to File and Serve Notice of Successful Bidder |
| **March 30, 2021 at noon (ET)** | Adequate Assurance Objection Deadline for Successful Bidder other than the Stalking Horse Bidder and Deadline to Reply to Sale Objections (other than Adequate Assurance Objections) |
| **March 31, 2021 at 10:00 a.m. (ET)** | Sale Hearing (Subject to Court Availability) |

1.    <u>**Participation Requirements**</u>

Any person or entity that wishes to participate in the bidding process for the Assets (each, a "<u>Potential Bidder</u>") must first become a "<u>Qualifying Bidder</u>" in the reasonable discretion of the Committee and the Chapter 11 Trustee after consultation with the U.S. Trustee (as defined below).  In

order to become a Qualifying Bidder, and thus being able to conduct due diligence and gain access to the confidential electronic data room concerning the Assets (the "Data Room"), a Potential Bidder must submit to the Committee, the Chapter 11 Trustee, and their advisors (unless waived by the Committee and the Chapter 11 Trustee):

(a)    documentation identifying the interested party, its principals, and the representatives thereof who are authorized to appear and act on their behalf for all purposes regarding the contemplated transaction;

(b)    an executed nondisclosure or confidentiality agreement in form and substance reasonably satisfactory to the Committee and the Chapter 11 Trustee;

(c)    a statement and other factual support demonstrating to the Committee and the Chapter 11 Trustee reasonable satisfaction that the interested party has a *bona fide* interest in consummating a sale transaction; and

(d)    sufficient information, as determined by the Committee and the Chapter 11 Trustee to allow the Committee and the Chapter 11 Trustee to determine that the interested party (x) has, or can obtain, the financial wherewithal and any required internal corporate, legal or other authorizations to close a sale transaction, including, but not limited to, current audited financial statements of the interested party (or such other form of financial disclosure acceptable to the Committee and the Chapter 11 Trustee in their discretion), and (y) can provide adequate assurance of future performance under any executory contracts and unexpired leases to be assumed by the Debtors and assigned to such bidder, pursuant to section 365 of the Bankruptcy Code, in connection with the Sale.

Each Potential Bidder shall comply with all reasonable requests for information and due diligence access by the Committee, the Chapter 11 Trustee, or their advisors regarding the ability of such Potential Bidder to consummate its contemplated transaction.

### 2.    Bankruptcy Court Jurisdiction

Any Potential Bidders and Qualifying Bidders shall: (a) be deemed to have waived any right to a jury trial in connection with, and consented and submitted to the exclusive jurisdiction of the Court over, any actions or proceedings arising from or relating the Bidding Procedures, the Sale, the Auction and the construction and enforcement of the contemplated transaction documents of such parties, (b) bring any such action or proceeding in the Court, and (c) be deemed to have consented to the Court entering a final judgment determining any such action or proceeding and that such final judgment in any such action or proceeding, including all appeals, shall be conclusive and may be enforced in other jurisdictions (including any foreign jurisdictions) by suit on the judgment or in any other manner provided by applicable law.

### 3.    Due Diligence

The Committee and the Chapter 11 Trustee shall provide any Qualifying Bidder with reasonable access to the Data Room and any other additional information that the Committee and the Chapter 11 Trustee believe to be reasonable and appropriate under the circumstances.  All additional due diligence requests shall be directed to:

Walter Oh                                    Province, LLC
Managing Director                            1230 Rosecrans Ave., Suite 405

BN 43891813v3

Manhattan Beach, CA 90266
Tel: (917) 675-1439
woh@provincefirm.com

Edward Kim
Managing Director

Province, LLC
1230 Rosecrans Ave., Suite 405
Manhattan Beach, CA 90266
Tel: (646) 509-3490
ekim@provincefirm.com

The due diligence period shall extend through and including the Bid Deadline.  The Committee and the Chapter 11 Trustee may, but shall not be obligated to furnish any due diligence information after the Bid Deadline.

The Committee and the Chapter 11 Trustee reserve the right, in their reasonable discretion, to withhold or limit access to any due diligence information that the Committee and the Chapter 11 Trustee determine is business-sensitive or otherwise not appropriate for disclosure to a Qualifying Bidder. Notwithstanding any prepetition limitations, including, without limitation, any nondisclosure, confidentiality or similar provisions relating to any due diligence information, the Committee, the Chapter 11 Trustee, and the Debtors and their estates shall be authorized to provide due diligence information to Qualifying Bidders provided that such Qualifying Bidders have delivered an executed confidentiality agreement in form and substance acceptable to the Committee.  The Committee, the Chapter 11 Trustee, the Debtors and their estates are not responsible for, and shall have no liability with respect to, any information obtained by, or provided to, any Qualifying Bidders in connection with the Bidding Procedures and the Sale.

## 4.     Designation of Stalking Horse Bidder

The Chapter 11 Trustee and the Committee are authorized to designate a bid from a Qualified Bidder that desires to serve as a potential stalking horse bidder (the "Stalking Horse Bidder") and to grant the following Bid Protections (defined herein), subject to execution of a definitive agreement (the "Stalking Horse Agreement") on or before March 1, 2021 (the "Stalking Horse Designation Deadline"):

- As a component of the Stalking Horse Agreement, the Chapter 11 Trustee and the Committee may provide a break-up fee of up to 5% of the cash purchase price (provided that such amount reasonably approximate the costs and risks associated with serving as a stalking horse), plus any minimum bid increment for other bidders to submit competing bids, or other buyer protections (collectively, the "Bid Protections") requested by the Stalking Horse Bidder.

In the event that the Chapter 11 Trustee enters into a Stalking Horse Agreement, the Chapter 11 Trustee and the Committee shall file with the Bankruptcy Court on or before March 1, 2021, and serve (i) all parties that have requested notice in these Chapter 11 Cases as of the date thereof; (ii) all persons identified as potential purchasers of the Assets; and (iii) all Sale Notice Parties, a notice that includes: (a) the identity of the Stalking Horse; (b) the purchase price to be paid by the Stalking Horse; (c) the Stalking Horse deposit paid by the Stalking Horse; and (d) the amount and nature of the Bid Protections.

## 5.     Bid Requirements

Other than in the case of the Stalking Horse Bid, as applicable, to be deemed a "Qualifying Bid," a bid must be received from a Qualifying Bidder on or before the Bid Deadline and satisfy each of the following requirements (each, a "Bid Requirement"):

(a)     be in writing;

(b)     fully disclose the identity of the Qualifying Bidder and provide the contact information of the specific person(s) whom the Committee, the Chapter 11 Trustee, or their advisors should contact in the event that they have any questions or wish to discuss the bid submitted by the Qualifying Bidder;

(c)     set forth the purchase price to be paid by such Qualifying Bidder, which in all events must exceed the amount of the Stalking Horse Bid by at least the amount of any Bid Protections *plus* $100,000 or, in the event that there is no Stalking Horse Bid, meet or exceed the amount of $4 million;

(d)     not propose payment in any form other than cash (except as otherwise expressly set forth in the Bidding Procedures);

(e)     state the liabilities proposed to be paid or assumed by such Qualifying Bidder;

(f)     specify the Assets that are included in the bid and state that such Qualifying Bidder offers to (i) purchase the Assets, or a number or combination of the Assets, and (ii) assume liabilities, upon substantially the same terms as, or terms more favorable to the Debtors' estates than, the terms set forth in the Stalking Horse Agreement, as applicable;

(g)     be accompanied by an asset purchase agreement (a "Modified Agreement") marked to reflect any variations from the Asset Purchase Agreement;

(h)     state that such Qualifying Bidder's offer is formal, binding and unconditional and is irrevocable until two (2) business days after the closing of the Sale;

(i)     state that such Qualifying Bidder is financially capable of consummating the transactions contemplated by the Modified Agreement and provide written evidence in support thereof;

(j)     contain such financial and other information to allow the Committee and the Chapter 11 Trustee to make a reasonable determination as to the Qualifying Bidder's financial and other capabilities to close the transactions contemplated by the Modified Agreement, including, without limitation, such financial and other information supporting the Qualifying Bidder's ability to comply with the requirements of adequate assurance of future performance under section 365(f)(2)(B), including the Qualifying Bidder's financial wherewithal and willingness to perform under any contracts and leases that are assumed and assigned to the Qualifying Bidder, in a form that allows the Committee and the Chapter 11 Trustee to serve such information on any counterparties to any contracts or leases potentially being assumed and assigned in connection with the Sale within one (1) business day after receipt of such information;

(k)     identify with particularity each and every executory contract and unexpired lease the assumption and assignment of which is a condition to close the transactions contemplated by the Modified Agreement;

(l)      a commitment to close the transactions contemplated by the Modified Agreement by no later than April 30, 2021;

(m)      not request or entitle such Qualifying Bidder to any break-up fee, termination fee, expense reimbursement or similar type of fee or payment;

(n)      not contain any contingencies of any kind, including, without limitation, contingencies related to financing, internal approval or due diligence;

(o)      contain written evidence satisfactory to the Committee and the Chapter 11 Trustee that the Qualifying Bidder has a commitment for financing or other evidence of the ability to close the transactions contemplated by the Modified Agreement, with appropriate contact information for such financing sources;

(p)      contain a written acknowledgement and representation that the Qualifying Bidder (i) has had an opportunity to conduct any and all due diligence regarding the Assets, (ii) has relied solely upon its own independent review, investigation and/or inspection of any documents and other information in making its Qualifying Bid, and (iii) did not rely upon any written or oral statements, representations, promises, warranties or guaranties whatsoever, whether express, implied, by operation of law or otherwise, regarding the Assets, or the completeness of any documents or other information provided in connection with the Bidding Procedures and the Sale;

(q)      sets forth (i) a statement or evidence that the Qualifying Bidder has made or will make in a timely manner all necessary filings under the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended, if applicable, and pay the fees associated with such filings, and (ii) any regulatory and third-party approval required for the Qualifying Bidder to close the transactions contemplated by the Modified Agreement, and the time period within which the Qualifying Bidder expects to receive such regulatory and third-party approvals (and in the case that receipt of any such regulatory or third-party approval is expected to take more than five (5) days following execution and delivery of such Qualifying Bidder's Modified Agreement, those actions the bidder will take to ensure receipt of such approval(s) as promptly as possible); provided that a Qualifying Bidder agrees that its legal counsel will coordinate in good faith with Chapter 11 Trustee's and Committee's legal counsel to discuss and explain Qualifying Bidder's regulatory analysis, strategy, and timeline for securing all such approvals as soon as reasonably practicable, and in no event later than the time period contemplated in the Modified Agreement; provided, further that the offer contains a covenant to cooperate with the Chapter 11 Trustee and Committee to provide pertinent factual information regarding the bidder's operations reasonably required to analyze issues arising with respect to any applicable antitrust laws and other applicable regulatory requirements;

(r)      provides for the Qualifying Bidder to serve as a backup bidder (the "Back-Up Bidder") if the Qualifying Bidder's bid is the next highest and best bid (the "Back-Up Bid") after the Successful Bid, in accordance with the terms of the Modified Agreement;

(s)      includes written evidence of authorization and approval from the Qualifying Bidder's board of directors (or comparable governing body) with respect to the submission, execution, and delivery of the Modified Agreement;

BN 43891813v3

(t)     provides a good faith cash deposit (the "Deposit") in an amount equal to ten percent (10%) of the purchase price provided for in the Modified Agreement (or such additional amount as may be determined by the Committee and the Chapter 11 Trustee in their reasonable discretion); and

(u)     provides that the Deposit shall be forfeited to the estates in the event of the Qualifying Bidder's breach of, or failure to perform under, the Modified Agreement, without prejudice to any and all other rights and remedies of the Debtors, the Chapter 11 Trustee, and the Committee.

A bid from a Qualifying Bidder satisfying all of the above requirements, as determined by the Committee and the Chapter 11 Trustee, in consultation with the U.S. Trustee, shall constitute a Qualifying Bid. The Committee and the Chapter 11 Trustee reserve the right to work with any Qualifying Bidder in advance of the Auction and in consultation with the U.S. Trustee, except for the Stalking Horse Bidder, if any, to cure any deficiencies in a bid that is not initially deemed a Qualifying Bid.

The Committee and the Chapter 11 Trustee, in consultation with the U.S. Trustee, shall be entitled to consider any proposal from a Qualifying Bidder for a transaction to be implemented through a chapter 11 plan of reorganization (a "Plan Transaction"), and the Committee and the Chapter 11 Trustee shall be authorized to support and pursue any such transaction in its discretion.

Each Qualifying Bidder submitting a bid shall be deemed to: (a) acknowledge and represent that it is bound by all of the terms and conditions of the Bidding Procedures; and (b) have waived the right to pursue a substantial contribution claim under section 503 of the Bankruptcy Code related in any way to the submission of its bid, the Bidding Procedures, and the Sale.

## 6.     Bid Deadline

A Qualifying Bidder, other than the Stalking Horse Bidder, if any, that desires to make a bid shall deliver a written and electronic copy of its bid in both PDF and MS-WORD format to the Committee or its advisors, the Chapter 11 Trustee or his advisors, and the U.S. Trustee so as to be received on or before **March 24, 2021 at 5:00 p.m. (ET)** (the "Bid Deadline"); provided that the Committee and the Chapter 11 Trustee may extend the Bid Deadline without further order of the Court. **Any party that does not submit a bid by the Bid Deadline will not be allowed to (a) submit any offer after the Bid Deadline, or (b) participate in the Auction.**

## 7.     Evaluation of Qualifying Bids

The Committee and the Chapter 11 Trustee will deliver, within one (1) business day after receipt thereof, copies of all bids from Qualifying Bidders to the U.S. Trustee.

The Committee and the Chapter 11 Trustee, in consultation with the U.S. Trustee, shall make a determination regarding whether a timely submitted bid from a Qualifying Bidder is a Qualifying Bid.

No later than March 25, 2021, the Committee, the Chapter 11 Trustee, and their advisors shall: (i) notify all Qualifying Bidders whether their bids have been determined to be a Qualifying Bid; and (ii) determine, in consultation with the U.S. Trustee, which of the Qualifying Bids, at such time, is the highest or best bid for purposes of constituting the opening bid of the Auction (the "Baseline Bid" and the Qualifying Bidder submitting the Baseline Bid, the "Baseline Bidder"), and shall promptly notify the Stalking Horse Bidder, if any, and all Qualifying Bidders with Qualifying Bids of the Baseline Bid.

8.    **No Qualifying Bids**

If no timely Qualifying Bids other than the Stalking Horse Bid, if any, are submitted on or before the Bid Deadline, the Committee and the Chapter 11 Trustee shall not hold an Auction and shall request at the Sale Hearing that the Court approve the Stalking Horse Bid, if any, and the transactions contemplated thereunder.

9.    **Auction**

If the Committee and the Chapter 11 Trustee receive two or more timely Qualifying Bids (including the Stalking Horse Bid, if any), then the Committee and the Chapter 11 Trustee shall conduct the Auction. For the avoidance of doubt, if there are timely Qualifying Bids submitted other than the Stalking Horse Bid, if any, the Stalking Horse Bidder, if any, will participate in the Auction. Following the Auction, the Committee and the Chapter 11 Trustee will determine, in consultation with the U.S. Trustee, which Qualifying Bid is the highest or best bid for the Assets, which will be determined by considering, among other things, the following non-binding factors: (a) the number, type and nature of any changes to the Asset Purchase Agreement requested by each bidder; (b) the extent to which such modifications are likely to delay closing of the Sale and the cost to the estates of such modifications or delay; (c) the total consideration to be received by the estates; (d) the transaction structure and execution risk, including conditions to, timing of and certainty of closing, termination provisions, availability of financing and financial wherewithal to meet all commitments, and required governmental or other approval; (e) the net benefit to the Debtors' estates; and (f) any other factors the Committee and the Chapter 11 Trustee may reasonably deem relevant.

The Auction shall be governed by the following procedures:

(a)    the Auction shall be held on **March 26, 2021 commencing at 10:00 a.m. (ET)** (i) virtually by videoconference, (ii) only if permitted and advisable in light of the then-current status of the COVID-19 pandemic, at the offices of Polsinelli, PC, counsel for the Chapter 11 Trustee, 401 Commerce Street, Suite 900, Nashville, TN 37219, or (iii) on such other date and/or at such other location as determined by the Committee and the Chapter 11 Trustee in consultation with the U.S. Trustee;

(b)    only the Qualifying Bidders with Qualifying Bids (the "Auction Bidders"), shall be entitled to make any subsequent bids at the Auction;

(c)    each Auction Bidder must attend the Auction, either on its own behalf or through a duly authorized representative with power to bind such Auction Bidder at the Auction;

(d)    only the Committee, the Chapter 11 Trustee, the Auction Bidders, the U.S. Trustee and all creditors of the Debtors, together with the professional advisors to each of the foregoing parties, may attend the Auction; provided that any such creditors provide counsel for the Committee and the Chapter 11 Trustee three (3) day's prior written notice of their intent to attend the Auction, including the name, title, contract, information, and affiliation of any individual attending on behalf of such creditor; provided that creditors may only attend the auction to observe the proceedings and shall not be entitled to participate; provided further that the Committee's and Chapter 11 Trustee's right to object on an emergency basis to any such creditor's proposed attendance at the Auction is reserved; for the avoidance of doubt, a representative from the Office of the United States Trustee shall be permitted to attend the Auction;

(e)      the Committee chairperson, the Chapter 11 Trustee, and their respective professional advisors shall direct and preside over the Auction, which shall be transcribed;

(f)      the Auction Bidders shall confirm on the record that they have not engaged in any collusion with respect to their bid, the Bidding Procedures, the Auction or the Sale;

(g)      bidding shall commence at the amount of the Baseline Bid, and subsequently continue in minimum increments to be determined by the Committee and the Chapter 11 Trustee (each, an "Overbid"), provided that: (i) each Overbid must be a Qualifying Bid; and (ii) the Committee and the Chapter 11 Trustee shall retain the right to modify the bid increment requirements at the Auction in consultation with the U.S. Trustee;

(h)      any Overbid must remain open and binding on the Qualified Bidder until and unless (i) the Committee and the Chapter 11 Trustee recognize a higher or otherwise better bid submitted by another Qualified Bidder during the Auction as an Overbid and (ii) such Overbid is not selected as the Back-Up Bid;

(i)      the Auction may include separate discussions or negotiations with any of the Auction Bidders, but all bids shall be made on the record and in the presence of the Auction Bidders;

(j)      all material terms of the bid that is deemed to be the highest or otherwise best bid for each round of bidding shall be fully disclosed to the Auction Bidders, and the Committee, the Chapter 11 Trustee, and their advisors shall use reasonable efforts to clarify any and all questions that the Auction Bidders may have regarding the announcement of the then-current highest and best bid;

(k)      the Committee, the Chapter 11 Trustee, and their professional advisors, in consultation with the U.S. Trustee, may employ and announce at the Auction additional or modified procedural rules that are reasonable under the circumstances (e.g., the amount of time allotted to make subsequent bids) for conducting the Auction, provided that such rules are (i) not materially inconsistent with the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, or any applicable order of the Court entered in connection with the Chapter 11 Cases, including, without limitation, the Bidding Procedures Order, and (ii) disclosed to the Auction Bidders;

(l)      each Auction Bidder shall (i) be deemed to have waived any right to a jury trial in connection with, and consented and submitted to the exclusive jurisdiction of the Court over, any actions or proceedings arising from or relating to the Bidding Procedures, the Sale, the Auction and the construction and enforcement of the contemplated transaction documents of the Auction Bidders, (ii) bring any such action or proceeding in the Court, and (iii) be deemed to have consented to the Court entering a final judgment determining any such action or proceeding and that such final judgment in any such action or proceeding, including all appeals, shall be conclusive and may be enforced in other jurisdictions (including any foreign jurisdictions) by suit on the judgment or in any other manner provided by applicable law;

(m)      the Auction Bidders shall have the right to make additional modifications to the Modified Agreement in conjunction with each Qualifying Bid submitted in each round of bidding during the Auction, provided that (i) any such modifications on an aggregate

basis and viewed in whole, shall not, in the Committee's and Chapter 11 Trustee's discretion, in consultation with the U.S. Trustee, be less favorable to the Debtors' estates than the terms of the Asset Purchase Agreement or Stalking Horse Agreement, as applicable, and (ii) each Qualifying Bid shall constitute an irrevocable offer and shall be binding on the Auction Bidder submitting such bid until such party shall have submitted a subsequent Qualifying Bid at the Auction or the conclusion of the Sale Hearing, whichever occurs sooner, unless such bid is selected as the Successful Bid or the Back-Up Bid, which shall remain binding as provided for herein;

(n)     the Committee, the Chapter 11 Trustee, and the U.S. Trustee shall have the right to request any additional financial information that will allow the Committee, the Chapter 11 Trustee, and the U.S. Trustee to make a reasonable determination as to an Auction Bidder's financial and other capabilities to consummate the transactions contemplated by the Modified Agreement as may be amended during the Auction, and any further information that the Committee or the Chapter 11 Trustee may believe is reasonably necessary to clarify and evaluate any bid made by an Auction Bidder during the Auction;

(o)     upon the conclusion of the Auction, the Committee and the Chapter 11 Trustee shall determine, in consultation with the U.S. Trustee, subject to Court approval, the offer or offers for the Assets that is or are the highest or otherwise best from among the Qualifying Bids submitted at the Auction (the "Successful Bid(s)"). In making this decision, the Committee and the Chapter 11 Trustee may consider, in consultation with the U.S. Trustee, among other things, the amount of the purchase price, the likelihood of the bidder's ability to close a transaction and the timing thereof, the number, type and nature of any changes to the Asset Purchase Agreement requested by each bidder, and the net benefit to the Debtors' estates. The bidder(s) submitting such Successful Bid(s) shall become the "Successful Bidder(s)," and shall have such rights and responsibilities of the purchaser as set forth in the applicable Modified Agreement(s). The Committee and the Chapter 11 Trustee may, in their sole discretion, designate one or more Back-Up Bid(s) (and the corresponding Back-Up Bidder(s)) to purchase the Assets in the event that the Successful Bidder(s) do not close the Sale(s); and

(p)     prior to the Sale Hearing, the Successful Bidder(s) and any Back-Up Bidder(s) shall complete and execute all agreements, contracts, instruments and other documents evidencing and containing the terms and conditions upon which the Successful Bid was made.

**THE SUCCESSFUL BID(S) AND ANY BACK-UP BID(S) SHALL CONSTITUTE AN IRREVOCABLE OFFER AND BE BINDING ON THE SUCCESSFUL BIDDER(S) AND THE BACK-UP BIDDER(S), RESPECTIVELY, FROM THE TIME THE BID IS SUBMITTED UNTIL TWO (2) BUSINESS DAYS AFTER THE SALE HAS CLOSED. EACH QUALIFYING BID THAT IS NOT DESIGNATED A SUCCESSFUL BID OR BACK-UP BID SHALL BE DEEMED WITHDRAWN AND TERMINATED AT THE CONCLUSION OF THE SALE HEARING.**

**10.     Sale Hearing**

The Successful Bid(s) and any Back-Up Bid(s) (or if no Qualifying Bid other than the Stalking Horse Bid is received, then the Stalking Horse Bid as the Successful Bid) will be subject to approval by the Court. The Sale Hearing to approve the Successful Bid(s) and any Back-Up Bid(s) shall take place on

**March 31, 2021 at 10:00 a.m. (ET)** subject to Court availability. After consultation with the U.S. Trustee, the Sale Hearing may be adjourned by the Committee and the Chapter 11 Trustee from time to time without further notice to creditors or other parties in interest other than by announcement of the adjournment in open court on the date scheduled for the Sale Hearing, or by filing a hearing agenda or notice on the docket of the Chapter 11 Cases.

11.    **Backup Bidder**

Notwithstanding any of the foregoing, in the event that Successful Bidder fails to close the Sale prior to twenty-four (24) days after the completion of the Auction (or such date as may be extended by the Committee and the Chapter 11 Trustee), the Back-Up Bid will be deemed to be the Successful Bid, the Back-Up Bidder will be deemed to be the Successful Bidder, and the Chapter 11 Trustee, on behalf of the Debtors, shall be authorized and directed to close the Sale to the Back-Up Bidder subject to the terms of the Back-Up Bid without the need for further order of the Court and without the need for further notice to any interested parties other than a general notice field on the docket to reflect the Back-Up Bidder became the Successful Bidder.

12.    **Return of Deposits**

All Deposits shall be returned to each bidder not selected by the Committee and the Chapter 11 Trustee as the Successful Bidder no later than five (5) business days following the closing of the Sale. The deposit of the Successful Bidder or, if the Sale is closed with the Back-Up Bidder, the deposit of the Back-Up Bidder, shall be applied to the purchase price for the Sale. If the Successful Bidder (or, if the Sale is to be closed with the Back-Up Bidder, then the Back-Up Bidder) fails to consummate the Sale because of a breach or failure to perform on the part of such bidder, then, subject to the terms of the Modified Agreement the Debtors' estates shall be entitled to retain the Deposit of the Successful Bidder (or, if the Sale is to be closed with the Back-Up Bidder, then the Back-Up Bidder) as part of the damages resulting to the Debtors and their estates for such breach or failure to perform unless otherwise ordered by this Court. For the avoidance of doubt, the retention of a Deposit shall not constitute a waiver of any of the Debtors' or estates' legal or equitable rights relating to a Successful Bidder's or Back-Up Bidder's breach or failure to close and all such rights and remedies are preserved.

**For the avoidance of doubt and notwithstanding anything to the contrary herein, the Committee and the Chapter 11 Trustee shall have joint decision making authority under these Bidding Procedures and the Bidding Procedures Order.**

**For the avoidance of doubt, any consultation rights provided to the U.S. Trustee by these Bidding Procedures shall not limit the Committee's and Chapter 11 Trustee's discretion in any way and shall not include the right to veto any decision made by the Committee and the Chapter 11 Trustee in the exercise of their business judgment.**

BN 43891813v3

## Exhibit 2

**Sale Notice**

## IN THE UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF TENNESSEE

| | |
|---|---|
| In re | Chapter 11 |
| **NEOPHARMA, INC.,** | Case No. 2:20-52015 SDR |
| Debtor.[1] | |
| In re | Case No. 2:20-bk-52016 SDR<br>Jointly Administered |
| **NEOPHARMA TENNESSEE LLC,** | |
| Debtor | |

## NOTICE OF SALE, BIDDING PROCEDURES, POTENTIAL
## AUCTION, AND SALE HEARING

**PLEASE TAKE NOTICE** that, on December 22, 2020 (the "Petition Date"), the above-captioned debtors and debtors in possession (collectively, the "Debtors") each filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Eastern District of Tennessee (the "Court"), commencing these chapter 11 cases (the "Chapter 11 Cases").

**PLEASE TAKE FURTHER NOTICE** that, on January 27, 2021, the official committee of unsecured creditors in the above-captioned cases (the "Committee") filed a motion [Docket No. 118] (the "Bidding Procedures Motion") seeking entry of an order (the "Bidding Procedures Order") (i) authorizing the Committee to market the Debtors' assets for sale (the "Sale"), (ii) approving certain bidding procedures (the "Bidding Procedures"), (iii) approving the form of Asset Purchase Agreement, (iv) approving a stalking horse bid and certain bid protections, (v) authorizing the Committee chairperson or the Committee's designee to execute all necessary documents in furtherance of the sale process and (vi) granting certain related relief.

**PLEASE TAKE FURTHER NOTICE** that, on January 29, 2021, the Court appointed Gary M. Murphey as the chapter 11 trustee for the Debtors (the "**Chapter 11 Trustee**"). On February 12, 2021, the Chapter 11 Trustee filed the *Joinder to the Motion of Official Committee of Unsecured Creditors for an Order (i) Authorizing The Committee to Market the Debtors' Assets for Sale, (ii) Approving Bidding Procedures, (iii) Approving the Form of Asset Purchase Agreement, (iv) Approving a Stalking Horse Bid and Certain Bid Protections, (v) Authorizing the Committee Chairperson or the Committee's Designee to Execute Transaction Documents, and (vi) Granting*

---

[1]    The Debtors in these cases, along with the last four digits of each Debtor's federal EIN, are as follows: Neopharma, Inc. (4726) and Neopharma Tennessee LLC (5508). The Debtors' mailing address is 201 Industry Drive, Bristol, TN 37620.

*Related Relief* (the "Trustee Joinder"), pursuant to which the Chapter 11 Trustee joined the Committee's Bidding Procedures Motion.

**PLEASE TAKE FURTHER NOTICE** that, on [_____], 2021, the Court entered the Bidding Procedures Order [Docket No. __], approving, among other things, the Bidding Procedures, which establish key dates and times relating to the Sale and the Auction. All interested bidders should carefully read the Bidding Procedures Order and the Bidding Procedures in their entirety.[2]

## Contact Persons for Parties Interested in Submitting a Bid

The Bidding Procedures set forth in detail the requirements for submitting Qualified Bids, and any person interested in making an offer to purchase the Assets must comply strictly with the Bidding Procedures. Only Qualified Bids that are submitted in accordance with the Bidding Procedures will be considered by the Committee and the Chapter 11 Trustee.

**Any persons interested in making an offer to purchase the Assets should contact the Committee's financial advisor as soon as possible:**

---

[2]  To the extent of any inconsistencies between the Bidding Procedures and the summary descriptions of the Bidding Procedures in this notice, the terms of the Bidding Procedures shall control in all respects.

Walter Oh
**Managing Director**
**Province, LLC**
**1230 Rosecrans Ave., Suite 405**
**Manhattan Beach, CA 90266**
**Tel: (917) 675-1439**
woh@provincefirm.com

Edward Kim
**Managing Director**
**Province, LLC**
**1230 Rosecrans Ave., Suite 405**
**Manhattan Beach, CA 90266**
**Tel: (646) 509-3490**
ekim@provincefirm.com

## Important Dates and Deadlines[3]

- **Stalking Horse Designation Deadline.** The deadline for the Chapter 11 Trustee and the Committee to designate a bid from a Qualified Bidder that desires to serve as a potential stalking horse bidder (the "Stalking Horse Bidder") and to grant certain Bid Protections (as defined in the Bidding Procedures) is on or before **March 1, 2021.**

- **Bid Deadline.** The deadline to submit a Qualified Bid is **March 24, 2021 at 5:00 p.m. (prevailing Eastern Time).**

- **Auction.** If two or more Qualified Bids are received by the Bid Deadline, the Committee and the Chapter 11 Trustee will conduct the Auction, which shall take place on **March 26, 2021 commencing at 10:00 a.m. (prevailing Eastern Time)** (i) virtually by videoconference, (ii) only if permitted and advisable in light of the then-current status of the COVID-19 pandemic, at the offices of counsel to the Chapter 11 Trustee: Polsinelli, PC, 401 Commerce Street, Suite 900, Nashville, TN 37219, or (iii) on such other date and/or at such other location or by other virtual means as determined by the Committee and the Chapter 11 Trustee in consultation with the U.S. Trustee. If the Committee and the Chapter 11 Trustee receive only one timely Qualifying Bid, the Committee and the Chapter 11 Trustee will not hold an Auction and the Qualifying Bid will be deemed the Successful Bid.

- **Objection Deadlines.** The deadline to file an objection with the Court to the consummation of the Sale (excluding objections relating solely to the conduct of the Auction or identity of the Successful(s) Bidder) is **March 16, 2021 at 4:00 p.m. (prevailing Eastern Time)** (the "Sale Objection Deadline"). If the Auction is held, objections relating solely to the identity of the Successful Bidder(s) (other than any Stalking Horse Bidder), including objections to adequate assurance of future performance provided by the Successful Bidder(s) (other than any Stalking Horse Bidder), must be filed with the Court by **March 30, 2021 at noon (prevailing Eastern Time)** (the "Adequate Assurance Objection Deadline"). Any objections not resolved prior to the Sale Hearing shall be argued at the Sale Hearing or such other time as set by the Court.

- **Sale Hearing.** The Sale Hearing to consider the proposed Sale will be held before the Honorable Shelley D. Rucker on **March 31, 2021 at 10:00 a.m. (prevailing Eastern Time)**, or such other date as determined by the Court, at the United States Bankruptcy

---

[3] The following dates and deadlines may be extended by the Debtors or the Court pursuant to the terms of the Bidding Procedures and the Bidding Procedures Order.

Court for the Eastern District of Tennessee, James H. Quillen United States Courthouse, 220 West Depot Street, Suite 218, Greeneville, Tennessee 37743. **Given the current public health crisis, hearings may be telephonic only. Please check the Court's website www.tneb.uscourts.gov prior to the hearing for instructions on whether to appear in person or by telephone. Information on how to call in and participate is also posted on the website.**

### Filing Objections

Objections to the Sale or conduct of the Auction, if any, must (i) be in writing and specify the nature of such objection, (ii) comply with the Bankruptcy Code, the Bankruptcy Rules, the Local Rules and all orders of the Court entered in the Chapter 11 Cases, (iii) be filed with the Court by the Sale Objection Deadline or Adequate Assurance Objection Deadline, as applicable, and (iv) be served upon the following parties (collectively, the "Objection Notice Parties"): (a) proposed counsel to the Committee: Buchalter, P.C., 18400 Von Karman Ave., Suite 800, Irvine, CA 92612, Attn: Jeffrey K. Garfinkle and Julian I. Gurule (jgarfinkle@buchalter.com and jgurule@buchalter.com) and Woolf, McClane, Bright, Allen & Carpenter, PLLC, 900 S. Gay Street, Suite 900, Knoxville, TN 37902, Attn: Gregory C. Logue (glogue@wmbac.com); (b) counsel to the Debtors: Hunter, Smith & Davis LLP, P.O. Box 3740, Kingsport, TN, Attn: Mark S. Dessauer (dessauer@hsdlaw.com); (c) the Office of the United States Trustee for the Eastern District of Tennessee, 31 East 11th Street, 4th Floor, Chattanooga, TN 37402, Attn: Tiffany DiIorio (Tiffany.Diiorio@usdoj.gov); (d) proposed counsel to the Chapter 11 Trustee: Polsinelli PC, 1201 West Peachtree St. NW, Suite 1100, Atlanta, GA 30309, Attn: David E. Gordon and Caryn E. Wang (dgordon@polsinelli.com and cewang@polsinelli.com); and (e) any Stalking Horse Bidder.

### Consequences of Failing to Timely File an Objection

**ANY PARTY WHO FAILS TO MAKE A TIMELY SALE OBJECTION ON OR BEFORE THE SALE OBJECTION DEADLINE OR, SOLELY WITH RESPECT TO OBJECTIONS RELATED TO THE IDENTITY OF THE SUCCESSFUL BIDDER(S) OR ADEQUATE ASSURANCE OF FUTURE PERFORMANCE PROVIDED BY THE SUCCESSFUL BIDDER(S), ADEQUATE ASSURANCE OBJECTION DEADLINE, AS APPLICABLE, IN ACCORDANCE WITH THE BIDDING PROCEDURES ORDER SHALL BE FOREVER BARRED FROM ASSERTING ANY SALE OBJECTION, INCLUDING WITH RESPECT TO THE TRANSFER OF THE ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES AND OTHER INTERESTS.**

### Sale Free and Clear

**The Sale will be free and clear of, among other things, any claim arising from any conduct of the Debtors prior to the closing of the Sale, whether known or unknown, whether due or to become due, whether accrued, absolute, contingent or otherwise, so long as such claim arises out of or relates to events occurring prior to the closing of the Sale. Accordingly, as a result of the Sale, the Purchaser will not be a successor to any of the**

Debtors by reason of any theory of law or equity, and the Purchaser, solely in its capacity as such, will have no liability, except as expressly provided in the Purchaser's Asset Purchase Agreement, for any liens, claims, encumbrances and other interests against or in any of the Debtors under any theory of law, including successor liability theories.

<u>Obtaining Additional Information</u>

Copies of the Bidding Procedures Motion, the Bidding Procedures, the Bidding Procedures Order, the Asset Purchase Agreement and all other documents filed with the Court can be accessed through the Court's electronic docket or by contacting proposed counsel for the Chapter 11 Trustee or proposed counsel for the Committee at the contact information set forth below.

**FAILURE TO ABIDE BY THE BIDDING PROCEDURES, THE BIDDING PROCEDURES ORDER, OR ANY OTHER ORDER OF THE COURT IN THE CHAPTER 11 CASES MAY RESULT IN THE REJECTION OF YOUR BID.**

February ___, 2021

POLSINELLI PC

/s/ David E. Gordon
David E. Gordon
Georgia Bar No. 111877 (admitted *Pro Hac Vice*)
Caryn E. Wang
Georgia Bar No. 542093 (admitted *Pro Hac Vice*)
1201 West Peachtree Street NW
Atlanta, Georgia 30309
Telephone: (404) 253-6000
Facsimile: (404) 684-6060
dgordon@polsinelli.com
cewang@polsinelli.com

– and –

Michael Malone (Tenn. Bar No. 031219)
401 Commerce Street, Suite 900
Nashville, TN 37219
Telephone: (615) 259-1510
Facsimile: (615) 259-1573
mmalone@polsinelli.com

*Proposed Counsel to Gary M. Murphey*
*As Chapter 11 Trustee*

/s/ Gregory C. Logue
WOOLF, McCLANE, BRIGHT, ALLEN & CARPENTER, PLLC
Gregory C. Logue
(Tenn. Bar. No. 012157)
900 S. Gay Street, Suite 900
Knoxville, TN 37902
Telephone: (865) 215-1000
glogue@wmbac.com

– and –

BUCHALTER, P.C.
Jeffrey K. Garfinkle
(Cal Bar. No. 153496; Wash. Bar No. 55968)
(Admitted *Pro Hac Vice*)
Julian I. Gurule
(Cal. Bar. No. 252160)
(Admitted *Pro Hac Vice*)
18400 Von Karman Ave., Suite 800
Irvine, CA 92612
Telephone: (949) 760-1121
jgarfinkle@buchalter.com
jgurule@buchalter.com

*Proposed Counsel to Official Committee of Unsecured Creditors*

**Exhibit 3**

**Executory Contract Notice**

## IN THE UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF TENNESSEE

| | |
|---|---|
| In re | Chapter 11 |
| **NEOPHARMA, INC.,** | Case No. 2:20-52015 SDR |
| Debtor.[1] | |
| In re | Case No. 2:20-bk-52016 SDR |
| **NEOPHARMA TENNESSEE LLC,** | Jointly Administered |
| Debtor | |

## NOTICE OF POSSIBLE ASSUMPTION AND ASSIGNMENT OF CERTAIN
## EXECUTORY CONTRACTS AND UNEXPIRED LEASES

**PLEASE TAKE NOTICE** that, on December 22, 2020 (the "Petition Date"), the above-captioned debtors and debtors in possession (collectively, the "Debtors") each filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Eastern District of Tennessee (the "Court"), commencing these chapter 11 cases (the "Chapter 11 Cases").

**PLEASE TAKE FURTHER NOTICE** that, on January 27, 2021, the official committee of unsecured creditors in the above-captioned cases (the "Committee") filed a motion [Docket No. 118] (the "Bidding Procedures Motion") seeking entry of an order (the "Bidding Procedures Order") (i) authorizing the Committee to market the Debtors' assets for sale (the "Sale"), (ii) approving certain bidding procedures (the "Bidding Procedures"), (iii) approving the form of Asset Purchase Agreement, (iv) approving a stalking horse bid and certain bid protections, (v) authorizing the Committee chairperson or the Committee's designee to execute all necessary documents in furtherance of the sale process and (vi) granting certain related relief.

**PLEASE TAKE FURTHER NOTICE** that, on January 29, 2021, the Court appointed Gary M. Murphey as the chapter 11 trustee for the Debtors (the "**Chapter 11 Trustee**"). On February 12, 2021, the Chapter 11 Trustee filed the *Joinder to the Motion of Official Committee of Unsecured Creditors for an Order (i) Authorizing The Committee to Market the Debtors' Assets for Sale, (ii) Approving Bidding Procedures, (iii) Approving the Form of Asset Purchase Agreement, (iv) Approving a Stalking Horse Bid and Certain Bid Protections, (v) Authorizing the Committee Chairperson or the Committee's Designee to Execute Transaction Documents, and (vi) Granting*

---

[1]     The Debtors in these cases, along with the last four digits of each Debtor's federal EIN, are as follows: Neopharma, Inc. (4726) and Neopharma Tennessee LLC (5508).  The Debtors' mailing address is 201 Industry Drive, Bristol, TN 37620.

*Related Relief* (the "Trustee Joinder"), pursuant to which the Chapter 11 Trustee joined the Committee's Bidding Procedures Motion.

**PLEASE TAKE FURTHER NOTICE** that, on [_____], 2021, the Court entered the Bidding Procedures Order [Docket No. __], approving, among other things, the Bidding Procedures, which establish key dates and times relating to the Sale and the Auction. All interested bidders should carefully read the Bidding Procedures Order and the Bidding Procedures in their entirety.[2]

**PLEASE TAKE FURTHER NOTICE** that, upon the closing of the Sale, the Chapter 11 Trustee, with Court authority, intends to cause the Debtors to assume and assign to the Purchaser certain executory contracts and unexpired leases (the "Assigned Contracts"). A schedule listing the contracts and leases that may potentially be assumed and assigned as part of the Sale is attached hereto as **Exhibit 1** (the "Contracts Schedule") and on the Court's electronic docket for the Chapter 11 Cases, accessible through PACER.

**PLEASE TAKE FURTHER NOTICE** that Cure Amounts, if any, for the assumption and assignment of such contracts and leases are also set forth on the Contracts Schedule. Each Cure Amount listed on the Contracts Schedule represents all liabilities of any nature of the Debtors arising under a contract or lease prior to the closing of the Sale or other applicable effective date of the assumption and assignment of such contract or lease, whether known or unknown, whether due or to become due, whether accrued, absolute, contingent or otherwise, so long as such liabilities arise out of or relate to events occurring prior to the closing of the Sale or other applicable effective date of the assumption and assignment of such contract or lease.

**YOU ARE RECEIVING THIS NOTICE BECAUSE YOU HAVE BEEN IDENTIFIED AS A COUNTERPARTY TO A CONTRACT OR LEASE THAT MAY BE ASSUMED AND ASSIGNED AS PART OF THE SALE.** *The presence of a contract or lease listed on **Exhibit 1** attached hereto does not constitute an admission that such contract or lease is an executory contract or unexpired lease or that such contract or lease will be assumed and assigned as part of the Sale. The Committee, the Chapter 11 Trustee, and the Debtors reserve all their rights, claims and causes of action with respect to the contracts and leases listed on **Exhibit 1** attached hereto.*

## Filing Objections

Pursuant to the Assumption and Assignment Procedures, objections to the proposed assumption and assignment of a contract or lease on any basis (other than objections related solely to adequate assurance of future performance by a Successful Bidder), including any objection relating to Cure Amounts must (1)(a) be in writing; (b) state the basis for such objection; and (c) if such objection is to the Cure Amount, state with specificity what Cure Amount the counterparty believes is required (in all cases, with appropriate documentation in support thereof) and (2) be filed with the Court and served no later than [_____], 2021 at 4:00 p.m. (prevailing Eastern Time) on the following parties (collectively, the "Objection Notice Parties"): (a) proposed counsel to the Committee: Buchalter, P.C., 18400 Von Karman Ave., Suite 800, Irvine, CA 92612, Attn:   Jeffrey K. Garfinkle and Julian I. Gurule (jgarfinkle@buchalter.com and jgurule@buchalter.com) and Woolf, McClane, Bright, Allen &

---

[2]    To the extent of any inconsistencies between the Bidding Procedures and the summary descriptions of the Bidding Procedures in this notice, the terms of the Bidding Procedures shall control in all respects.

Carpenter, PLLC, 900 S. Gay Street, Suite 900, Knoxville, TN 37902, Attn: Gregory C. Logue (glogue@wmbac.com); (b) counsel to the Debtors: Hunter, Smith & Davis LLP, P.O. Box 3740, Kingsport, TN, Attn: Mark S. Dessauer (dessauer@hsdlaw.com); (c) the Office of the United States Trustee for the Eastern District of Tennessee, 31 East 11th Street, 4th Floor, Chattanooga, TN 37402, Attn: Tiffany DiIorio (Tiffany.Diiorio@usdoj.gov); (d) proposed counsel to the Chapter 11 Trustee: Polsinelli PC, 1201 West Peachtree St. NW, Suite 1100, Atlanta, GA 30309, Attn: David E. Gordon and Caryn E. Wang (dgordon@polsinelli.com and cewang@polsinelli.com); and (e) any Stalking Horse Bidder.

The Committee and the Chapter 11 Trustee shall file a notice identifying the Successful Bidder(s) and Back-Up Bidder(s) (if selected) (the "Notice of Successful Bidder") and shall serve the Notice of Successful Bidder on each counterparty to a potential Assigned Contract as soon as reasonably practicable after closing the Auction, if any. Each counterparty to a potential Assigned Contract will then have an opportunity to object to the identity of the Successful Bidder(s) (other than any Stalking Horse Bidder) or adequate assurance of future performance with respect to such counterparty's contract or lease provided by the Successful Bidder(s) (other than any Stalking Horse Bidder), which must (i) be in writing, (ii) comply with the Bankruptcy Code, Bankruptcy Rules and Local Rules, (iii) state, with specificity, the legal and factual bases thereof, (iv) be filed with the Court by **March 30, 2021 at noon (prevailing Eastern Time)** (the "Adequate Assurance Objection Deadline"), and (v) be served on the Objection Notice Parties.

The Court will hear and determine any objections to the assumption and assignment of the Assigned Contracts to the Purchaser at the Sale Hearing or at a later hearing, as determined by the Committee and the Chapter 11 Trustee in consultation with the U.S. Trustee. The Sale Hearing to consider the proposed Sale shall be held before the Honorable Shelley D. Rucker on **March 31, 2021 at 10:00 a.m.** (prevailing Eastern Time), or such other date as determined by the Court, at the United States Bankruptcy Court for the Eastern District of Tennessee, James H. Quillen United States Courthouse, 220 West Depot Street, Suite 218, Greeneville, Tennessee 37743. **Given the current public health crisis, hearings may be telephonic only. Please check the Court's website www.tneb.uscourts.gov prior to the hearing for instructions on whether to appear in person or by telephone. Information on how to call in and participate is also posted on the website.**

## Consequences of Failing to Timely Assert an Objection

**UNLESS YOU FILE AN OBJECTION TO THE CURE AMOUNT AND/OR THE ASSUMPTION OR ASSIGNMENT OF YOUR CONTRACT OR LEASE IN ACCORDANCE WITH THE INSTRUCTIONS AND DEADLINES SET FORTH HEREIN, YOU SHALL BE (A) BARRED FROM OBJECTING TO THE CURE AMOUNT SET FORTH ON EXHIBIT 1, (B) ESTOPPED FROM ASSERTING OR CLAIMING ANY CURE AMOUNT AGAINST THE DEBTORS OR THE SUCCESSFUL BIDDER(S) THAT IS GREATER THAN THE CURE AMOUNT SET FORTH ON EXHIBIT 1 AND (C) DEEMED TO HAVE CONSENTED TO THE ASSUMPTION AND/OR ASSIGNMENT OF YOUR CONTRACT OR LEASE AND THE ADEQUACY OF ASSURANCE OF FUTURE PERFORMANCE THEREUNDER.**

## Obtaining Additional Information

Copies of the Bidding Procedures Motion, the Bidding Procedures, the Bidding Procedures Order, the Asset Purchase Agreement and all other documents filed with the Court can be accessed through the Court's electronic docket or by contacting proposed counsel for the Chapter 11 Trustee or proposed counsel for the Committee at the contact information set forth below.

February __, 2021

POLSINELLI PC

/s/ David E. Gordon
David E. Gordon
Georgia Bar No. 111877 (admitted *Pro Hac Vice*)
Caryn E. Wang
Georgia Bar No. 542093 (admitted *Pro Hac Vice*)
1201 West Peachtree Street NW
Atlanta, Georgia 30309
Telephone: (404) 253-6000
Facsimile: (404) 684-6060
dgordon@polsinelli.com
cewang@polsinelli.com

– and –

Michael Malone (Tenn. Bar No. 031219)
401 Commerce Street, Suite 900
Nashville, TN 37219
Telephone: (615) 259-1510
Facsimile: (615) 259-1573
mmalone@polsinelli.com

*Proposed Counsel to Gary M. Murphey*
*As Chapter 11 Trustee*

/s/ Gregory C. Logue
WOOLF, MCCLANE, BRIGHT, ALLEN &
CARPENTER, PLLC
Gregory C. Logue
(Tenn. Bar. No. 012157)
900 S. Gay Street, Suite 900
Knoxville, TN 37902
Telephone: (865) 215-1000
glogue@wmbac.com

– and –

BUCHALTER, P.C.
Jeffrey K. Garfinkle
(Cal Bar. No. 153496; Wash. Bar No. 55968)
(Admitted *Pro Hac Vice*)
Julian I. Gurule
(Cal. Bar. No. 252160)
(Admitted *Pro Hac Vice*)
18400 Von Karman Ave., Suite 800
Irvine, CA 92612
Telephone: (949) 760-1121
jgarfinkle@buchalter.com
jgurule@buchalter.com

*Proposed Counsel to Official Committee of*
*Unsecured Creditors*

## Exhibit 4

**Asset Purchase Agreement**

# ASSET PURCHASE AGREEMENT

THIS ASSET PURCHASE AGREEMENT (as amended from time to time, the "*Agreement*") is made as of \_\_, 2021 (the "*Execution Date*") by and among the following: (i) _____, a _____ ("*Purchaser*") and (ii) Gary Murphey, solely in his capacity as chapter 11 trustee ("*Trustee*") of, and on behalf of, Neopharma, Inc., a Delaware corporation ("*Neopharma*") and Neopharma Tennessee, LLC, a Delaware limited liability company ("*Neopharma LLC*" and together with Neopharma, "*Sellers*"). Purchaser and Sellers are referred to collectively as the "*Parties*."

The Agreement is based upon the following recitals of fact, and each of the Parties acknowledges that each of the following is entirely true and correct:

# RECITALS:

A.    Sellers own and operate, or have operated various assets comprising a pharmaceuticals manufacturing, processing, testing, warehousing, packaging and distribution business located in Bristol, Tennessee that includes the manufacture of plastic bottles that are utilized to bottle pharmaceutical products (the "*Business*"). In addition, Sellers are engaged in the business of, directly or indirectly, developing, making or having made, promoting, using, licensing and selling certain assets related to its pharmaceutical products under certain trademarks related to certain antibiotic products (collectively, the "*Products*").

B.    Sellers further own various drug applications issued by the United States Food and Drug Administration (the "*FDA*") pursuant to which Neopharma produces or has produced and markets or has marketed the Products. The Business, together with the Products, is referred to as the "*Pharmaceutical Business.*"

C.    Neopharma is the sole member and managing member of Neopharma LLC. Neopharma LLC owns or leases certain real property and improvements including each of the following: (i) an antibiotic manufacturing facility, processing, testing, packaging, warehouse, distribution and print shop located at 201 Industrial Drive, Bristol, Tennessee (the "*Industrial Drive Property*"); (ii) a plastics processing facility located at 605 5th Street, Bristol, Tennessee (the "*Fifth Street Property*") and (iii) certain vacant land located at 4th Street, Bristol, Tennessee (the "*Fourth Street Property*"). The Industrial Drive Property, the Fifth Street Property and the Fourth Street Property are referred to collectively the "*Real Property*").

D.    The Pharmaceutical Business is located on and operated from the Industrial Drive Property and the Fifth Street Property.

E.    Neopharma LLC also owns certain equipment, machinery, fixtures, furniture, furnishings and other personal property located on the Real Property utilized by Neopharma in the Pharmaceutical Business.

F.    Neopharma LLC is a party to a certain Facility Lease Agreement dated September 28, 2018 with the Industrial Development Board of the City of Bristol, Tennessee (the "*Facility*

1

*Lease*"). In addition, and in the ordinary course of business the Sellers have entered into and remain obligated under certain executory contracts and unexpired leases of real and personal property (collectively, the "*Contracts and Leases*"). The Facility Lease and certain of those Contracts and Leases are to be assumed and assigned to the Purchaser as part of the Proposed Transaction described in this Agreement (collectively, the "*Assumed Contracts and Leases*").

G.      On the terms and conditions set forth in this Agreement, the Purchaser desires to purchase from Sellers, and Sellers desire to sell to Purchaser (the "*Proposed Transaction*"), all of the Sellers' right, title and interest in, to and under the various assets, property and business more particularly described below, the "*Purchased Assets*" which includes (i) the Real Property, the Assumed Contracts and Leases, and (iii) the other assets, property and business associated with the Pharmaceutical Business, in each instance, free and clear of all Liens.

H.      The Parties acknowledge that in every respect, the Proposed Transaction has been negotiated at arm's length and in good faith and without the intent to hinder, delay or defraud creditors of the Sellers.

I.      On December 22, 2020, Neopharma commenced a chapter 11 bankruptcy case in the United States Bankruptcy Court for the Eastern District of Tennessee (the "*Bankruptcy Court*") as case no. 2:20-bk-52015-SDR (the "*Neopharma Bankruptcy Case*"). Also on December 22, 2020, Neopharma LLC commenced a chapter 11 bankruptcy case in the Bankruptcy Court as case no. 2:20-bk-52016-SDR (the "*Neopharma LLC Bankruptcy Case*," and together with the Neopharma Bankruptcy Case, the "*Bankruptcy Cases*").

J.      On January 29, 2021, the Bankruptcy Court appointed Gary Murphey as the Chapter 11 trustee in the Neopharma and Neopharma LLC Bankruptcy Cases.

K.      Sellers have determined that the offer of Purchaser for the Purchased Assets (i) is the highest and best price for the Purchased Assets, (ii) the sale of the Purchased Assets as a whole is in the best interest of Sellers, the respective creditors of Sellers and their bankruptcy estates and (iii) constitutes a fair and adequate purchase price for the Purchased Assets.

**NOW, THEREFORE**, for good and valuable consideration and in consideration of the performance of the mutual covenants and agreements contained herein, the receipt and adequacy of which are conclusively acknowledged, the Parties agree as follows:

**1.      Incorporation of Recitals; Definitions and Rules of Construction.**

1.1      As used in this Agreement each of the words and phrases that are capitalized shall have the meaning ascribed to them in Schedule 1.1.

1.2      The recitals set forth above are incorporated by this reference.

**2.      Purchase and Sale of Assets of the Pharmaceutical Business.**

2.1      Assets of the Pharmaceutical Business. Subject to the terms and conditions hereof and on the basis of the representations, warranties and covenants contained herein, Sellers agree to sell, assign, transfer, convey, grant and deliver to Purchaser, and Purchaser agrees to purchase

2

from Sellers the Purchased Assets, described as all of Sellers' respective right, title and interest in, to and under all of the tangible and intangible real and personal property, assets and rights located at or used in connection with the Pharmaceutical Business, as set forth below (excepting only those assets specifically identified as "*Excluded Assets*" in Section 2.3 herein), free and clear of and expressly excluding any and all liens, security interests, pledges, charges and encumbrances of any kind, character or description whatsoever (collectively, the "*Liens*") except for the Permitted Liens as set forth on <u>Schedule 2.1</u> (collectively, the "*Permitted Liens*").

      2.2    <u>The Purchased Assets include the following</u>:

      (a)    All of Sellers' right, title and interest in trademarks, trade names, service marks, recipes, formulas, copyrights, methods, licenses, processes and know-how relating to the Pharmaceutical Business, whether owned, used or licensed by Sellers, including those trademarks and trade names set forth on <u>Schedule 2.2(a)</u> and the goodwill of the Pharmaceutical Business as a going concern (collectively, the "*Intangible Rights*");

      (b)    The Products and Neopharma's drug authorizations including the documents referenced in the complete regulatory chronology for each IND, NDA or ANDA for the applicable Products, whether such IND, NDA or ANDA exist now or in the past, whether currently marketed or discontinued, and whether filed, approved or pending, as more specifically set forth on <u>Schedule 2.2(b)</u>;

      (c)    All of Sellers' right, title and interest in and to all confidentiality agreements, non-disclosure agreements, non-compete agreements relating to the assignment of ideas and inventions to Sellers by current or past employees;

      (d)    The names "Neopharma," and "Neopharma Tennessee, LLC" and any associated logos or marks;

      (e)    To the extent assignable, all applications, consents, approvals, licenses, permits, franchises, filings or authorizations, including certificates of occupancy (collectively, "*Governmental Authorizations*"), granted by any public or governmental entity, department, bureau, commission, agency and similar bodies or authority including the FDA (collectively, the "*Governmental Entities*" and, individually, each a "*Governmental Entity*") in connection with the operation of the Pharmaceutical Business, the Intangible Rights and the Real Property;

      (f)    All of Sellers' right, title and interest in and to the Facility Lease and all buildings, fixtures, appurtenances and other leasehold improvements located at the Real Property and maps, reports, plans, easements, access rights, parking spaces, title documents, surveys, construction contracts, warranties, reports, drawings including the drawings that show the information technology, data recording and retrieval, electrical, mechanical, heating ventilating, air conditioning and plumbing systems that serve the buildings, site plans, as-built plans, permits and other materials having to do with the Real Property and the Pharmaceutical Business;

      (g)    All of the fixed and tangible assets owned by Sellers and used in the maintenance and operation of the Pharmaceutical Business, including the machinery,

apparatus, appliances, furniture, fixtures, trade fixtures, signs, equipment, computers, computer hardware and computer-related software, information technology systems and servers, services, replacement parts and other physical assets including the tangible assets (i) listed on <u>Schedule 2.2(g)</u>, and (ii) located or stored at the Real Property;

(h)    To the extent assignable, all raw materials, work-in-process, finished goods, supplies (including clinical drug supplies), samples, components, packaging materials and other inventories to which Sellers have title, located on, warehoused or stored at the Real Property, including all goods, merchandise and other personal property owned, excipients inert materials, bottles, plastic, packaging, materials and supplies of every nature which contribute to the manufacturing, processing, testing, bottling, packaging, release and distribution of finished products of Seller in the ordinary course of the Pharmaceutical Business, as more particularly described on <u>Schedule 2.2(h)</u> (collectively, the "***Inventory***");

(i)    All warranties and similar rights in favor of Seller with respect to the Purchased Assets;

(j)    Originals, if available, or copies of all customer lists and supplier lists to the extent related to the Business or the Purchased Assets;

(k)    the Real Property, as more particularly described in <u>Schedule 2.2(k)</u> together with tax credits, benefits or incentives or the like that have accrued or are related or incidental to the Real Property, to the extent such credits, benefits, or incentives are assignable and still in force; and

(l)    all of Sellers' rights under the Assumed Contracts and Leases as Purchaser may, at least ten (10) days before entry of the Approval Order, elect to assume as set forth on <u>Schedule 2.2(l)</u>(subject to the right to update such schedule to remove any Assumed Contract and Lease, in Purchaser's discretion, if it exceeds the Aggregate Cure Cap, with such contract or lease then no longer to be assumed).  In each instance, Purchaser shall be obligated to cure any defaults under the Assumed Contracts and Leases, and shall provide adequate assurance of future performance to the extent determined by the Bankruptcy Court.

2.3    <u>Excluded Assets</u>.  The Purchased Assets shall not include any and all right, title and interest of Sellers, if any, in and to the following assets (collectively, the "***Excluded Assets***"):

(a)    tax returns and other records which are not directly related to or reasonably necessary to the conduct of the Pharmaceutical Business;

(b)    all accounts held and generated in the ordinary course of Pharmaceutical Business,

(c)    cash or cash equivalents, including bank accounts and the Purchase Price, as defined below;

(d)    all utility, security, and other deposits and prepaid items;

4

(e)     any tax credits, tax refunds, tax benefits or other benefits relating to periods prior to the Closing Date, which are and shall remain exclusively the property of Seller;

(f)     the capital stock of or membership interests in Sellers;

(g)     all Contracts and Leases that are not Assumed Contracts and Leases; and

(h)     all causes of action, demands, judgments, claims (including insurance claims), indemnity rights (to the extent assignable to Purchaser), setoffs, recoupments, or other similar right of Sellers including all avoidance or other claims of the Sellers or their bankruptcy estates including without limitation those that may exist against Sellers' prior management pursuant to any provision of the Bankruptcy Code or pursuant to applicable state law, except for those claims arising under express or implied warranties from suppliers or other third parties with respect to the Purchased Assets.

2.4     <u>Assumed Liabilities</u>. On the terms and subject to the conditions set forth in this Agreement, at the Closing, in consideration for the sale, assignment, conveyance, transfer and delivery of the Purchased Assets to the Purchaser, the Purchaser shall assume from the Sellers and agree to pay, perform, and discharge when due in accordance with their respective terms and subject to the respective conditions thereof, only the following liabilities and obligations (of any nature or kind, and whether based in common law or statute or arising under written contract or otherwise, known or unknown, fixed or contingent, accrued or unaccrued, liquidated or unliquidated, asserted or unasserted) of the Sellers (collectively, the "<u>Assumed Liabilities</u>"):

(a)     all liabilities and obligations arising from the ownership, possession or use of the Purchased Assets and the operation of the business, in each case from and after the Closing;

(b)     all liabilities and obligations arising under the Assumed Contracts and Leases, arising after the Closing;

(c)     all Cure Costs;

(d)     all current accounts payable owed by the Sellers as of the Closing to the extent such amounts are in respect of manufacturing costs related to Inventory;

(e)     all claims related to or arising from rebates, coupon programs, chargebacks and credits;

(f)     any liability in respect of royalty payments that initially become due and payable after the Closing Date and are due to third parties arising with respect to sales occurring before the Closing;

(g)     claims related to or arising from returns or expirations of the Products to the extent arising after the Closing; and

5

(h)    all liabilities and obligations relating to the employment or termination of the Transferred Employees whether arising before or after the Closing.

The transactions contemplated by this Agreement shall in no way expand the rights or remedies of any third party against the Purchaser or Sellers as compared to the rights and remedies that such third party would have had against Sellers absent the Bankruptcy Cases had the Purchaser not assumed such Assumed Liabilities.

2.5    Excluded Liabilities.  Notwithstanding anything contained in this Agreement to the contrary, Purchaser shall not assume, be obligated to assume, be deemed to have assumed, or be obligated to pay, perform, or otherwise discharge, and the Sellers shall be solely and exclusively liable with respect to any liabilities or obligations (or any nature, and whether based on common law or statute or arising under written contract or otherwise, known or unknown, fixed or contingent, accrued or unaccrued, liquidated or unliquidated, asserted or unasserted) of the Sellers other than the Assumed Liabilities (such liabilities and obligations other than Assumed Liabilities, the *Excluded Liabilities*"). Without limiting the foregoing, Purchaser does not assume or agree to pay, perform or otherwise discharge the liabilities or obligations (whether known or unknown, fixed or contingent, accrued or unaccrued, liquidated or unliquidated, asserted or unasserted) of the Sellers with respect to, arising out of or relating to, the following Excluded Liabilities:

(a)    except as otherwise expressly set forth in this Agreement, any liability arising out of facts or circumstances in existence prior to the Closing and from or related to any breach, default under, failure to perform, torts related to the performance of, violations of law, infringements or indemnities under, guaranties pursuant to and overcharges, underpayments or penalties on the part of the Seller under any contract, agreement, arrangement or understanding to which Sellers are a party prior to the Closing;

(b)    except as otherwise expressly set forth in this Agreement, any liability arising from or related to any action against Sellers, or related to the business, the Purchased Assets or the Assumed Liabilities, pending or threatened or based on facts, actions, omissions, circumstances or conditions existing, occurring or accruing before the Closing Date;

(c)    all Indebtedness of the Sellers (other than any obligations under the Assumed Contracts and Leases);

(d)    all guarantees of third-party Indebtedness made by the Sellers and reimbursement obligations to guarantors of the Sellers' obligations or under letters of credit or similar agreements or instruments;

(e)    all liabilities or obligations to any current or former owner of capital stock or other equity interests of the Sellers or any securities convertible into, exchangeable or exercisable for shares of capital stock or other equity interests of the Sellers, any current or former holder of indebtedness for borrowed money of the Sellers or, in respect of obligations for indemnification or advancement of expenses, any current or former officer or director of the Sellers;

(f)    all drafts or checks outstanding at the Closing under which the Sellers are obligated;

6

(g)     all liabilities or obligations to the extent relating to the ownership, possession or use of the Excluded Assets;

(h)     all fees, charges, expenditures, and costs incurred or otherwise payable by the Sellers in connection with the administration of the Bankruptcy Cases, including the fees and expenses of financial advisors and legal counsel, whether incurred, accrued or payable on, prior to, or after the date of this Agreement or the Closing Date;

(i)     all liabilities or obligations (x) under Environmental Laws to the extent relating to (i) facts, actions, omissions, circumstances or conditions existing, occurring or accruing, or noncompliance with or violations of Environmental Laws by the Sellers on or before the Closing Date, (ii) the transportation, off-site storage or off-site disposal of any hazardous substances generated by or on behalf of the Sellers on or before the Closing Date or (iii) real property not acquired under this Agreement, including any real property formerly owned, operated or leased by Sellers prior to the Closing Date; and (y) for toxic torts arising as a result of or in connection with loss of life or injury to Persons (whether or not such loss or injury was made manifest on or after the Closing Date);

(j)     any liability relating to any Product that is or has been manufactured, tested, distributed, held or marketed by or on behalf of the Sellers arising from any recall, withdrawal, or suspension (whether voluntarily or otherwise), except to the extent that such recall, withdrawal or suspension results from Purchaser's operation of the business or the Purchased Assets following the Closing; and

(k)     all intercompany accounts payable, liabilities and obligations that are owed or payable to any Seller as to which any Seller is an obligor or is otherwise responsible or liable.

2.6     <u>Method of Conveyance</u>. The sale, transfer, conveyance, assignment and delivery by Sellers of the Purchased Assets shall occur on the Closing Date by Sellers' execution and delivery to Purchaser of one or more bills of sale, assignments, and special warranty deeds in form and scope satisfactory to Purchaser. At the Closing, Sellers shall transfer, assign, convey and deliver good, valid and indefeasible title to the Purchased Assets free and clear of all Liens.

**3.     Consideration**.

3.1     <u>Purchase Price</u>. On the Closing Date, the Purchaser shall pay (a) $_____ for the Purchased Assets (the "***Purchase Price***"), less the Deposit, and (b) the amount necessary to pay the Cure Costs on all Assumed Contracts and Leases (the "***Aggregate Cure Amount***"), which two amounts shall be paid to Sellers on the Closing Date (the "***Closing Date Payment***"). The Purchase Price, less the Deposit, and the Aggregate Cure Amount shall be payable in immediately available federal funds.

3.2     <u>Deposit</u>. Contemporaneous with the execution of this Agreement, Purchaser agrees to deposit into escrow ten percent (10%) of the Purchase Price, consisting of the sum of $_____ (the "***Deposit***") pursuant to the terms of an escrow agreement in the form attached as <u>Schedule 3.2</u>. The Deposit will be applied to the Purchase Price at Closing.

7

**4.**   **Closing**.

4.1    Closing.  The Transaction shall close (the "*Closing*") on the second business day (the "*Closing Date*") (or as soon thereafter as may be practicable) after the conditions set forth herein in sections 8 (with respect to the Purchaser) and 9 (with respect to the Sellers), as applicable, shall have been satisfied or (if permissible) waived (except for such conditions that, by their nature, are to be satisfied at the Closing) or such later date as the Parties shall mutually agree.

4.2    Prorations and Adjustments.  Purchaser and Sellers agree that the following items shall be prorated, with the Sellers to be responsible for the same through and including the Closing Date and Purchaser to be responsible for the same after the Closing Date:

(a)    all real and personal property taxes and assessments related to the Purchased Assets (whether payable by Seller as owner or lessee, and which shall be deemed to accrue ratably over the lease year to which it relates), provided however, that if the amount of taxes or assessments for the year in which Closing occurs is unknown at the time of Closing, such taxes or assessments shall be prorated based on the rate and valuation shown on the prior year's tax bill.  The Parties shall, promptly upon request of either Party, re-prorate taxes and assessments when the figures for the year in which Closing occurs is known; and

(b)    any charges for water, electric, oil, gas, telephone and other utilities.

4.3    Utilities.  Sellers shall cause any and all services for water, electric, oil, gas, telephone and other utilities to take a final reading in respect of the Pharmaceutical Business as of the Closing Date, to cause the charges therefor incurred through the Closing Date to be paid by Sellers and to notify such utilities to transfer such services to Purchaser from and after the Closing Date without interruption of service.

4.4    Expenses.  Purchaser shall be solely liable for and shall pay on the Closing Date all documentary or transfer taxes, recording charges and similar taxes and charges with respect to the transfer of the Purchased Assets as well as the cost of recording all curative title documents. Each Party shall be responsible for its own attorneys' fees and costs.

**5.**    **Representations and Warranties of Sellers**.

As an inducement to Purchaser to enter into this Agreement and to consummate the transactions contemplated hereby, each Seller makes the following representations and warranties to Purchaser relating to itself and the Purchased Assets, each of which is true and correct on the Execution Date:

5.1    Organization; Good Standing.  Subject to entry of the Approval Order, Seller has the full power and authority, corporate or otherwise, to enter into this Agreement, to carry out its obligations hereunder and to consummate the respective transactions contemplated to be consummated hereunder.  The execution, delivery and consummation of this Agreement has been duly and validly authorized by Seller.

8

5.2    Authorization. Subject to entry of the Approval Order, this Agreement constitutes a valid and binding obligation of Seller enforceable in accordance with its terms.

5.3    Non-Contravention. Except as otherwise contemplated by this Agreement, Seller's execution and delivery of this Agreement and compliance with and fulfillment of the terms of this Agreement do not (i) violate or conflict with any of the terms, conditions or provisions of any organizational documents of Seller; (ii) violate any Laws applicable to Seller; or (iii) materially impair the Purchaser's ability to operate the Pharmaceutical Business.

5.4    Title to Purchased Assets. Seller has good and valid legal title and beneficial ownership to the Purchased Assets.  At Closing and pursuant to the Approval Order, the Seller shall convey to Purchaser good, valid, marketable and insurable title to the Purchased Assets, free and clear of all Liens (except for Permitted Liens) pursuant to sections 363(b), 363(f) and 365 of the Bankruptcy Code.

5.5    Condition of Purchased Assets. All of the Purchased Assets are being sold "AS IS", "WHERE IS" WITH ALL FAULTS AND WITHOUT ANY REPRESENTATION OR WARRANTIES, EXPRESS OR IMPLIED, INCLUDING THE IMPLIED WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE, EXCEPT AS EXPRESSLY SET FORTH HEREIN.

5.6    Governmental Authorizations. To Seller's knowledge, Seller has all material Governmental Authorizations that are required in connection with the operation of the Pharmaceutical Business as presently conducted.

5.7    Contracts. To Seller's knowledge, true and correct originals or, where originals are not available, copies of all material contracts and agreements of Sellers relating to the Purchased Assets have been delivered by Sellers to Purchaser or will be delivered to Purchaser within a reasonable time after a request from the Purchaser.  Sellers shall also disclose to Purchaser the Sellers' good faith estimate of the Cure Costs.

5.8    Compliance with Laws. Except as previously disclosed to Purchaser, Neopharma has been in material compliance with any Laws applicable to it or the Pharmaceutical Business.

5.9    Facility Lease.  Neopharma LLC has received no notice of termination of the Facility Lease.

5.10   Real Property. Seller has not been informed or received any notice of any condemnation proceedings involving the Real Property; there are no parties with a right of occupancy to the Real Property other that Seller; and there are no parties other than Seller in possession of the Real Property.

5.11   Environmental Matters. To Seller's knowledge, in its operation of the Pharmaceutical Business, Neopharma has materially complied with all Environmental Laws applicable to it, has not discharged any Hazardous Substances and has not used any above ground storage tanks or underground storage tanks.

9

5.12    Labor Relations Matters.    To Seller's knowledge, with respect to the Pharmaceutical Business, (a) Neopharma is not a party to any collective bargaining agreement and has no relationship with any labor organization; (b) to the knowledge of Neopharma, no labor organization has filed any representation petition or made any oral or written demand for recognition; and (c) to the knowledge of Neopharma, no union organizing efforts are underway or threatened.

5.13    Healthcare Regulatory Matters.

(a)    Each Seller has fulfilled and performed all of its material obligations with respect to Regulatory Authorizations.  As of the date of this Agreement, no Seller has received any written notice or written communication from any Regulatory Authority (i) withdrawing or placing any of the Products on "clinical hold" or requiring the termination or suspension or investigation of any pre-clinical studies or clinical trials of the Products or (ii) alleging any material violation of any Law with respect to the Products.

(b)    None of the Sellers or, to the knowledge of the Sellers, any Person acting on any Seller's behalf has, with respect to any Product, (i) been subject to a Regulatory Authority shutdown or import or export prohibition or (ii) received any FDA Form 483, or other written Regulatory Authority notice of inspectional observations, "warning letters," "untitled letters" or written demand or written request to make any change to any Product or any processes or procedures of any of the Sellers.

(c)    No Product that is or has been manufactured, tested, distributed, held or marketed by or on behalf of any Seller has been recalled, withdrawn or suspended (whether voluntarily or otherwise) or, to the knowledge of the Sellers, has been adulterated or misbranded. No Actions (whether complete or pending) seeking the recall, withdrawal, suspension or seizure of any such Product or pre-market approvals or marketing authorizations are pending or, to the knowledge of the Sellers, threatened against any Seller, nor have any such Actions been pending at any time.

(d)    The Sellers have complied in all material respects with all applicable security and privacy standards regarding protection of health information under (i) the Health Insurance Portability and Accountability Act of 1996, as amended by the Health Information Technology for Economic and Clinical Health Act of 2009, and their implementing regulations and agency guidance and (ii) any other applicable state or foreign privacy Laws.

5.14    Taxes.    To Seller's knowledge, all material Tax Returns required to be filed with respect to the Business, the Purchased Assets and Assumed Liabilities have been timely filed with the appropriate Taxing Authority in all jurisdictions in which such Tax Returns are required to be filed (after giving effect to any valid extensions of time in which to make such filings), and all such Tax Returns are true, complete and correct in all material respects; and (ii) all material amounts of Taxes payable with respect to the Business, the Purchased Assets and Assumed Liabilities have been timely paid.

6.    **Purchaser's Representations and Warranties.**

Purchaser hereby makes the following representations and warranties, each of which is true and correct on the Execution Date:

6.1     Organization; Good Standing. Purchaser has all power and authority to enter into and perform its obligations under this Agreement and to consummate the Proposed Transaction.

6.2     Authorization. The execution, delivery and performance of this Agreement have been duly authorized by the board of directors of Purchaser and no further authorization, approval or consent is required. This Agreement constitutes a valid and binding obligation of Purchaser enforceable in accordance with its terms.

6.3     Litigation. Except as described in this Agreement, there are no actions, suits or proceedings pending or threatened against Purchaser or to which its properties, rights or assets are the subject, at law or in equity, or before any governmental or administrative body or agency which would impede the Proposed Transaction, or which would prevent Purchaser from being able to perform its obligations under this Agreement.

6.4     Non-Contravention. Except as otherwise contemplated by this Agreement, the Purchaser's execution and delivery of this Agreement and compliance with and fulfillment of the terms of this Agreement do not (i) require any authorization, consent, approval, exemption or other action by or notice to any governmental or other entity, or conflict with or result in a breach of the terms, conditions or provision of any applicable Articles of Incorporation or Bylaws of Purchaser, or any contract to which Purchaser is a party, or (ii) constitute a default, or result in the creation of any lien, security interest, charge or encumbrance upon the Purchased Assets.

**7.      Covenants.**

7.1     Investigation. During the period from the date hereof until the Closing Date, upon reasonable request and at reasonable times, Purchaser's representatives, attorneys and accountants shall have access to the Purchased Assets and the books, records and files of the Sellers which relate to the Purchased Assets, to the extent such books, records and files are in the possession or control of Sellers. If the sale and purchase contemplated by this Agreement is not consummated, the Purchaser shall return to the Seller or destroy (at Seller's option) all copies of documents received from Seller as it may reasonably request.

7.2     Insurance. Neopharma currently maintains general liability insurance on the Business. Sellers have disclosed to Purchaser the status of Sellers' other insurance coverage.

7.3     Utilities. Sellers will maintain water, electricity, natural gas and other utilities to the Property through the Closing to the extent currently maintained, and to the extent necessary to preserve the Purchased Assets through Closing. Purchaser shall be obligated to maintain all utilities to the Business after the Closing Date.

7.4     Employees. Effective as of the Closing Date, the employment by Neopharma of the Employees shall terminate. No Employees shall have any right to be hired or employed by Purchaser as a result of the consummation of the Proposed Transaction, provided that Purchaser may, in its sole and absolute discretion, offer employment to the Employees at the Closing Date, and shall offer employment to sufficient Employees to avoid triggering obligations under the federal WARN Act or similar state laws. Such employment offers and acceptances shall be on the terms and conditions as may be acceptable to the Employees and Purchaser in their sole discretion and need not bear any relationship

11

to the terms and provisions applicable to their employment with Seller.   Nothing in this Agreement, express or implied, shall confer upon any employee of Seller any rights or remedies against Seller or Purchaser, including any right to employment or continued employment for any period or of any nature whatsoever.

7.5   <u>Further Assurances</u>. Following the Closing, the Parties shall execute and deliver such documents and take such other action as shall be reasonably requested by any other Party to carry out the Proposed Transaction.   Sellers shall take all reasonable actions necessary to facilitate the orderly transition of the ownership of the Purchased Assets to Purchaser.

7.6   <u>Existing Restrictive Covenant Agreements</u>. All non-compete, non-solicitation and restrictive covenant agreements and arrangements between Sellers and any of its personnel who are retained by Purchaser are assigned to the Purchaser as part of the Purchased Assets to the extent that the Purchaser may enforce same.  To the extent (and only to the extent) of benefit and not of burden to Purchaser and to the extent permitted by legal requirements, all invention assignments and work-made-for-hire provisions regarding Sellers arising by operation of law or contract with respect to the relationship between Sellers and any of its employees or independent contractors are hereby assigned by Seller to Purchaser.

7.7   <u>Availability of Records</u>.  After the Closing, the Seller and the Purchaser shall make available to each other Party and their respective Representatives during normal business hours when reasonably requested, all product records in their respective possession.  The Purchaser and the Seller shall also make available for consultation to each other during normal business hours, when reasonably requested, personnel responsible for preparing or maintaining information, records and documents, in connection with tax matters, governmental matters, or litigation as it relates to any pre- or post-Closing issue.

7.8   <u>Title Policy</u>.  Seller has ordered a Title Policy (the "**_Title Policy_**") as of or prior to the Execution Date, and Seller will make the Title Policy available to Purchaser as soon as it is reasonably available, but in no event later than thirty (30) days after the date of this Agreement. In the event of any material, non-customary exceptions to such Title Policy (other than Permitted Exceptions), Purchaser shall have until five (5) days after receipt of the draft Title Policy to object in writing to any such exceptions to Seller.  Seller shall have five (5) days thereafter to respond in writing to Purchaser of how it proposes to resolve each such exception to the reasonable satisfaction of Purchaser, or if Seller will not resolve such exception, in which case Seller shall have the right to terminate within two (2) days after receipt thereof (but only for material, non-customary exceptions).

7.9   <u>Accounts Receivable</u>.  The Parties acknowledge and agree that all accounts receivable of the Seller are and shall after Closing remain the property of the Seller and shall be collected by the Sellers subsequent to the Closing.  In the event that, following the Closing, the Purchaser receives any payments from any obligor with respect to an account receivable of the Seller, then Purchaser shall within ten (10) Business Days of receipt of such payment remit the full amount of such payment to the Seller.  In the event that, following the Closing, the Seller receives any payments from any obligor with respect to an account receivable of the Purchaser, then Seller shall within ten (10) Business Days of receipt of such payment remit the full amount of such payment to the Purchaser.

7.10    <u>NDC Codes</u>.    To the extent not transferred as part of the Purchased Assets, the Sellers hereby grant, effective as of the Closing Date, to the Purchaser a royalty-free, paid-up license under the Sellers' NDC numbers used in connection with the Business to the extent necessary to allow the Purchaser and its Affiliates and their designees to market, distribute and sell the inventory acquired as part of the Purchased Assets.

**8.      <u>Conditions to Obligations of Purchaser</u>.**

The obligations of the Purchaser under this Agreement are subject to the fulfillment of the following conditions precedent, each of which may be waived in writing in the sole discretion of the Purchaser (unless other specified, these conditions must be fulfilled on or before the Closing Date):

8.1    <u>Bankruptcy Court Approval</u>. The Proposed Transaction shall be approved by the Bankruptcy Court as described in <u>Section 10</u> hereof, and the Approval Order shall be in full force and effect and shall not have been stayed by the Bankruptcy Court or any court of competent jurisdiction.

8.2    <u>Continued Truth of Representations and Warranties of the Sellers; Compliance with Covenants and Obligations</u>. The representations and warranties of the Sellers contained in this Agreement and any Schedule attached hereto shall be true and correct, and the Sellers shall have performed and complied with all covenants and obligations required by this Agreement.

8.3    <u>No Material Adverse Change</u>. No Material Adverse Change shall have occurred between the Execution Date and Closing.

8.4    <u>Governmental Approvals</u>. All Governmental Entities, the consent, authorization or approval of which is necessary under any applicable law, rule, order or regulation for the consummation by the Sellers of the Proposed Transaction shall have consented to, authorized, permitted or approved such transactions.

8.5    <u>Adverse Proceedings</u>. No action or proceeding by or before any court or Governmental Entity shall have been instituted by any court or Governmental Entity whatsoever which shall seek to restrain, prohibit or invalidate the transactions contemplated by this Agreement or which is likely to affect the right of the Purchaser to own or use the Purchased Assets after the Closing Date.

8.6    <u>Closing Deliveries</u>. The Purchaser shall have received at or prior to the Closing Date each of the following documents:

(a)    the Approval Order, in form and substance reasonably acceptable to the Purchaser and its counsel;

(b)    a bill of sale and assignment agreement executed and acknowledged by the Seller, in the form reasonably acceptable to the Purchaser, with respect to the Purchased Assets;

13

(c)    an assignment agreement executed by Seller assigning its rights to Purchaser in and to the Intangible Rights;

(d)    special warranty deed in a form acceptable to Purchaser and its counsel conveying fee simple title to the Real Property to Purchaser or its designee, and approval of the assumption and assignment of the Facility Lease;

(e)    a closing statement in form and content reasonably acceptable to the Purchaser; and

(f)    possession of all of the Purchased Assets including, but not limited to, keys to the Real Property and keys to any buildings located on the Real Property and all computer, software and/or document access codes (to the extent in the possession or control of Seller);

(g)    the Title Policy, in form reasonably acceptable to Purchaser; and

(h)    such other documents which Purchaser may request to effectuate the terms and conditions of this Agreement.

**9.**    <u>**Conditions to Obligations of the Seller**</u>. The obligations of the Seller under this Agreement are subject to the fulfillment of the following conditions precedent, each of which may be waived in writing at the sole discretion of the Seller (unless otherwise specified, these conditions must be fulfilled before the Closing Date):

9.1    <u>Bankruptcy Court Approval</u>. The transactions involving the Seller contemplated by this Agreement shall be approved by the Bankruptcy Court as described in <u>Section 10</u> hereof, and the Approval Order, as hereinafter defined, shall be in full force and effect and shall not have been stayed by the Bankruptcy Court or any court of competent jurisdiction.

9.2    <u>Continued Truth of Representations and Warranties of the Purchaser: Compliance with Covenants and Obligations</u>. The representations and warranties of the Purchaser in this Agreement shall be true and correct, and the Purchaser shall have performed any covenants and obligations required by this Agreement to be performed or complied with by it prior to or at the Closing Date.

9.3    <u>No Material Adverse Change</u>. No Material Adverse Change shall have occurred between the Execution Date and Closing.

9.4    <u>Governmental Approvals</u>. All Governmental Entities, the consent, authorization or approval of which is necessary under any applicable law, rule, order or regulation for the consummation by the Sellers of the Proposed Transaction shall have consented to, authorized, permitted or approved such transactions.

9.5    <u>Adverse Proceedings</u>. No action or proceeding by or before any court or Governmental Entity shall have been instituted by any court or Governmental Entity whatsoever which shall seek to restrain, prohibit or invalidate the transactions contemplated by this

Agreement or which is likely to affect the right of the Purchaser to own or use the Purchased Assets after the Closing Date.

9.6     Closing Deliveries. The Seller shall have received at or prior to the Closing each of the following documents duly executed by Purchaser (if applicable):

(a)     the payment of the Closing Date Payment to Seller;

(b)     a certificate of the Secretary of the state of the Purchaser's organization as to the legal existence of the Purchaser in such jurisdiction;

(c)     certificates of an appropriate responsible party of the Purchaser attesting to the incumbency of the Purchaser's officers, and the authenticity and continuing validity of the charter documents;

(d)     A closing statement in form and content acceptable to the Seller;

(e)     letters required from Purchaser under 21 CFR 314.72 for the transfer of the IND's, NDA's and ANDA's for the Products; and

(f)     Such other documents which Sellers may reasonably request to effectuate the terms and conditions of this Agreement.

**10.     Bankruptcy Court Approval.**

10.1     The Agreement.   Execution of this Agreement by Purchaser shall constitute Purchaser's bid for the Purchased Assets.

10.2     Approval Order. Seller has filed a motion (the "***Sale Motion***") with the Bankruptcy Court seeking approval of the Proposed Transaction.  It is a material inducement to Purchaser to be able to acquire the Purchased Assets pursuant to the provision of § 363 of the Bankruptcy Code, including in particular free and clear of Liens pursuant to § 363(f) of the Bankruptcy Code. Therefore, any and all obligations of the Purchaser under this Agreement are subject to the entry of an Order of the Bankruptcy Court (the "***Approval Order***"), in form reasonably satisfactory to the Purchaser, approving this Agreement and the Proposed Transaction, and ordering, finding and concluding that, among other things, (i) notice of the Sale Motion and the Proposed Transaction was proper and sufficient to all parties entitled to such notice; (ii) the sale of the Purchased Assets to the Purchaser is approved pursuant to §363(b) of the Bankruptcy Code; (iii) the assumption and assignment the Assumed Contracts and Leases; (iv) the sale of the Purchased Assets to the Purchaser pursuant to this Agreement will be free and clear of all Liens pursuant to § 363(f) of the Bankruptcy Code with the Liens, if any, to attach to the Purchase Price or proceeds of the sale; (v) Purchaser has acted in good faith within the context of and is entitled to the protections of § 363(m) of the Bankruptcy Code; and (vi) authorizing and approving this Agreement as the highest and best offer for the Purchased Assets.

10.3     Appeal/Reconsideration. If an appeal is taken, or a stay pending appeal is requested or reconsideration sought, from any order approving bid procedures in connection herewith or the Approval Order, then Sellers will immediately notify Purchaser of such appeal,

15

stay or reconsideration request and will provide to Purchaser within one (1) business day a copy of the related notice of appeal or order of stay or motion for reconsideration. The Sellers will also provide Purchaser with written notice and copies of any other or further notice of appeal, motion or application filed in connection with any appeal from, or application for reconsideration of, any of such orders and related briefs.

10.4    Bidding Procedures and Order. The purchase and sale of the Purchased Assets will be subject to competitive bidding in accordance with the terms of the Bidding Procedures Order. If the Purchaser is designated as the Successful Bidder in accordance with the terms of the Bidding Procedures Order, Sellers will seek entry of the Approval Order. Sellers and Purchaser agree that, in the event that (a) Purchaser is not the Successful Bidder (as defined in the Bidding Procedures Order), (b) the transaction with the Successful Bidder does not close, and (c) Purchaser is designated as the Back-Up Bidder (as defined in the Bidding Procedures Order), Purchaser shall promptly consummate this Agreement upon the terms and conditions set forth herein (or as such terms may be amended at the Auction); provided that, Purchaser's obligation to remain as the Back-Up Bidder shall not terminate until the closing of the transaction with the Successful Bidder. Purchaser acknowledges that time is of the essence in achieving the Closing and shall take all commercially reasonable efforts to reach the Closing as quickly as possible.

**11.    Termination.**

11.1    Termination. This Agreement may be terminated and the transactions contemplated hereby may be abandoned:

(a)    by mutual written consent of the Purchaser and the Seller;

(b)    by either the Seller or the Purchaser if a Governmental Entity has issues a final and non-appealable order or taken any other final and non-appealable action, in any case having the effect of permanently restraining, enjoining or otherwise prohibiting the Proposed Transactions;

(c)    by either the Seller or the Purchaser if the Closing does not occur on or before _____, 2021 (such date, the "*Outside Closing Date*"); provided, however, that a Party is not entitled to terminate this Agreement pursuant to this section 11.1(c) if such Party's material breach of one or more of its covenants hereunder is the cause of or results in the failure of the Closing to occur on or before the Outside Closing Date.

(d)    by Purchaser if there shall occur a material breach of any of the representations, warranties, covenants or agreements of the Sellers, provided however that Purchaser agrees to provide notice thereof and a right to cure any such breach within ten (10) business days thereafter;

(e)    by Purchaser if the Bankruptcy Cases are converted to cases under Chapter 7 of the Bankruptcy Code;

(f)    by Sellers if there shall occur a material breach of any of the representations, warranties, covenants or agreements of Purchaser, provided however that Sellers

16

agree to provide notice thereof and a right to cure any such breach within ten (10) business days thereafter; and

(g)    by Purchaser regarding the Title Policy pursuant to Section 7.8.

11.2    Effect of Termination.  If the Agreement is terminated pursuant to section 11.1 then this Agreement will become void and of no further force and effect, with no liability or obligation on the part of the Parties, provided, however, that if the Agreement is terminated by the Sellers pursuant to section 11.1(f), the Purchaser shall forfeit the Deposit and any interest thereon and such amounts shall be delivered to the Sellers.

11.3    No Survival. No representations or warranties shall survive the Closing Date.

**12.     General**.

12.1    No Agreement to Assign.   With the exception of the Facility Lease, this Agreement shall not constitute an agreement to assign or transfer and shall not affect the assignment or transfer of any Purchased Asset if (a) an attempted assignment thereof, without the approval, authorization or consent of, or granting or issuance of any license or permit by, any third party thereto would constitute a breach thereof or (b) the Bankruptcy Court shall not have approved assumption and assignment of any Assumed Contract or Lease for any reason, including without limitation, that the cure amount is not acceptable to Purchaser (each such action in (a) and (b), a "Necessary Consent").  In such event, Seller and Purchaser shall use their commercially reasonable efforts, to obtain the Necessary Consents with respect to any such Assumed Contract after the Closing; provided that the failure to obtain any Necessary Consent shall not delay the Closing or give rise to a reduction in the Purchase Price.

12.2    **WAIVER/JURISDICTION.  TO THE FULL EXTENT PERMITTED BY APPLICABLE LAW, SELLER AND PURCHASER HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVE ALL RIGHT TO TRIAL BY JURY IN ANY ACTION, SUIT OR PROCEEDING THAT RELATES TO OR ARISES OUT OF THIS AGREEMENT. IF ANY ACTION, SUIT OR PROCEEDING IS BROUGHT BY EITHER SELLER OR PURCHASER ARISING OUT OF THIS AGREEMENT, SELLER AND PURCHASER AGREE THAT THE BANKRUPTCY COURT SHALL HAVE EXCLUSIVE JURISDICTION OVER THE ACTION, SUIT OR PROCEEDING.**

12.3    Construction. This Agreement shall be construed and enforced in accordance with the internal laws of the State of Tennessee without regard to principles of conflicts of laws.

12.4    Notices. Any notices or other communications required or permitted hereunder shall be in writing and shall be considered to have been duly given, when received, if delivered by hand, email, telegram, overnight courier:

(a)    If to Seller, to:

Gary Murphey, solely in his capacity as chapter 11 trustee
Resurgence Financial Services, LLC
3330 Cumberland Blvd., Suite 500

17

Atlanta, GA 30339
Phone: (404) 886-9104
Email: Murphey@RFSLimited.com

With a copy (which shall not constitute notice) to:

David Gordon, Esq.; Bobby Guy, Esq.
Polsinelli PC
1201 West Peachtree St. NW, Suite 1100
Atlanta, GA 30309
Phone: (404) 253-6005
Email: dgordon@polsinelli.com; bguy@polsinelli.com

(b)     If to the Purchaser, to:

12.5    Entire Agreement and Amendments. This Agreement, together with the Schedules attached hereto, and all documents contemplated by this Agreement, contain all of the terms agreed upon by the Parties with respect to the subject matter hereof, and supersede all prior agreements and understandings among the parties and may not be changed or terminated orally. No attempted amendment, change, termination or waiver of any of the provisions hereof shall be binding unless in writing and signed by the party against whom the same is sought to be enforced.

12.6    Additional Documents.  After the Closing Date, each Party shall, at the request of any other, furnish, execute and deliver such documents and instruments as the requesting Party shall reasonably require as necessary or desirable to carry out the transactions contemplated hereunder.

12.7    Paragraph Headings. Paragraph headings herein have been inserted for reference only and shall not be deemed to limit or otherwise affect, in any matter, or be deemed to interpret in whole or part, any of the terms or provisions of this Agreement.

Third Parties. Nothing in this Agreement, whether express or implied, is intended to confer any rights or remedies on any persons other than the parties hereto and their respective successors and permitted assigns, nor is anything in this Agreement intended to relieve or discharge the obligation or liability of any third persons to any party to this Agreement.

12.9    Severability. If any one or more of the provisions contained in this Agreement shall be invalid, illegal or unenforceable in any respect of any reason, the validity, legality and enforceability of any provision in every other respect and of the remaining provisions of this Agreement shall not be in any way impaired.

12.10   <u>Counterparts</u>. This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

12.11   <u>Jurisdiction and Venue</u>. This Agreement shall be subject to the jurisdiction of the Bankruptcy Court, and if the Bankruptcy Court lacks jurisdiction for any reason, then the state and federal courts overseeing Sullivan County, Tennessee.

12.12   <u>Time is of the Essence</u>. Time is of the essence of each provision hereof.

12.13   <u>Construction</u>. Should any provision of this Agreement require judicial interpretation, it is agreed that the court interpreting or construing the same shall not construe this Agreement against one party more strictly by reason of any rule of interpretation which relates to preparation of a document, it being agreed that the agents of all parties have participated in the preparation of this Agreement and that legal counsel was consulted by each party prior to its execution hereof.

**IN WITNESS WHEREOF**, the parties have executed this Asset Purchase Agreement as of the day and year first above written.

**PURCHASER:**

_____

By: _____

_____

**SELLERS:**

**NEOPHARMA INC.**

By: _____


**NEOPHARMA TENNESSEE LLC**

By: _____

# SCHEDULE 1.1

### [Defined Terms]

For purposes of this Agreement, the following terms shall be defined as follows:

"Actions" means any claim, hearing, charge, action, suit, arbitration, litigation, mediation, grievance, audit, examination, inquiry, proceeding or investigation by or before any Governmental Entity.

"Aggregate Cure Amount" has the meaning set forth in Section 3.1.

"Agreement" has the meaning set forth in the Preamble.

"ANDA" means an Abbreviated New Drug Application as defined by the FDA.

"Approval Order" has the meaning set forth in Section 10.2.

"Assumed Contracts and Leases" has the meaning set forth in the Recitals.

"Bankruptcy Cases" has the meaning set forth in the Recitals.

"Bankruptcy Code" means title 11 of the United States Code.

"Bankruptcy Court" has the meaning set forth in the Recitals.

"Bidding Procedures Order" means the Bankruptcy Court's [ORDER TITLE] [Docket No. __].

"Business" has the meaning set forth in the Recitals.

"Closing" has the meaning set forth in Section 4.1.

"Closing Date" has the meaning set forth in Section 4.1.

"Closing Date Payment" has the meaning set forth in Section 3.1.

"Contracts and Leases" has the meaning set forth in the Recitals.

"Cure Costs" means, with respect to any of the Assumed Contracts and Leases, the amount required to be paid under section 365 of the Bankruptcy Code to effectuate the assumption and assignment of such executory contract or unexpired lease by the Sellers to the Purchaser, as determined by the agreement of the parties to such executory contract or lease or by order of the Bankruptcy Court.

"Deposit" has the meaning set forth in Section 3.2.

"<u>Employees</u>" means the employees of the Sellers as of the date of this Agreement, which shall be listed in a schedule to be provided by the Seller to the Purchaser by no later than _____, 2021 (accompanied by a list of Sellers' employees as of the date of the Furlough).

"<u>Environmental Laws</u>" means any and all applicable Laws which (a) regulate or relate to the protection or clean-up of the environment, the use, treatment, storage, transportation, handling, disposal or release of Hazardous Substances, the preservation or protection of waterways, groundwater, drinking water, air, wildlife, plants or other natural resources, or the health and safety of persons or property, including protection of the health and safety of employees or (b) impose liability or responsibility with respect to any of the foregoing, including the Comprehensive Environmental Response, Compensation and Liability Act (42 U.S.C. § 9601 *et seq.*), or any other Law of similar effect.

"<u>Excluded Assets</u>" has the meaning set forth in Section 2.3.

"<u>Excluded Liabilities</u>" has the meaning set forth in Section 2.5.

"<u>Execution Date</u>" has the meaning set forth in the Preamble.

"<u>Facility Lease</u>" has the meaning set forth in the Recitals.

"<u>FDA</u>" has the meaning set forth in the Recitals.

"<u>FDCA</u>" means the U.S. Food, Drug and Cosmetic Act of 1938, as amended.

"<u>Fifth Street Property</u>" has the meaning set forth in the Recitals.

"<u>Fourth Street Property</u>" has the meaning set forth in the Recitals.

"<u>Furlough</u>" means the temporary pause of operations of the Sellers in early August 2020.

"<u>Government Authorizations</u>" has the meaning set forth in Section 2.2(e).

"<u>Governmental Entity</u>" has the meaning set forth in Section 2.2(e).

"<u>Hazardous Substances</u>" means any noxious, toxic, or hazardous substance, material or waste, and any contaminant, chemicals, pollutant or constituent thereof including petroleum, or petroleum products, asbestos or any asbestos containing material, or lead containing paint or coating material.

"<u>HIPAA</u>" means the Health Insurance Portability and Accountability Act of 1996, as amended and supplemented by the Health Information Technology for Clinical Health Act of the American Recovery and Reinvestment Act of 2009.

"<u>IND</u>" means means an Investigational New Drug Application submitted to the FDA pursuant to 21 C.F.R. Part 312 (as amended from time to time) with respect to the Products, or the equivalent application or filing submitted to any equivalent agency or Governmental Entity outside the United States of America (including any supra-national agency such as the EMA),

and all supplements, amendments, variations, extensions and renewals thereof that may be submitted with respect to the foregoing.

"Indebtedness" means with respect to any person, all obligations for borrowed money.

"Industrial Drive Property" has the meaning set forth in the Recitals.

"Intangible Rights" has the meaning set forth in Section 2.2(a).

"Inventory" has the meaning set forth in Section 2.2(h).

"Law" means any law (including common law), statute, requirement, code, rule, regulation, order, ordinance, judgment or decree or other pronouncement of any Governmental Entity.

"Liens" has the meaning set forth in Section 2.1.

"Material Adverse Change" means any state of facts, change, event, effect or occurrence that has, or reasonably expected to have, a material adverse effect on the business, financial condition or results of operations of the Seller taken as a whole, other than any state of facts, change, event, effect or occurrence resulting from (i) economic, financial market or geopolitical conditions in general (including the cost and availability of debt or equity financing), (ii) changes in law or applicable accounting regulations or principles or interpretations thereof, (iii) conditions in the healthcare or pharmaceutical industry generally, (iv) any outbreak or escalation of hostilities or war or any act of terrorism, (v) any weather condition, earthquake or natural disaster, (vi) epidemic, pandemic or disease outbreaks (including the COVID-19 virus), public health emergencies (as declared by an applicable Governmental Authority) or quarantine restrictions implemented by any applicable Governmental Authority, whether negatively affecting the Business specifically or negatively affecting economic conditions generally, (vii) the execution of this Agreement, the announcement of this Agreement and the Transaction (including any action or inaction as a result thereof by the employees, customers, vendors or competitors of the Seller), (viii) actions taken or consented to by Purchaser pursuant to this Agreement, and (ix) Seller's status as a debtor in bankruptcy and ordinary course or typical events taking place during the bankruptcy.

"NDA" means a new drug application for a drug submitted to the FDA pursuant to 21 C.F.R. Part 314 (as amended from time to time), and all amendments or supplements thereto, including all documents, data and other information concerning the applicable drug which are necessary for FDA approval to market such drug in the United States, and any equivalent application submitted to any other health authority.

"NDC" means the unique, three-segment National Drug Code issued by the FDA that serves as a universal product identifier for pharmaceuticals, or the equivalent in countries outside of the United States.

"Neopharma" has the meaning set forth in the Preamble.

"Neopharma Bankruptcy Case" has the meaning set forth in the Recitals.

"Neopharma LLC" has the meaning set forth in the Preamble.

"Neopharma LLC Bankruptcy Case" has the meaning set forth in the Recitals.

"Outside Closing Date" has the meaning set forth in Section 11.1(c).

"Parties" has the meaning set forth in the Preamble.

"Permitted Liens" has the meaning set forth in Section 2.1.

"Pharmaceutical Business" has the meaning set forth in the Recitals.

"Products" has the meaning set forth in the Recitals.

"Proposed Transaction" has the meaning set forth in the Recitals.

"Purchase Price" has the meaning set forth in Section 3.1.

"Purchased Assets" has the meaning set forth in the Recitals.

"Purchaser" has the meaning set forth in the Preamble.

"Real Property" has the meaning set forth in the Recitals.

"Regulatory Authority" means any national or supranational governmental authority, including the FDA, with responsibility for granting any Regulatory Authorizations with respect to the Products.

"Regulatory Authorizations" means any approvals, clearances, authorizations, registrations, certifications, licenses or permits granted by any Regulatory Authority.

"Tax" or "Taxes" means any and all U.S. federal, state, local and non-U.S. taxes, assessments, levies, duties, tariffs, imposts and other similar charges and fees imposed by any Governmental Entity, including income, franchise, windfall or other profits, gross receipts, property, sales, use, net worth, capital stock, payroll, employment, social security, workers' compensation, unemployment compensation, excise, withholding, ad valorem, stamp, transfer, value-added, occupation, environmental, disability, real property, personal property, registration, alternative or add-on minimum, or estimated tax, including any interest, penalty, additions to tax and any additional amounts imposed with respect thereto.

"Tax Return" means any report, return, certificate, claim for refund, election, estimated Tax filing or declaration filed or required to be filed with any Governmental Entity with respect to Taxes, including any schedule or attachment thereto, and including any amendments thereof.

"Taxing Authority" means any federal, state, local or foreign Governmental Entity or authority responsible for the imposition, collection or administration of any Tax.

"Title Policy" shall have the meaning set forth in Section 7.8.

"Transferred Employees" means each Employee (and any former employee who would be an Employee except for, as a result of the Furlough, having ceased employment or been furloughed) with respect to whom the Purchaser has offered employment and such Employee has accepted such employment extended by the Purchaser.

"Trustee" has the meaning set forth in the Recitals.

## SCHEDULE 2.1

[Permitted Liens]

## SCHEDULE 2.2(a)

[Trademarks and Trade Names]

## SCHEDULE 2.2(b)

[Products and Drug Authorizations][1]

**Amoxil**

NDA 50-542
NDA50-754
NDA 50-760
NDA50-761

ANDA62-216
ANDA62-226

**Augmentin**

IND 16,896

NDA50-564
NDA 50-575
NDA50-597
NDA 50-725
NDA 50-726
NDA 50-755
NDAS0-720
NDA 50-785

**Tripacks**

ANDA 20-4610
ANDA 20-5316

---

[1] [NTD:  This Schedule needs to be confirmed]

# SCHEDULE 2.2(g)

[Fixed and Tangible Assets]

# SCHEDULE 2.2(h)

[Inventory]

**SCHEDULE 2.2(l)**

[Real Property]

## SCHEDULE 2.2(m)

[Assumed Contracts and Leases]

## SCHEDULE 3.2

[Form of Escrow Agreement]

[Title Company is anticipated to be the Escrow Agent]