## UNITED STATES BANKRUPTCY COURT
### EASTERN DISTRICT OF TENNESSEE

| | |
|---|---|
| In re | Case No. 2:20-bk-52015-SDR |
| NEOPHARMA, INC., | Chapter 11 |
| Debtor. | |

| | |
|---|---|
| In re | Case No. 2:20-bk-52016-SDR |
| NEOPHARMA TENNESSEE LLC, | |
| Debtor. | Jointly Administered |

## NOTICE OF EXTENSION OF STALKING HORSE DESIGNATION DEADLINE AND OF STALKING HORSE DESIGNATION

**PLEASE TAKE NOTICE** that, on January 27, 2021, the official committee of unsecured creditors in the above-captioned cases (the "Committee") filed a motion [Docket No. 118] (the "Bidding Procedures Motion") seeking entry of an order (the "Bidding Procedures Order") (i) authorizing the Committee to market the Debtors' assets for sale (the "Sale"), (ii) approving certain bidding procedures (the "Bidding Procedures"),[1] (iii) approving the form of Asset Purchase Agreement, (iv) approving a stalking horse bid and certain bid protections, (v) authorizing the Committee chairperson or the Committee's designee to execute all necessary documents in furtherance of the sale process and (vi) granting certain related relief.

**PLEASE TAKE FURTHER NOTICE** that, on January 29, 2021, the Court appointed Gary M. Murphey as the chapter 11 trustee for the Debtors (the "Chapter 11 Trustee"). On February 12, 2021, the Chapter 11 Trustee filed the *Joinder to the Motion of Official Committee of Unsecured Creditors for an Order (i) Authorizing The Committee to Market the Debtors' Assets for Sale, (ii) Approving Bidding Procedures, (iii) Approving the Form of Asset Purchase Agreement, (iv) Approving a Stalking Horse Bid and Certain Bid Protections, (v) Authorizing the Committee Chairperson or the Committee's Designee to Execute Transaction Documents, and (vi) Granting Related Relief* (the "Trustee Joinder"), pursuant to which the Chapter 11 Trustee joined the Committee's Bidding Procedures Motion.

**PLEASE TAKE FURTHER NOTICE** that, on February 18, 2021, the Court entered the Bidding Procedures Order [Docket No. 185], approving, among other things, the Bidding Procedures, which establish key dates and times relating to the Sale and the Auction.

**PLEASE TAKE FURTHER NOTICE** that the Bidding Procedures and the Bidding Procedures Order set March 1, 2021 as the Stalking Horse Designation Deadline. The Bidding

---

[1] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Bidding Procedures or the Bidding Procedures Order, as applicable.

Procedures and the Bidding Procedures Order set March 16, 2021 at 4:00 p.m. as the Sale Objection Deadline.

**PLEASE TAKE FURTHER NOTICE** that, on March 9, 2021, in accordance with the Bidding Procedures and the Bidding Procedures Order, the Chapter 11 Trustee and the Committee, in consultation with the U.S. Trustee, extended the Stalking Horse Designation Deadline through and including March 15, 2021 [Docket No. 221].

**PLEASE TAKE FURTHER NOTICE** that, in accordance with the Bidding Procedures and the Bidding Procedures Order, the Chapter 11 Trustee and the Committee, in consultation with the U.S. Trustee, **hereby extend the Stalking Horse Designation Deadline through and including March 17, 2021**. The Chapter 11 Trustee and the Committee, in consultation with the U.S. Trustee, also **hereby extend the Sale Objection Deadline to March 29, 2021 at 4:00 p.m. (prevailing Eastern Time).**

**PLEASE TAKE FURTHER NOTICE** that, in accordance with the Bidding Procedures and the Bidding Procedures Order, the Chapter 11 Trustee and the Committee **hereby designate American Antibiotics, LLC as the Stalking Horse**. On the date hereof, the Chapter 11 Trustee, on behalf of the Debtors, and the Stalking Horse executed a Stalking Horse Agreement. As required under the Bidding Procedures and the Bidding Procedures Order, the Chapter 11 Trustee and the Committee disclose the following information related to the Stalking Horse and the Stalking Horse Agreement:

**Identity of Stalking Horse**: American Antibiotics, LLC, a Georgia limited liability company.

**Purchase Price**: On the Closing Date, the Purchaser shall pay Four Million Dollars ($4,000,000.00) for the Purchased Assets, less the Deposit to the Sellers on the Closing Date, plus assume certain liabilities.

**Amount of Stalking Horse Deposit**: Contemporaneous with the execution of the Stalking Horse Agreement, Stalking Horse agrees to deposit into escrow ten percent (10%) of the Purchase Price, consisting of the sum of $400,000.00 pursuant to the terms of an escrow agreement in a form to be attached to the Stalking Horse Agreement. In the event the Stalking Horse is the Successful Bidder, the Deposit will be applied to the Purchase Price at Closing.

**Amount and Nature of Bid Protections**: In the event the Stalking Horse is not in breach of the Stalking Horse Agreement and has not terminated the Stalking Horse Agreement before the Outside Closing Date, and (i) the Bankruptcy Court approves a sale of all or some of the Purchased Assets to a purchaser other than Purchaser which is consummated by Sellers, (ii) Sellers enter into a definitive agreement for a transaction other than the Proposed Transaction which is consummated by Sellers; (iii) Sellers file a plan of reorganization that does not contemplate a sale of the Purchased Assets to Purchaser and a plan is confirmed, or (iv) Sellers otherwise breach the Stalking Horse Agreement and subsequently sell all or some of the Purchased Assets to a purchaser other than Stalking Horse which is consummated by Sellers, Sellers shall be required to pay to Purchaser a break-up fee in an amount equal to five percent (5.0%) of the Purchase Price (the "Break-Up Fee"). The Break-Up Fee will be deemed an allowed superpriority administrative expense claim of

Stalking Horse under Section 364(c)(1) of the Bankruptcy Code with priority over any and all administrative expenses of any kind, including, without limitation, those specified in Sections 503(b) and 507(b) of the Bankruptcy Code and shall be paid at closing from the sales proceeds prior to the payment of any other amounts.

The Debtors also agree to use their best efforts in the exercise of their discretion under (or to amend) the Bidding Procedures Order to require that any bid that includes a cash component of at least $4,500,000 and otherwise complies with the Bidding Procedures Order will be deemed a Qualified Bid.

**PLEASE TAKE FURTHER NOTICE** that a copy of the Stalking Horse Agreement, without Schedules, is attached hereto as "**Exhibit A**". The Schedules to the Stalking Horse Agreement may be obtained by contacting the undersigned counsel for the Chapter 11 Trustee or the Committee.

**Dated March 17, 2021,**

POLSINELLI PC

/s/ *David E. Gordon*            
David E. Gordon
Georgia Bar No. 111877 (admitted *Pro Hac Vice*)
Caryn E. Wang
Georgia Bar No. 542093 (admitted *Pro Hac Vice*)
1201 West Peachtree Street NW
Atlanta, Georgia 30309
Telephone: (404) 253-6000
Facsimile: (404) 684-6060
dgordon@polsinelli.com
cewang@polsinelli.com


– and –

Michael Malone (Tenn. Bar No. 031219)
401 Commerce Street, Suite 900
Nashville, TN 37219
Telephone: (615) 259-1510
Facsimile: (615) 259-1573
mmalone@polsinelli.com

*Counsel to Gary M. Murphey*
*As Chapter 11 Trustee*

/s/ *Gregory C. Logue*            
WOOLF, MCCLANE, BRIGHT, ALLEN & CARPENTER, PLLC
Gregory C. Logue
(Tenn. Bar. No. 012157)
900 S. Gay Street, Suite 900
Knoxville, TN 37902
Telephone: (865) 215-1000
glogue@wmbac.com


– and –

BUCHALTER, P.C.
Jeffrey K. Garfinkle
(Cal Bar. No. 153496; Wash. Bar No. 55968)
(Admitted *Pro Hac Vice*)
Julian I. Gurule
(Cal. Bar. No. 252160)
(Admitted *Pro Hac Vice*)
18400 Von Karman Ave., Suite 800
Irvine, CA 92612
Telephone: (949) 760-1121
jgarfinkle@buchalter.com
jgurule@buchalter.com

*Counsel to Official Committee of Unsecured Creditors*

## **Exhibit A**

(Stalking Horse Agreement)

*EXECUTION COPY*

## ASSET PURCHASE AGREEMENT

THIS ASSET PURCHASE AGREEMENT (as amended from time to time, the "***Agreement***") is made as of March 16, 2021 (the "***Execution Date***") by and among the following: (i) American Antibiotics, LLC, a Georgia limited liability company ("***Purchaser***"), and (ii) Gary Murphey, solely in his capacity as Chapter 11 trustee ("***Trustee***") of, and on behalf of, Neopharma, Inc., a Delaware corporation ("***Neopharma***") and Neopharma Tennessee, LLC, a Delaware limited liability company ("***Neopharma LLC***" and together with Neopharma, "***Sellers***").  Purchaser and Sellers are referred to collectively as the "***Parties***."

The Agreement is based upon the following recitals of fact, and each of the Parties acknowledges that each of the following is entirely true and correct:

### RECITALS:

A.     Sellers own and operate, or have operated various assets comprising a pharmaceuticals manufacturing, processing, testing, warehousing, packaging and distribution business located in Bristol, Tennessee that includes the manufacture of plastic bottles that are utilized to bottle pharmaceutical products (the "***Business***").  In addition, Sellers are engaged in the business of, directly or indirectly, developing, making or having made, promoting, using, licensing and selling certain assets related to its pharmaceutical products under certain trademarks related to certain antibiotic products (collectively, the "***Products***").

B.     Sellers further own various drug applications issued by the United States Food and Drug Administration (the "***FDA***") pursuant to which Neopharma produces or has produced and markets or has marketed the Products.  The Business, together with the Products, is referred to as the "***Pharmaceutical Business***".

C.     Neopharma is the sole member and managing member of Neopharma LLC. Neopharma LLC owns or leases certain real property and improvements including each of the following:  (i) an antibiotic manufacturing facility, processing, testing, packaging, warehouse, distribution and print shop located at 201 Industrial Drive, Bristol, Tennessee (the "***Industrial Drive Property***"); (ii) a plastics processing facility located at 605 5th Street, Bristol, Tennessee (the "***Fifth Street Property***") and (iii) certain vacant land located at 4th Street, Bristol, Tennessee (the "***Fourth Street Property***").  The Industrial Drive Property, the Fifth Street Property and the Fourth Street Property are referred to collectively the "***Real Property***".

D.     The Pharmaceutical Business is located on and operated from the Industrial Drive Property and the Fifth Street Property.

E.     Neopharma LLC also owns certain equipment, machinery, fixtures, furniture, furnishings and other personal property located on the Real Property utilized by Neopharma in the Pharmaceutical Business.

F.     Neopharma LLC is a party to a certain Facility Lease Agreement dated September 28, 2018 with the Industrial Development Board of the City of Bristol, Tennessee (the "***Facility Lease***", and the real property improvements subject thereto, the "***Facility Lease Premises***").  In

1

addition, and in the ordinary course of business the Sellers have entered into and remain obligated under certain executory contracts and unexpired leases of real and personal property (collectively, the "***Contracts and Leases***").  The Facility Lease and certain of those Contracts and Leases are to be assumed and assigned to the Purchaser as part of the Proposed Transaction described in this Agreement (collectively, the "***Assumed Contracts and Leases***").

G.      On the terms and conditions set forth in this Agreement, the Purchaser desires to purchase from Sellers, and Sellers desire to sell to Purchaser (the "***Proposed Transaction***"), all of the Sellers' right, title and interest in, to and under the various assets, property and business more particularly described below, the "***Purchased Assets***" which includes (i) all of the Real Property, the Assumed Contracts and Leases, and (ii) the other assets, property and business associated with the Pharmaceutical Business, in each instance, free and clear of all Liens, in accordance with Section 105, 363 and 365 and other applicable provisions of the Bankruptcy Code and the Bankruptcy Rules.

H.      The Parties acknowledge that in every respect, the Proposed Transaction has been negotiated at arm's length and in good faith and without the intent to hinder, delay or defraud creditors of the Sellers.

I.      On December 22, 2020, Neopharma commenced a chapter 11 bankruptcy case in the United States Bankruptcy Court for the Eastern District of Tennessee (the "***Bankruptcy Court***") as case no. 2:20-bk-52015-SDR (the "***Neopharma Bankruptcy Case***").  Also on December 22, 2020, Neopharma LLC commenced a chapter 11 bankruptcy case in the Bankruptcy Court as case no. 2:20-bk-52016-SDR (the "***Neopharma LLC Bankruptcy Case***," and together with the Neopharma Bankruptcy Case, the "***Bankruptcy Cases***").

J.      On January 29, 2021, the Bankruptcy Court appointed Gary Murphey as the Chapter 11 trustee in the Neopharma and Neopharma LLC Bankruptcy Cases.

K.      Sellers have determined that the offer of Purchaser for the Purchased Assets (i) is the highest and best price for the Purchased Assets, (ii) the sale of the Purchased Assets as a whole is in the best interest of Sellers, the respective creditors of Sellers and their bankruptcy estates and (iii) constitutes a fair and adequate purchase price for the Purchased Assets.

L.      The Parties intend that Purchaser be designated as the Stalking Horse Bidder (as defined in the Sales Procedures Order).

**NOW, THEREFORE**, for good and valuable consideration and in consideration of the performance of the mutual covenants and agreements contained herein, the receipt and adequacy of which are conclusively acknowledged, the Parties agree as follows:

1.      **Incorporation of Recitals; Definitions and Rules of Construction**.

1.1     As used in this Agreement each of the words and phrases that are capitalized shall have the meaning ascribed to them in Schedule 1.1.

1.2     The recitals set forth above are incorporated by this reference.

2

2.    **Purchase and Sale of Assets of the Pharmaceutical Business**.

2.1    Assets of the Pharmaceutical Business. Subject to the terms and conditions hereof and on the basis of the representations, warranties and covenants contained herein, Sellers agree to sell, assign, transfer, convey, grant and deliver to Purchaser, and Purchaser agrees to purchase from Sellers the Purchased Assets, described as all of Sellers' respective right, title and interest in, to and under all of the tangible and intangible real and personal property, assets and rights located at or used in connection with the Pharmaceutical Business, including all the assets set forth below (excepting only those assets specifically identified as "***Excluded Assets***" in Section 2.3 herein), free and clear of and expressly excluding any and all liens, claims (including as defined in 11 U.S.C. § 101(5)), losses, damages, penalties, suits, legal actions, expenses, and encumbrances of any kind, character or description whatsoever, including any mortgage, deed of trust, pledge, security interest, hypothecation, assignment, statutory or other lien, charge, or other encumbrance of any kind or nature whatsoever (including, without limitation, pursuant to any conditional sale or other title retention agreement, any financing lease having substantially the same economic effect as any of the foregoing, and the filing of any financing statement under the UCC or comparable law of any jurisdiction to evidence any of the foregoing) on personal or real property or fixtures (collectively, the "***Liens***") except for the Permitted Liens as set forth on Schedule 2.1 (collectively, the "***Permitted Liens***").

2.2    The Purchased Assets include the following:

(a)    All of Sellers' right, title and interest in trademarks, trade names, service marks, recipes, formulas, patents, patent applications, renewals, extensions, reissues, divisions, continuations, continuations-in-part, reexaminations, utility models, inventions and discoveries, statutory invention registrations, copyrights, methods, licenses, processes and know-how relating to the Pharmaceutical Business in all jurisdictions worldwide, whether owned, used or licensed by Sellers, including those trademarks and patents licensed to the Seller as set forth on Schedule 2.2(a) and the goodwill of the Pharmaceutical Business as a going concern (collectively, the "***Intangible Rights***");

(b)    The Products and Neopharma's drug authorizations including the documents referenced in the complete regulatory chronology for each IND, DMF, NDA or ANDA for the applicable Products, whether such IND, DMF, NDA or ANDA exist now or in the past, whether currently marketed or discontinued, and whether filed, approved or pending, including those set forth on Schedule 2.2(b);

(c)    All of Sellers' right, title and interest in and to all confidentiality agreements, non-disclosure agreements, non-compete agreements relating to the assignment of ideas and inventions to Sellers by current or past employees;

(d)    The names "Neopharma," and "Neopharma Tennessee, LLC" and any associated logos or marks;

(e)    To the extent assignable, all applications, consents, approvals, licenses, permits, franchises, filings or authorizations, including certificates of occupancy (collectively, "***Governmental Authorizations***"), granted by any public or governmental entity,

3

including federal, state or local, department, bureau, commission, agency and similar bodies or authority including the FDA (collectively, the "*Governmental Entities*" and, individually, each a "*Governmental Entity*") in connection with the operation of the Pharmaceutical Business, the Intangible Rights and the Real Property;

(f)     All of Sellers' right, title and interest in and to the Facility Lease and all buildings, fixtures, appurtenances and other leasehold improvements located at the Real Property and maps, reports, plans, easements, access rights, parking spaces, title documents, surveys, construction contracts, warranties, reports, drawings including the drawings that show the information technology, data recording and retrieval, electrical, mechanical, heating ventilating, air conditioning and plumbing systems that serve the buildings, site plans, as-built plans, permits and other materials having to do with the Real Property and the Pharmaceutical Business;

(g)     All of the fixed and tangible assets owned by Sellers and used in the maintenance and operation of the Pharmaceutical Business, including the machinery, apparatus, appliances, furniture, fixtures, trade fixtures, signs, equipment, computers, computer hardware and computer-related software, information technology systems and servers, services, replacement parts and other physical assets including the tangible assets located or stored at the Real Property;

(h)     To the extent assignable, all raw materials, work-in-process, finished goods, supplies (including clinical drug supplies), samples, components, packaging materials and other inventories to which Sellers have title, located on, warehoused or stored at the Real Property, including all goods, merchandise and other personal property owned, excipients inert materials, bottles, plastic, packaging, materials and supplies of every nature which contribute to the manufacturing, processing, testing, bottling, packaging, release and distribution of finished products of Sellers in the ordinary course of the Pharmaceutical Business, including what is described on Schedule 2.2(h) (collectively, the "*Inventory*");

(i)     All warranties and similar rights in favor of Sellers with respect to the Purchased Assets;

(j)     Originals, if available, or copies of all customer lists and supplier lists to the extent related to the Business or the Purchased Assets;

(k)     the Real Property, including what is described in Schedule 2.2(k), together with tax credits, benefits or incentives or the like, including but not limited to the tax credits, benefits or incentives available pursuant to the Payment in Lieu of Tax agreement together with all documents, instruments and agreement for the benefit or in favor of Sellers in connection therewith (collectively, the "*PILOT Agreement*") in connection with the Real Property (to the extent assignable and still in force) that have accrued or are related or incidental to the Real Property, to the extent such credits, benefits, or incentives are assignable and still in force;

(l)     all of Sellers' rights under the Assumed Contracts and Leases as Purchaser may, within sixty (60) days following the Closing Date (or such shorter period of time as permitted by the Bankruptcy Court, but in no event earlier than the Closing Date), elect to assume as set forth on Schedule 2.2(l) or not assume (with Seller's right to update such schedule to add or remove any Contract or Lease), in Purchaser's discretion; and if a Cure Amount exceeds

4

an amount acceptable to Purchaser in its sole discretion, such Contract or Lease shall not be assumed and assigned, and shall not be an Assumed Contract and Lease. In each instance, Purchaser shall be obligated to cure any defaults under the Assumed Contracts and Leases, and shall provide adequate assurance of future performance to the extent determined by the Bankruptcy Court. Purchaser shall also be entitled to accounts receivable owed by a pharmaceutical distributor (i) whose distribution contract is an Assumed Contracts or Leases, or (ii) whose unsaleable inventory claim against the estate is eliminated by Purchaser replacing such inventory following Closing (collectively "***Distributor A/R***"); and

      (m)     The Acquired Causes of Action.

     2.3   <u>Excluded Assets</u>. The Purchased Assets shall not include any and all right, title and interest of Sellers, if any, in and to the following assets (collectively, the "***Excluded Assets***"):

      (a)     tax returns and other records which are not directly related to or reasonably necessary to the conduct of the Pharmaceutical Business;

      (b)     all accounts held and generated in the ordinary course of Pharmaceutical Business (except as set out in Section 2.2(l));

      (c)     cash or cash equivalents, including bank accounts and the Purchase Price, as defined below;

      (d)     all utility, security, and other deposits and prepaid items;

      (e)     any tax refunds, tax benefits or other benefits relating to periods prior to the Closing Date, which are and shall remain exclusively the property of Seller;

      (f)     the capital stock of or membership interests in Sellers;

      (g)     all Contracts and Leases that are not Assumed Contracts and Leases, (including any equipment or IP leased or licensed under such Contracts and Leases); and

      (h)     all causes of action, demands, judgments, claims (including insurance claims), indemnity rights (to the extent assignable to Purchaser), setoffs, recoupments, or other similar right of Sellers, including all avoidance or other claims of the Sellers or their bankruptcy estates including without limitation those that may exist against Sellers' prior management pursuant to any provision of the Bankruptcy Code or pursuant to applicable state law (collectively, the "***Causes of Action***"), provided that those Causes of Action arising under express or implied warranties from suppliers, or other third parties with respect to the Purchased Assets, or related to an Assumed Contact or Lease or counterparty to such Assumed Contract or Lease shall not be Excluded Assets (the "***Acquired Causes of Action***").

     2.4   <u>Assumed Liabilities</u>. On the terms and subject to the conditions set forth in this Agreement, at the Closing, in consideration for the sale, assignment, conveyance, transfer and delivery of the Purchased Assets to the Purchaser, the Purchaser shall assume from the Sellers and agree to pay, perform, and discharge when due in accordance with their respective terms and

5

subject to the respective conditions thereof, only the following liabilities and obligations (of any nature or kind, and whether based in common law or statute or arising under written contract or otherwise, known or unknown, fixed or contingent, accrued or unaccrued, liquidated or unliquidated, asserted or unasserted) of the Sellers (collectively, the "*Assumed Liabilities*"):

(a)      except as expressly set forth herein, all liabilities and obligations arising from the ownership, possession or use of the Purchased Assets and the operation of the business, in each case from and after the Closing;

(b)      all liabilities and obligations arising under the Assumed Contracts and Leases, arising after the Closing;

(c)      all Cure Amounts;

(d)      to the extent of any Distributor A/R, all claims related to or arising from rebates, coupon programs, chargebacks and credits of Sellers' pharmaceutical distributors, and claims related to or arising from returns or expirations of the Products of Sellers' pharmaceutical distributors;

(e)      the FDA Fees;

(f)      to the extent the PILOT Agreement is assigned, any payments required under the PILOT Agreement; and

(g)      salary/wages accrued prior to December 22, 2020 for any Employee that is employed by the Purchaser within 90 days of Closing and that remains continuously employed by the Purchaser for at least 180 consecutive days after being hired, provided that such obligations shall not exceed the amount set forth for such Employee in Schedule E/F filed in the Bankruptcy Cases as of March 1, 2021. Any such payments made pursuant to this subsection will (i) reduce, dollar for dollar, any claims such Employee has in the Bankruptcy Case, first against any priority claim, and then against any general unsecured claim, and (ii) be paid by Purchaser as W-2 wages regardless of how such amounts were incurred or categorized by the Sellers.

The Proposed Transaction contemplated by this Agreement shall in no way expand the rights or remedies of any third party against the Purchaser or Sellers as compared to the rights and remedies that such third party would have had against Sellers absent the Bankruptcy Cases had the Purchaser not assumed such Assumed Liabilities.

2.5      Excluded Liabilities.      Notwithstanding anything contained in this Agreement to the contrary, Purchaser shall not assume, be obligated to assume, be deemed to have assumed, or be obligated to pay, perform, or otherwise discharge, and the Sellers shall be solely and exclusively liable with respect to any liabilities or obligations (or any nature, and whether based on common law or statute or arising under written contract or otherwise, known or unknown, fixed or contingent, accrued or unaccrued, liquidated or unliquidated, asserted or unasserted) of the Sellers other than the Assumed Liabilities (such liabilities and obligations other than Assumed Liabilities, the "*Excluded Liabilities*").      Without limiting the foregoing, Purchaser does not assume or agree to pay, perform or otherwise discharge the liabilities or obligations (whether known or unknown, fixed or contingent, accrued or unaccrued, liquidated or unliquidated, asserted

6

or unasserted) of the Sellers with respect to, arising out of or relating to, the following Excluded Liabilities:

(a)     except as otherwise expressly set forth in this Agreement, any liability arising out of facts or circumstances in existence prior to the Closing and from or related to any breach, default under, failure to perform, torts related to the performance of, violations of law, infringements or indemnities under, guaranties pursuant to and overcharges, underpayments or penalties on the part of the Sellers under any contract, agreement, arrangement or understanding to which Sellers are a party prior to the Closing;

(b)     except as otherwise expressly set forth in this Agreement, any liability arising from or related to any action against Sellers, or related to the business, the Purchased Assets or the Assumed Liabilities, pending or threatened or based on facts, actions, omissions, circumstances or conditions existing, occurring or accruing before the Closing Date;

(c)     all Indebtedness of the Sellers (other than any obligations under the Assumed Contracts and Leases);

(d)     all guarantees of third-party Indebtedness made by the Sellers and reimbursement obligations to guarantors of the Sellers' obligations or under letters of credit or similar agreements or instruments;

(e)     all liabilities or obligations to any current or former owner of capital stock or other equity interests of the Sellers or any securities convertible into, exchangeable or exercisable for shares of capital stock or other equity interests of the Sellers, any current or former holder of indebtedness for borrowed money of the Sellers or, in respect of obligations for indemnification or advancement of expenses, any current or former officer or director of the Sellers;

(f)     all drafts or checks outstanding at the Closing under which the Sellers are obligated;

(g)     all liabilities or obligations to the extent relating to the ownership, possession or use of the Excluded Assets;

(h)     all fees, charges, expenditures, and costs incurred or otherwise payable by the Sellers in connection with the administration of the Bankruptcy Cases, including the fees and expenses of financial advisors and legal counsel, whether incurred, accrued or payable on, prior to, or after the date of this Agreement or the Closing Date;

(i)     all liabilities or obligations (x) under Environmental Laws to the extent relating to (i) facts, actions, omissions, circumstances or conditions existing, occurring or accruing, or noncompliance with or violations of Environmental Laws by the Sellers on or before the Closing Date, (ii) the transportation, off-site storage or off-site disposal of any hazardous substances generated by or on behalf of the Sellers on or before the Closing Date or (iii) real property not acquired under this Agreement, including any real property formerly owned, operated or leased by Sellers prior to the Closing Date; and (y) for toxic torts arising as a result of or in

7

77151867.5
77151867.7

connection with loss of life or injury to Persons (whether or not such loss or injury was made manifest on or after the Closing Date);

(j)   any liability relating to any Product that is or has been manufactured, tested, distributed, held or marketed by or on behalf of the Sellers arising from any recall, withdrawal, or suspension (whether voluntarily or otherwise), except to the extent that such recall, withdrawal or suspension results from Purchaser's operation of the business or the Purchased Assets following the Closing; and

(k)   all intercompany accounts payable, liabilities and obligations that are owed or payable to any Seller as to which any Seller is an obligor or is otherwise responsible or liable.

2.6   <u>Method of Conveyance</u>. The sale, transfer, conveyance, assignment and delivery by Sellers of the Purchased Assets shall occur on the Closing Date by Sellers' execution and delivery to Purchaser of one or more bills of sale, assignments, and special warranty deeds in form and scope satisfactory to Purchaser. At the Closing, Sellers shall transfer, assign, convey and deliver good, valid and indefeasible title to the Purchased Assets free and clear of all Liens.

## 3.   **Consideration**.

3.1   <u>Purchase Price</u>. On the Closing Date, the Purchaser shall pay (a) Four Million Dollars ($4,000,000.00) for the Purchased Assets (the "***Purchase Price***"), less the Deposit to the Sellers on the Closing Date (the "***Closing Date Payment***"). The Purchase Price, less the Deposit, shall be payable in immediately available federal funds.

3.2   <u>Deposit</u>. Contemporaneous with the execution of this Agreement, Purchaser agrees to deposit into escrow ten percent (10%) of the Purchase Price, consisting of the sum of $400,000.00 (the "***Deposit***") pursuant to the terms of an escrow agreement in the form attached as <u>Schedule 3.2</u>. The Deposit will be applied to the Purchase Price at Closing.

3.3   <u>Cure Amounts</u>. Purchaser shall pay the Cure Amounts for Assumed Contracts as provided by Order of the Court and <u>Section 10.3</u> below.

## 4.   **Closing**.

4.1   <u>Closing</u>. The Transaction shall close (the "***Closing***") on the second business day (the "***Closing Date***") (or as soon thereafter as may be practicable) after the conditions set forth herein in <u>Sections 8</u> (with respect to the Purchaser) and <u>9</u> (with respect to the Sellers), as applicable, shall have been satisfied or (if permissible) waived (except for such conditions that, by their nature, are to be satisfied at the Closing) or such later date as the Parties shall mutually agree.

4.2   <u>Prorations and Adjustments</u>. Purchaser and Sellers agree to prorate the following items for new services, charges or taxes that are on a bill, statement or invoice covering a time period in which the Closing Date occurs, with the Sellers to be responsible for the same through and including the Closing Date and Purchaser to be responsible for the same after the Closing Date; provided that, the parties agree that the Sellers' obligations for any prorations under

8

subparagraph (a) up to $325,000 and under subsection (b) up to $125,000 shall be reduced to the extent that the purchase price would fall below $4,000,000 without such reduction:

(a)      all real and personal property taxes and assessments related to the Purchased Assets (whether payable by Sellers as owner or lessee, and which shall be deemed to accrue ratably over the lease year to which it relates), provided however, that if the amount of taxes or assessments for the year in which Closing occurs is unknown at the time of Closing, such taxes or assessments shall be prorated based on the rate and valuation shown on the prior year's tax bill. The Parties shall, promptly upon request of Purchaser, re-prorate taxes and assessments when the figures for the year in which Closing occurs is known; and

(b)      any charges for water, electric, oil, gas, telephone and other utilities.

4.3      Utilities. Sellers shall cause any and all services for water, electric, oil, gas, telephone and other utilities to take a final reading in respect of the Pharmaceutical Business as of the Closing Date, to cause the charges therefor incurred through the Closing Date to be paid by Sellers and to notify such utilities to transfer such services to Purchaser from and after the Closing Date without interruption of service.

4.4      Expenses. Purchaser shall be solely liable for and shall pay on the Closing Date all documentary or transfer taxes, recording charges and similar taxes and charges with respect to the transfer of the Purchased Assets as well as the cost of recording all curative title documents, and the Title Policy.  Each Party shall be responsible for its own attorneys' fees and costs.

4.5      Allocation of Purchase Price. No later than five (5) business days prior to Closing, Purchaser shall prepare an allocation ("**Allocation**") of an amount totaling the sum of the (a) Purchase Price, (b) Assumed Liabilities and (c) all other capitalized costs under this Agreement among the Purchased Assets, in accordance with Section 1060 of the Internal Revenue Code of 1986, as amended, and the rules and regulations promulgated thereunder for review of Seller.  So long as Seller believes there is a good faith basis for accepting the Allocation, Seller will accept the Allocation and all tax returns filed by both parties will be consistent therewith.  Otherwise, the Parties will make commercially reasonable efforts to agree to the Allocation as of the Closing Date, and in the event they cannot, the parties may file their own allocations.

## 5.      Representations and Warranties of Sellers.

As an inducement to Purchaser to enter into this Agreement and to consummate the Proposed Transaction contemplated hereby, each Seller makes the following representations and warranties to Purchaser relating to itself and the Purchased Assets, each of which is true and correct on the Execution Date:

5.1      Organization; Good Standing.  Each Seller is duly organized, validly existing and in good standing under the Laws of the state of its formation. Each Seller is duly authorized, qualified to do business and in good standing under all applicable laws of any jurisdiction (domestic and foreign) in which the character or the location of the assets owned or leased by it or the nature of the business conducted by it requires such authorization or

9

qualification. Subject to entry of the Approval Order, each Seller has the full power and authority, corporate or otherwise, to enter into this Agreement, to carry out its obligations hereunder and to consummate the respective transactions contemplated to be consummated hereunder. The execution, delivery and consummation of this Agreement has been duly and validly authorized by each Seller through all necessary company actions on the part of Seller, none of which actions have been modified or rescinded and all of which actions remain in full force and effect.

5.2    <u>Authorization</u>. Subject to entry of the Approval Order, this Agreement constitutes a valid and binding obligation of each Seller enforceable in accordance with its terms.

5.3    <u>Non-Contravention</u>. Except as otherwise contemplated by this Agreement, each Seller's execution and delivery of this Agreement and compliance with and fulfillment of the terms of this Agreement do not (i) violate or conflict with any of the terms, conditions or provisions of any organizational or governing documents of Seller; (ii) violate any Laws applicable to Seller; (iii) subject to the entry of the Approval Order, require any approval of or any other action to be taken by any Regulatory Authority; (iv) require any approval or any other action under, conflict with, or result in any violation of or default under (with or without notice or lapse of time or both), or give rise to a right of termination, cancellation, acceleration or augmentation of any obligation, or loss of a material benefit under, or result in the creation of any Lien (except for Permitted Liens) upon any of the Purchased Assets; or (v) impair the Purchaser's ability to operate the Pharmaceutical Business.

5.4    <u>Title to Purchased Assets</u>. Sellers have good and valid legal title and beneficial ownership to the Purchased Assets. At Closing and pursuant to the Approval Order, the Sellers shall convey to Purchaser good, valid, marketable and insurable title to the Purchased Assets, free and clear of all Liens (except for Permitted Liens and Permitted Encumbrances) pursuant to sections 363(b), 363(f) and 365 of the Bankruptcy Code. No Person other than Sellers owns or holds in its name any assets, real, personal or mixed, whether tangible or intangible, used or held for use in, or otherwise relating to, the Business. Except for Permitted Liens and Permitted Encumbrances, there are no outstanding rights (including any rights of first refusal or right of first offer), options or agreements giving any Person any current or future right to require Sellers to sell or transfer to such Person or to any third party any interest in any of the Purchased Assets. The Purchased Assets constitute all of the assets used in or necessary to operate, and are adequate for the purpose of operating, the Business in the manner in which it has been operated prior to the Execution Date. There are no facts or conditions affecting the Purchased Assets that could, individually or in the aggregate, interfere in any material respect with the use, occupancy or operation of the Purchased Assets as currently used, occupied or operated, or their adequacy for such use.

5.5    <u>Condition of Purchased Assets</u>. All of the Purchased Assets are being sold "AS IS", "WHERE IS" WITH ALL FAULTS AND WITHOUT ANY REPRESENTATION OR WARRANTIES, EXPRESS OR IMPLIED, INCLUDING THE IMPLIED WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE, EXCEPT AS EXPRESSLY SET FORTH HEREIN.

77151867.5
77151867.7

5.6     Governmental Authorizations. As set forth in Schedule 5.6, Sellers have all Governmental Authorizations that are required in connection with the operation of the Pharmaceutical Business as presently conducted.

5.7     Contracts. Schedule 5.7 sets forth an accurate and complete list of each material contract and agreement of Sellers ("***Material Contracts***"). True and correct originals or, where originals are not available, copies of all Material Contracts of Sellers relating to the Purchased Assets have been delivered by Sellers to Purchaser.  Schedule 5.7 also discloses to Purchaser the Sellers' good faith estimate of the Cure Amounts for all Material Contracts and Assumed Contracts and Leases. Each Material Contract and Assumed Contract and Lease is valid and binding on Sellers in accordance with its terms and is in full force and effect. With the exception of the Bankruptcy, Seller's financial difficulties, and matters related thereto, Sellers have properly conducted and otherwise performed all material obligations required to be performed by Sellers under each Material Contract and Assumed Contract and Leases, and Sellers have not received any notice of termination, cancellation, breach of default under any contractor agreement of Sellers, including, without limitation any Material Contracts and Assumed Contracts and Leases. With the exception of the Bankruptcy, Seller's financial difficulties, and matters related thereto, to the knowledge of Sellers, no event has occurred that, with the passage of time or the giving of notice or both, would result in a default, breach or event of noncompliance by Sellers under any contract or agreement, including, without limitation any Material Contracts and Assumed Contracts and Leases, or result in the termination thereof, or would cause or permit the acceleration or other changes of any right or obligation or the loss of any benefit thereunder. To the knowledge of Sellers, no other party to any contract or agreement is in breach thereof or default thereunder.

5.8     Compliance with Laws. Except as set forth on Schedule 5.8, Neopharma has been in compliance with any Laws applicable to it or the Pharmaceutical Business. Sellers have not received any notice, correspondence or other written or oral communication of any violation, alleged violation or potential violation of any Laws applicable to it or the Pharmaceutical Business or to the effect that Sellers, or any Person acting on behalf of Sellers, are or could potentially be under investigation or inquiry with respect to any violation or alleged violation of any Law applicable to Sellers. To the knowledge of Seller's, no event has occurred, and no condition exists, that would reasonably be expected to (with or without notice or lapse of time) constitute or result directly or indirectly in a violation by Sellers of, or a failure on the part of Sellers to comply with, any Law relating to the operation and conduct of the Business.

5.9     Facility Lease.  Neopharma LLC has received no notice of termination of the Facility Lease and the Facility Lease is legal, valid, binding and in full force and effect. There are no ongoing disputes with respect to the Facility Lease. With the exception of the Bankruptcy, Seller's financial difficulties, and matters related thereto, Neopharma LLC, or any other party to the Facility Lease, is not in breach or default under the Facility Lease, and no event has occurred or circumstance exists that, with the delivery of notice, the passage of time or both, would constitute such a breach or default, or permit the termination, modification or acceleration of rent under the Facility Lease. Sellers have made available to Purchaser accurate and complete copies of the Facility Lease, as amended or otherwise modified and in effect, together with all notices and other material correspondence, estoppel certificates and subordination, non-disturbance and attornment agreements related thereto.

11

5.10   Real Property. Sellers have not been informed or received any notice of any condemnation proceedings involving the Real Property; Sellers have not been informed or received any notice of any violations of Laws involving the Real Property; except as shown in the Title Commitment (if any), Sellers have not granted any rights to purchase, rights of first refusal, right of first offer, or any other similar rights to purchase or lease the Real Property; there are no parties with a right of occupancy to the Real Property other than Sellers; and there are no parties other than Sellers in possession of the Real Property.

5.11   Environmental Matters. Except as set forth in Schedule 5.11, To the knowledge of Sellers, in its operation of the Pharmaceutical Business, Neopharma has materially complied with all Environmental Laws applicable to it, has not discharged any Hazardous Substances and has not used any above ground storage tanks or underground storage tanks. Sellers have no liability under any Environmental Law with respect to any of the Purchase Assets or the Real Property, and Sellers are not responsible for any liability of any other Person under any Environmental Law with respect to any of the Purchase Assets or the Real Property.

5.12   Labor Relations Matters. Except as set forth in Schedule 5.12, To the knowledge of Sellers, with respect to the Pharmaceutical Business, (a) Neopharma is not a party to any collective bargaining agreement and has no relationship with any labor organization; (b) to the knowledge of Neopharma, no labor organization has filed any representation petition or made any oral or written demand for recognition; and (c) to the knowledge of Neopharma, no union organizing efforts are underway or threatened.

5.13   Healthcare Regulatory Matters. Except as set forth in Schedule 5.13:

(a)   Each Seller has fulfilled and performed all of its obligations with respect to Regulatory Authorizations, including but not limited to any annual reporting requirements of the FDA or any applicable state or local agency or authority or payment of any FDA Fees. As of the date of this Agreement, no Seller has received any written notice or written communication from any Regulatory Authority (i) withdrawing or placing any of the Products on "clinical hold" or requiring the termination or suspension or investigation of any pre-clinical studies or clinical trials of the Products or (ii) alleging any violation of any Law with respect to the Products.

(b)   None of the Sellers or, to the knowledge of the Sellers, any Person acting on any Seller's behalf has, with respect to any Product, (i) been subject to a Regulatory Authority shutdown or import or export prohibition or (ii) received any FDA Form 483, or other written Regulatory Authority notice of inspectional observations, "warning letters," "untitled letters" or written demand or written request to make any change to any Product or any processes or procedures of any of the Sellers.

(c)   No Product that is or has been manufactured, tested, distributed, held or marketed by or on behalf of any Seller has been recalled, withdrawn or suspended (whether voluntarily or otherwise) or, to the knowledge of the Sellers, has been adulterated or misbranded. No Actions (whether complete or pending) seeking the recall, withdrawal, suspension or seizure of any such Product or pre-market approvals or marketing authorizations are pending or, to the

12

knowledge of the Sellers, threatened against any Seller, nor have any such Actions been pending at any time.

(d)  The Sellers have complied in all respects with all applicable security and privacy standards regarding protection of health information under (i) the Health Insurance Portability and Accountability Act of 1996, as amended by the Health Information Technology for Economic and Clinical Health Act of 2009, and their implementing regulations and agency guidance and (ii) any other applicable state or foreign privacy Laws.

5.14  Taxes.  Except as set forth in Schedule 5.14, (i) all Tax Returns required to be filed with respect to the Business, the Purchased Assets and Assumed Liabilities have been timely filed with the appropriate Taxing Authority in all jurisdictions in which such Tax Returns are required to be filed (after giving effect to any valid extensions of time in which to make such filings), and all such Tax Returns are true, complete and correct in all respects; and (ii) all amounts of Taxes payable with respect to the Business, the Purchased Assets and Assumed Liabilities have been timely paid.

5.15  Litigation. Except as described in this Agreement or filed in the Bankruptcy, there are no actions, suits or proceedings pending or threatened against Sellers or the Purchased Assets, at law or in equity, or before any governmental or administrative body or agency which would impede the Proposed Transaction, or which would prevent Sellers from being able to perform their obligations under this Agreement.

5.16  No Broker. Except for Province, LLC, Sellers have no liability for any finder's fee, brokerage commission or similar payment with respect to the Proposed Transaction.

**6.  Purchaser's Representations and Warranties**.

Purchaser hereby makes the following representations and warranties, each of which is true and correct on the Execution Date:

6.1  Organization; Good Standing. Purchaser has all power and authority to enter into and perform its obligations under this Agreement and to consummate the Proposed Transaction.

6.2  Authorization. The execution, delivery and performance of this Agreement have been duly authorized by Purchaser and no further authorization, approval or consent is required.  This Agreement constitutes a valid and binding obligation of Purchaser enforceable in accordance with its terms.

6.3  Litigation. Except as described in this Agreement, there are no actions, suits or proceedings pending or threatened against Purchaser or to which its properties, rights or assets are the subject, at law or in equity, or before any governmental or administrative body or agency which would impede the Proposed Transaction, or which would prevent Purchaser from being able to perform its obligations under this Agreement.

6.4  Non-Contravention. Except as otherwise contemplated by this Agreement, the Purchaser's execution and delivery of this Agreement and compliance with and

13

fulfillment of the terms of this Agreement do not require any authorization, consent, approval, exemption or other action by or notice to any governmental or other entity, or conflict with or result in a breach of the terms, conditions or provision of any applicable organizational and governing documents of Purchaser, or any contract to which Purchaser is a party.

6.5    Purchaser's Acknowledgement.  Purchaser recognizes that the Purchased Assets are being sold at a Chapter 11 Section 363 sale due to financial distress, and therefore Purchaser acknowledges that it has conducted its own due diligence, and except for the representations and warranties contained in this Agreement or in the other Transaction Documents, Purchaser is not relying on any other express or implied representation or warranty of Seller with respect to the Pharmaceutical Business, the Purchased Assets or the Excluded Assets, and that except for the representations and warranties contained in this Agreement or in the other Transaction Documents, all Purchased Assets are conveyed on an "As Is" and "Where Is" basis.

6.6    No Brokers.  Purchaser has no liability for any finder's fee, brokerage commission or similar payment with respect to the Proposed Transaction.

7.    **Covenants**.

7.1    Investigation. During the period from the date hereof until the Closing Date, in order to prepare for the transition of the Pharmaceutical Business, and upon reasonable request and at reasonable times, Purchaser's representatives, attorneys and accountants shall have access to: (i) the Purchased Assets, including but not limited to an inspection of the Real Property (with a designated representative of Sellers present during such inspection); (ii) the books, records, documents and files of the Sellers which relate to the Purchased Assets or business, legal and accounting due diligence matters; and (iii) certain employees and representatives of Sellers, including but not limited to the Chief Technical Officer and Director of Quality Control (with a designated representative of Sellers present during such access).  If the sale and purchase contemplated by this Agreement is not consummated, the Purchaser shall return to the Sellers or destroy (at Seller's option) all copies of documents received from Sellers as it may reasonably request.

7.2    Insurance.  Neopharma currently maintains general liability insurance on the Business that is customary for businesses such as the Business.  Schedule 7.2 reflects the status of Sellers' insurance coverages.

7.3    Utilities. Sellers will maintain water, electricity, natural gas and other utilities to the Property through the Closing to the extent currently maintained, and to the extent necessary to preserve the Purchased Assets through Closing.  Purchaser shall be obligated to maintain all utilities to the Business after the Closing Date.

7.4    Employees. Effective as of the Closing Date, the employment by Neopharma of the Employees shall terminate.  Within a reasonable amount of time after the Closing Date, Purchaser shall make reasonable efforts to offer employment to a number of employees consistent with the Purchaser's operation of the Business.  Employment shall be offered by Purchaser on commercially reasonable terms, conditions, salary, wage, and benefit levels. Nothing in this Agreement, express or implied, shall confer upon any employee of Sellers any

14

rights or remedies against Sellers or Purchaser, including any right to employment or continued employment for any period or of any nature whatsoever. Prior to Closing, upon request of Purchaser, Sellers shall provide a listing of all employees who were employed (or contracted) as of the Execution Date (and, if requested, a listing of employees who were employed at the time of the Furlough).

   7.5 <u>Further Assurances</u>. Following the Closing, the Parties shall execute and deliver such documents and take such other action as shall be reasonably requested by any other Party to carry out the Proposed Transaction. Sellers shall take all reasonable actions necessary to facilitate the orderly transition of the ownership of the Purchased Assets to Purchaser.

   7.6 <u>Existing Restrictive Covenant Agreements</u>. All non-compete, non-solicitation and restrictive covenant agreements and arrangements between Sellers and any of its personnel who are retained by Purchaser are assigned to the Purchaser as part of the Purchased Assets to the extent that the Purchaser may enforce same. To the extent (and only to the extent) of benefit and not of burden to Purchaser and to the extent permitted by legal requirements, all invention assignments and work-made-for-hire provisions regarding Sellers arising by operation of law or contract with respect to the relationship between Sellers and any of its employees or independent contractors are hereby assigned by Sellers to Purchaser.

   7.7 <u>Availability of Records</u>. After the Closing, the Sellers and the Purchaser shall make available to each other Party and their respective Representatives during normal business hours when reasonably requested, all information, records and documents in any media that are in their respective possession. The Purchaser and the Sellers shall also make available for consultation to each other during normal business hours, when reasonably requested, personnel responsible for preparing or maintaining information, records and documents, in connection with tax matters, governmental matters, healthcare regulatory matters, or litigation as it relates to any pre- or post-Closing issue.

   7.8 <u>Title Commitment and Phase I</u>. Prior to the Execution Date, Sellers have provided a certain incomplete title report or title commitment more particularly identified as ALTA Commitment For Title Insurance No. TN252102073J/30061673 having an effective date of February 12, 2021 at 8:00 a.m. (the "*Title Commitment*") for a Title Policy as issued by First National Financial Title Services, LLC, as agent for Fidelity National Title Insurance Company (the "*Title Company*"), in the VDR with regard to portions of the Real Property. One or more revisions or updates to the Title Commitment have been requested by the Sellers or Purchaser or, alternatively, have been or may be mandated by the Title Company to address various topics or issues, including the scope of the Real Property, matters associated with the PILOT Agreement (and associated transaction) and other currently unspecified matters (collectively, the "*Title Commitment Updates*"). Matters shown on the current Title Commitment have been resolved as set forth on <u>Schedule 7.8</u>, and shall be Permitted Encumbrances as long as satisfied as set out thereon or any failure to satisfy such issue is not material. Title Commitment Updates are expected to be available as soon as reasonably practicable but may not be available until following the Execution Date. Thus, to the extent the Title Commitment Updates (1) (a) contain any new "Schedule B-1 Requirements," "Schedule B-2 Standard Exceptions," or other qualifications or conditions to Title Policy issuance that are not identified in the current Title Commitment, (b) that are not Permitted Encumbrances or Permitted Liens, and (c) that reasonably could materially

15

interfere with the use or occupancy of the affected Real Property or materially and adversely affect the value or ability to obtain commercially reasonable financing of the Real Property if not removed or otherwise cured (collectively, the "*Update Objection Threshold*"), then (2) Purchaser may, but shall not be obligated to, deliver title objections (collectively, the "*Title Objection Notice*") no later than five (5) business days after Purchaser's receipt of such Title Commitment Updates.  Failure of Purchaser to provide a Title Objection Notice within such period (or to include any such matters in a timely delivered Title Objection Notice) shall be deemed Purchaser's approval of all items not so objected to by Purchaser and contained in such Title Commitment Update, and they shall then be deemed Permitted Encumbrances.  Within three (3) business days after Sellers' receipt of a Title Objection Notice, Sellers will advise whether it will cure any matters in the Title Objection Notice.  If Sellers decline to cure any one or more of such matters identified in Purchaser's Title Objection Notice (with any failure to timely respond by Sellers being deemed as Sellers so declining), and so long as such matters meet the Update Objection Threshold, Purchaser shall have the right, upon written notice to Sellers, to (i) either terminate this Agreement in all respect within three (3) days thereafter and receive return and refund of Purchaser's entire Deposit, or (ii) waive the unresolved objections set forth in Purchaser's Title Objection Notice and proceed hereunder.

Prior to the Execution Date, Sellers have provided prior Phase I reports in the VDR, such Phase I reports from Environmental Resources Management-Southeast, Inc. dated August 28, 2018 with respect to the Industrial Drive Property and from Environmental Resources Management-Southeast, Inc. dated August 27, 2018 with respect to the Fifth Street Property. Sellers have also ordered a new Phase I as to the entirety of the Real Property which shall be made available as soon as reasonably practicable, but in no event less than five (5) days prior to Closing. Purchaser's review, objection and termination rights with respect to such new Phase I shall be governed by Section 11.1(h) of this Agreement.

7.9     Accounts Receivable.  The Parties acknowledge and agree that any accounts receivable of the Sellers that are Excluded Assets are and shall after Closing remain the property of the Sellers and shall be collected by the Sellers subsequent to the Closing.  In the event that, following the Closing, the Purchaser receives any payments from any obligor with respect to an account receivable of the Seller, then Purchaser shall within ten (10) business days of receipt of such payment remit the full amount of such payment to the Sellers.  In the event that, following the Closing, the Sellers receive any payments from any obligor with respect to an account receivable of the Purchaser, then Sellers shall within ten (10) business days of receipt of such payment remit the full amount of such payment to the Purchaser.

7.10    NDC Codes.   To the extent not transferred as part of the Purchased Assets, the Sellers hereby grant, effective as of the Closing Date, to the Purchaser a royalty-free, paid-up license under the Sellers' NDC numbers used in connection with the Business to the extent necessary to allow the Purchaser and its Affiliates and their designees to market, distribute and sell the inventory acquired as part of the Purchased Assets.

7.11    FDA Fees. Sellers and Purchaser will cooperate to try to obtain any waivers or reductions of FDA Fees that are reasonably available.

7.12    Supplements to Schedules. From time to time prior to the Closing, Seller shall

16

supplement or amend the Schedules hereto with respect to any matter hereafter arising or of which it becomes aware after the date hereof (each a "**Schedule Supplement**").  Any disclosure in any such Schedule Supplement shall not be deemed to have cured any inaccuracy in or breach of any representation or warranty contained in this Agreement.

## 8.    Conditions to Obligations of Purchaser.

The obligations of the Purchaser under this Agreement are subject to the fulfillment of the following conditions precedent, each of which may be waived in writing in the sole discretion of the Purchaser (unless other specified, these conditions must be fulfilled on or before the Closing Date):

8.1    Bankruptcy Court Approval. The Proposed Transaction shall be approved by the Bankruptcy Court as described in Section 10 hereof, and the Approval Order shall be in full force and effect and shall not have been stayed by the Bankruptcy Court or any court of competent jurisdiction, and shall be a final order.

8.2    Continued Truth of Representations and Warranties of the Sellers; Compliance with Covenants and Obligations. The representations and warranties of the Sellers contained in this Agreement and any Schedule attached hereto shall be true and correct in all material respects, and the Sellers shall have performed and complied with all material covenants and material obligations required by this Agreement in all material respects.

8.3    No Material Adverse Change. No Material Adverse Change shall have occurred between the Execution Date and Closing.

8.4    Governmental Approvals. All Governmental Entities, the consent, authorization or approval of which is necessary under any applicable law, rule, order or regulation for the consummation by the Sellers of the Proposed Transaction shall have consented to, authorized, permitted or approved such transactions.

8.5    Adverse Proceedings. No action or proceeding by or before any court or Governmental Entity shall have been instituted by any court or Governmental Entity whatsoever which shall seek to restrain, prohibit or invalidate the Proposed Transaction contemplated by this Agreement or which is likely to affect the right of the Purchaser to own or use the Purchased Assets after the Closing Date.

8.6    Closing Deliveries. The Purchaser shall have received at or prior to the Closing Date each of the following documents:

(a)    the Approval Order, in form and substance reasonably acceptable to the Purchaser and its counsel;

(b)    a bill of sale and assignment agreement executed and acknowledged by the Sellers, in the form reasonably acceptable to the Purchaser, with respect to the Purchased Assets;

77151867.5
77151867.7

(c)    an assignment agreement executed by Sellers assigning its rights to Purchaser in and to the Intangible Rights;

(d)    special warranty deed in a form reasonably acceptable to Purchaser and its counsel conveying fee simple title to the Real Property to Purchaser or its designee, and approval of the assumption and assignment of the Facility Lease, together with (to the extent assignable and still in force) the applicable PILOT Agreement;

(e)    a closing statement in form and content reasonably acceptable to the Purchaser;

(f)    a certificate of the Secretary of the State of each Seller's organization as to the legal existence and good standing of each Seller in such jurisdiction;

(g)    certificate of the Trustee attesting to the incumbency of the Trustee, and the authenticity and continuing validity of the Trustee's appointment;

(h)    possession of all of the Purchased Assets including, but not limited to, keys to the Real Property and keys to any buildings located on the Real Property and all computer, software and/or document access codes (to the extent in the possession or control of Sellers);

(i)    a Title Policy consistent with Section 7.8;

(j)    signed letters required under 21 CFR 314.72 for the transfer of the IND's, DMF's, NDA's and ANDA's for the Products, including complete and accurate copies of the Product files; and

(k)    such other documents which Purchaser may request to effectuate the terms and conditions of this Agreement.

8.7    Access to Regulatory Files.  Within 3 business days after signing of this Agreement, the Sellers have provided Purchaser access to all regulatory files for the Products and the Pharmaceutical Business, including the Annual Reports and inspection reports by any third party or Governmental Entity.

**9.    Conditions to Obligations of the Sellers**.  The obligations of the Sellers under this Agreement are subject to the fulfillment of the following conditions precedent, each of which may be waived in writing at the sole discretion of the Sellers (unless otherwise specified, these conditions must be fulfilled before the Closing Date):

9.1    Bankruptcy Court Approval.  The transactions involving the Sellers contemplated by this Agreement shall be approved by the Bankruptcy Court as described in Section 10 hereof, and the Approval Order, as hereinafter defined, shall be in full force and effect and shall not have been stayed by the Bankruptcy Court or any court of competent jurisdiction.

9.2    Continued Truth of Representations and Warranties of the Purchaser: Compliance with Covenants and Obligations. The representations and warranties of the Purchaser

18

in this Agreement shall be true and correct in all material respects, and the Purchaser shall have performed any material covenants and material obligations required by this Agreement to be performed or complied with by it prior to or at the Closing Date in all material respects.

9.3    No Material Adverse Change. No Material Adverse Change shall have occurred between the Execution Date and Closing.

9.4    Governmental Approvals. All Governmental Entities, the consent, authorization or approval of which is necessary under any applicable law, rule, order or regulation for the consummation by the Sellers of the Proposed Transaction shall have consented to, authorized, permitted or approved such transactions.

9.5    Adverse Proceedings. No action or proceeding by or before any court or Governmental Entity shall have been instituted by any court or Governmental Entity whatsoever which shall seek to restrain, prohibit or invalidate the transactions contemplated by this Agreement or which is likely to affect the right of the Purchaser to own or use the Purchased Assets after the Closing Date.

9.6    Closing Deliveries. The Sellers shall have received at or prior to the Closing each of the following documents duly executed by Purchaser (if applicable):

(a)    the payment of the Closing Date Payment to Sellers;

(b)    an assumption and assignment agreement providing for Purchaser's assumption of the Assumed Liabilities;

(c)    a certificate of the Secretary of the State of the Purchaser's organization as to the legal existence of the Purchaser in such jurisdiction;

(d)    certificates of an appropriate responsible party of the Purchaser attesting to the incumbency of the Purchaser's officers, and the authenticity and continuing validity of the governing documents;

(e)    a closing statement in form and content acceptable to the Sellers;

(f)    letters required from Purchaser under 21 C.F.R. § 314.72 for the transfer of all current and pending INDs, DMFs, NDAs and ANDAs for the Products; and

(g)    such other documents which Sellers may reasonably request to effectuate the terms and conditions of this Agreement.

**10.    Bankruptcy Court Approval**.

10.1    The Agreement. Execution of this Agreement by Purchaser shall constitute Purchaser's bid for the Purchased Assets. This Agreement is subject to approval by the Bankruptcy Court.

77151867.5
77151867.7

10.2    <u>Bankruptcy Court Documents</u>.  Sellers shall deliver or cause to be delivered to Purchaser for review and comment all documents to be filed by Sellers with the Bankruptcy Court that relate to the transactions contemplated by this Agreement, as soon as commercially reasonable and in any event not less than one (1) Business Day prior to filing, including all motions, proposed orders, applications, and supporting papers prepared by Sellers, prior to filing such documents. The Sale Motion shall only be amended with the approval of Purchaser, which will not be unreasonably withheld.

10.3    <u>Approval Order</u>.

(a)    Sellers have filed a motion (the "***Sale Motion***") with the Bankruptcy Court seeking approval of the Proposed Transaction.  It is a material inducement to Purchaser to be able to acquire the Purchased Assets pursuant to the provision of § 363 of the Bankruptcy Code, including in particular free and clear of Liens pursuant to § 363(f) of the Bankruptcy Code. Therefore, any and all obligations of the Purchaser under this Agreement are subject to the entry of an Order of the Bankruptcy Court (the "***Approval Order***"), in form reasonably satisfactory to the Purchaser, approving this Agreement and the Proposed Transaction, and ordering, finding and concluding that, among other things, (i) notice of the Sale Motion and the Proposed Transaction was proper and sufficient to all parties entitled to such notice; (ii) the sale of the Purchased Assets to the Purchaser is approved pursuant to §363(b) of the Bankruptcy Code; (iii) the assumption and assignment the Assumed Contracts and Leases; (iv) the sale of the Purchased Assets to the Purchaser pursuant to this Agreement will be free and clear of all Liens pursuant to § 363(f) of the Bankruptcy Code with the Liens, if any, to attach to the Purchase Price or proceeds of the sale; (v) Purchaser has acted in good faith within the context of and is entitled to the protections of § 363(m) of the Bankruptcy Code; and (vi) authorizing and approving this Agreement as the highest and best offer for the Purchased Assets.

(b)    Sellers shall use their best efforts to gain approval by the Bankruptcy Court of this purchase and sale of the Purchase Assets and the assumption and assignment of the Assumed Contracts and Leases and Assumed Liabilities contemplated hereby to the fullest extent required by Sections 363 and 365 and all other applicable provisions of the Bankruptcy Code within the terms of the Sale Motion. Sellers have timely served on all non-Seller counterparties to all of the Assumed Contracts a notice specifically stating that Sellers may be seeking the assumption and assignment of such Assumed Contracts and shall timely notify such non-Seller counterparties of the deadline for objecting to the Cure Amounts stated in such notices, if any, in compliance with the Bidding Procedures Order. Sellers and Purchaser shall cooperate to reasonably resolve any issues in connection with the Cure Amounts and Assumed Contracts.

(c)    From and after the date hereof and until the Closing Date or the termination of this Agreement, Sellers shall not take any action which is intended to (or is reasonably likely to), or fail to take any action the intent (or the reasonably likely result) of which failure to act is to, result in the reversal, voiding, modification or staying of the Sale Motion or this agreement. If Purchaser is the successful Bidder, Sellers shall not take any action which is intended to (or reasonably likely to), or fail to take any action the intent (or reasonably likely result) of which failure to act is to, result in the reversal, voiding, modification or staying of the Approval Order or this Agreement.

(d)     The Approval Order shall contain the following provisions:

(i)     Approval of this Agreement, including the sale of the Purchased Assets by Sellers to Purchaser, which shall vest in Purchaser all right, title and interest of Sellers to the Purchased Assets free and clear of all Liens (other than Permitted Liens), Excluded Liabilities and interests pursuant to Section 363(f) of the Bankruptcy Code;

(ii)     A finding that Purchaser has acted in good faith within the meaning of Section 363(m) of the Bankruptcy Code, the Proposed Transaction have been undertaken by Sellers and Purchaser at arms' length and without collusion, and Purchaser is entitled to the protections of Section 363(m) of the Bankruptcy Code;

(iii)     To the fullest extent allowed by law, all Persons shall be enjoined from taking any actions against Purchaser or the Purchased Assets to recover any claim that such Person has filed against Sellers;

(iv)     To the fullest extent allowed by law, Purchaser shall have no successor liability on account of the purchase or sale of the Purchased Assets, except on account of Assumed Liabilities;

(v)     Due notice of the Bidding Procedures Motion, Sales Motion, Approval Order and this Agreement have been provided;

(vi)     There shall be sufficient cause to lift the stay contemplated by Rules 6004(h) and 6006(d) of the Federal Rules of Bankruptcy Procedures with regards to the Proposed Transaction;

(vii)     The Bankruptcy Court retains exclusive jurisdiction to interpret and enforce the provisions of this Agreement and the Approval Order in all respects; and

(viii)     Such other and further terms as are reasonable and customary in orders approving a Section 363(f) sale of assets.

10.4     _Appeal/Reconsideration_. If an appeal is taken, or a stay pending appeal is requested or reconsideration sought, from any order approving bid procedures in connection herewith or the Approval Order, then Sellers will immediately notify Purchaser of such appeal, stay or reconsideration request and will provide to Purchaser within one (1) business day a copy of the related notice of appeal or order of stay or motion for reconsideration.  The Sellers will also provide Purchaser with written notice and copies of any other or further notice of appeal, motion or application filed in connection with any appeal from, or application for reconsideration of, any of such orders and related briefs.

10.5     _Bidding Procedures and Order_.

(a)     The purchase and sale of the Purchased Assets will be subject to competitive bidding in accordance with the terms of the Bidding Procedures Order.  If the Purchaser is designated as the Successful Bidder in accordance with the terms of the Bidding Procedures Order, Sellers will seek entry of the Approval Order.  Sellers and Purchaser agree that,

21

in the event that (i) Purchaser is not the Successful Bidder (as defined in the Bidding Procedures Order), (ii) the transaction with the Successful Bidder does not close, and (iii) Purchaser is designated as the Back-Up Bidder (as defined in the Bidding Procedures Order), Purchaser shall promptly consummate this Agreement upon the terms and conditions set forth herein (or as such terms may be amended at the Auction); provided that, Purchaser's obligation to remain as the Back-Up Bidder shall not terminate until the closing of the transaction with the Successful Bidder (and for the avoidance of doubt, the Outside Closing Date for the Back-Up Bidder shall be extended by thirty days).  Purchaser acknowledges that time is of the essence in achieving the Closing and shall take all commercially reasonable efforts to reach the Closing as quickly as possible.

(b)     In accordance with the Bidding Procedures Order, in the event Purchaser is not in breach of this Agreement and has not terminated this Agreement before the Outside Closing Date, and (i) the Bankruptcy Court approves a sale of all or some of the Purchased Assets to a purchaser other than Purchaser which is consummated by Sellers, (ii) Sellers enter into a definitive agreement for a transaction other than the Proposed Transaction which is consummated by Sellers; (iii) Sellers file a plan of reorganization that does not contemplate a sale of the Purchase Assets to Purchaser and a plan is confirmed, or (iv) Sellers otherwise breach this Agreement and subsequently sell all or some of the Purchased Assets to a purchaser other than Purchaser which is consummated by Sellers, Sellers shall be required to pay to Purchaser a break-up fee in an amount equal to five percent (5.0%) of the Purchase Price (the "Break-Up Fee"). The Break-Up Fee will be deemed an allowed superpriority administrative expense claim of Purchaser under Section 364(c)(1) of the Bankruptcy Code with priority over any and all administrative expenses of any kind, including, without limitation, those specified in Sections 503(b) and 507(b) of the Bankruptcy Code and shall be paid at closing from the sales proceeds prior to the payment of any other amounts.

(c)     The Debtors shall use their best efforts in the exercise of their discretion under (or to amend) the Bidding Procedures Order to require that any bid that includes a cash component of at least $4,500,000 and otherwise complies with the Bidding Procedures Order will be deemed a Qualified Bid.

**11.     Termination**.

11.1     Termination. This Agreement may be terminated and the transactions contemplated hereby may be abandoned:

(a)     by mutual written consent of the Purchaser and the Sellers;

(b)     by either the Sellers or the Purchaser if a Governmental Entity has issued a final and non-appealable order or taken any other final and non-appealable action, in any case having the effect of permanently restraining, enjoining or otherwise prohibiting the Proposed Transaction;

(c)     by either the Sellers or the Purchaser if the Closing does not occur on or before May 31, 2021 (such date, the "***Outside Closing Date***"); provided, however, that a Party is not entitled to terminate this Agreement pursuant to this Section 11.1(c) if such Party's

22

material breach of one or more of its covenants hereunder is the cause of or results in the failure of the Closing to occur on or before the Outside Closing Date, or if the failure to Close is the result of a failure to obtain a Governmental Approval, in which case the Parties shall use their reasonable efforts to agree upon a new Outside Closing Date and to procure the Governmental Approval.

(d)    by Purchaser if there shall occur a material breach of any of the representations, warranties, covenants or agreements of the Sellers that would give rise to the failure of a closing condition in <u>Section 8</u>, provided however that Purchaser agrees to provide notice thereof and a right to cure any such breach within ten (10) business days thereafter;

(e)    by Purchaser if the Bankruptcy Cases are converted to cases under Chapter 7 of the Bankruptcy Code;

(f)    by Purchaser, if a Schedule Supplement contains information that constitutes a Material Adverse Change;

(g)    by Sellers if there shall occur a material breach of any of the representations, warranties, covenants or agreements of Purchaser, provided however that Sellers agree to provide notice thereof and a right to cure any such breach within ten (10) business days thereafter, with the act of Closing automatically curing any such breach; and

(h)    by Purchaser if either (i) matters identified in a Title Objection Notice are not resolved as provided in <u>Section 7.8</u> or (ii) a Phase I Environmental Site Assessment pursuant to <u>Section 7.8</u> reveals material environmental liabilities to the extent not indicated on prior Phase I's that have been set out in the VDR prior to the Execution Date.

11.2    <u>Effect of Termination</u>.  If the Agreement is terminated pursuant to <u>Section 11.1</u> then this Agreement will become void and of no further force and effect, with no liability or obligation on the part of the Parties, provided, however, that if the Agreement is terminated by the Sellers pursuant to <u>Section 11.1(g)</u>, the Purchaser shall forfeit the Deposit and any interest thereon and such amounts shall be delivered to the Sellers as the sole and exclusive remedy of Sellers against Purchaser.  Termination and Purchaser's right to the Break-Up Fee shall be the sole and exclusive remedy of Purchaser against Sellers.

11.3    <u>No Survival</u>. No representations or warranties shall survive the Closing Date, but all covenants and agreements contained in this Agreement intended or anticipated to be performed post-closing shall survive the closing indefinitely.

## 12.    <u>General</u>.

12.1    <u>No Agreement to Assign</u>.  Except for the Facility Lease, and except to the extent that non-assignment of any Contract or Lease would constitute a Material Adverse Change, this Agreement shall not constitute an agreement to assign or transfer and shall not affect the assignment or transfer of any Purchased Asset if (a) an attempted assignment thereof, without the approval, authorization or consent of, or granting or issuance of any license or permit by, any third party thereto would constitute a breach thereof or (b) the Bankruptcy Court shall not have approved assumption and assignment of any Assumed Contract or Lease for any reason, including without limitation, that the cure amount is not acceptable to Purchaser (each such action in (a) and (b), a

23

77151867.5
77151867.7

"*Necessary Consent*").   In such event, Sellers and Purchaser shall use their commercially reasonable efforts, to obtain the Necessary Consents with respect to any such Assumed Contract after the Closing; provided that the failure to obtain any Necessary Consent shall not delay the Closing or give rise to a reduction in the Purchase Price. To the extent that Sellers are unable to assign the Facility Lease for any reason at Closing, the Sellers obligations shall be satisfied by transferring fee simple title to the Facility Lease Premises to Purchaser, and in the event of any delay which is not the result of any material dispute or subject to material contingency but simply a matter of timing, Purchaser will sublease the premises from Sellers post-closing at no cost until Sellers can transfer fee simple.

**12.2   WAIVER/JURISDICTION.  TO THE FULL EXTENT PERMITTED BY APPLICABLE LAW, SELLERS AND PURCHASER HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVE ALL RIGHT TO TRIAL BY JURY IN ANY ACTION, SUIT OR PROCEEDING THAT RELATES TO OR ARISES OUT OF THIS AGREEMENT. IF ANY ACTION, SUIT OR PROCEEDING IS BROUGHT BY EITHER SELLERS OR PURCHASER ARISING OUT OF THIS AGREEMENT, SELLERS AND PURCHASER AGREE THAT THE BANKRUPTCY COURT SHALL HAVE EXCLUSIVE JURISDICTION OVER THE ACTION, SUIT OR PROCEEDING.**

12.3   <u>Construction</u>. This Agreement shall be construed and enforced in accordance with the internal laws of the State of Tennessee without regard to principles of conflicts of laws.

12.4   <u>Notices</u>. Any notices or other communications required or permitted hereunder shall be in writing and shall be considered to have been duly given, when received, if delivered by hand, email, telegram, overnight courier:

(a)    If to Sellers, to:

Gary Murphey, solely in his capacity as chapter 11 trustee
Resurgence Financial Services, LLC
3330 Cumberland Blvd., Suite 500
Atlanta, GA 30339
Phone: (404) 886-9104
Email:  Murphey@RFSLimited.com

With a copy (which shall not constitute notice) to:

David Gordon, Esq.; Bobby Guy, Esq.
Polsinelli PC
1201 West Peachtree St. NW, Suite 1100
Atlanta, GA 30309
Phone:  (404) 253-6005
Email:  dgordon@polsinelli.com; bguy@polsinelli.com

(b)    If to the Purchaser, to:

24

American Antibiotics, LLC
2655 Northwinds Parkway
Alpharetta, Georgia 30009
Attn: Richard L. Jackson
Phone:  (770) 643-5605
Email: rlj@jacksonhealthcare.com

With a copy (which shall not constitute notice) to:

Kilpatrick Townsend & Stockton LLP
1100 Peachtree Street, Suite 2800
Atlanta, Georgia 30309
Attn:  Paul Rosenblatt, Esq.
Phone:  (404) 815-6321
Email: PRosenblatt@KilpatrickTownsend.com

12.5    <u>Entire Agreement and Amendments</u>. This Agreement, together with the Schedules attached hereto, and all documents contemplated by this Agreement, contain all of the terms agreed upon by the Parties with respect to the subject matter hereof, and supersede all prior agreements and understandings among the parties and may not be changed or terminated orally. No attempted amendment, change, termination or waiver of any of the provisions hereof shall be binding unless in writing and signed by the party against whom the same is sought to be enforced.

12.6    <u>Additional Documents</u>.  After the Closing Date, each Party shall, at the request of any other, furnish, execute and deliver such documents and instruments as the requesting Party shall reasonably require as necessary or desirable to carry out the transactions contemplated hereunder.

12.7    <u>Paragraph Headings</u>. Paragraph headings herein have been inserted for reference only and shall not be deemed to limit or otherwise affect, in any matter, or be deemed to interpret in whole or part, any of the terms or provisions of this Agreement.

12.8    <u>Third Parties.</u> Nothing in this Agreement, whether express or implied, is intended to confer any rights or remedies on any persons other than the parties hereto and their respective successors and permitted assigns, nor is anything in this Agreement intended to relieve or discharge the obligation or liability of any third persons to any party to this Agreement.

12.9    <u>Severability</u>. If any one or more of the provisions contained in this Agreement shall be invalid, illegal or unenforceable in any respect of any reason, the validity, legality and enforceability of any provision in every other respect and of the remaining provisions of this Agreement shall not be in any way impaired.

12.10   <u>Counterparts</u>. This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

77151867.5
77151867.7

12.11 <u>Jurisdiction and Venue</u>. This Agreement shall be subject to the jurisdiction of the Bankruptcy Court, and if the Bankruptcy Court lacks jurisdiction for any reason, then the state and federal courts overseeing Sullivan County, Tennessee.

12.12 <u>Time is of the Essence</u>. Time is of the essence of each provision hereof.

12.13 <u>Construction</u>. Should any provision of this Agreement require judicial interpretation, it is agreed that the court interpreting or construing the same shall not construe this Agreement against one party more strictly by reason of any rule of interpretation which relates to preparation of a document, it being agreed that the agents of all parties have participated in the preparation of this Agreement and that legal counsel was consulted by each party prior to its execution hereof.

***(Signature Page Follows)***

77151867.5
77151867.7

**IN WITNESS WHEREOF**, the parties have executed this Asset Purchase Agreement as of the day and year first above written.

PURCHASER:

**AMERICAN ANTIBIOTICS, LLC**

By: _____

Name: RICHARD L. JACKSON

Title: CEO & President

**SELLERS:**

**NEOPHARMA INC.**

By: _____

**NEOPHARMA TENNESSEE LLC**

By: _____

**IN WITNESS WHEREOF**, the parties have executed this Asset Purchase Agreement as of the day and year first above written.

PURCHASER:

**AMERICAN ANTIBIOTICS, LLC**

By: _____
     Name:

     Title:

NEOPHARMA, INC.,
a Delaware corporation

By: _____
Name: _____GARY MURPHEY_____
Title: _____TRUSTEE_____

NEOPHARMA TENNESSEE LLC,
a Delaware limited liability company

By: _____
Name: _____GARY MURPHEY_____
Title: _____TRUSTEE_____

*EXECUTION COPY*

## SCHEDULE 1.1

[Defined Terms]

For purposes of this Agreement, the following terms shall be defined as follows:

"Actions" means any claim, hearing, charge, action, suit, arbitration, litigation, mediation, grievance, audit, examination, inquiry, proceeding or investigation by or before any Governmental Entity.

"Agreement" has the meaning set forth in the Preamble.

"ANDA" means an Abbreviated New Drug Application for a drug submitted to the FDA pursuant to 21 C.F.R. Part 314 (as amended from time to time), and all amendments or supplements thereto, including all documents, data and other information concerning the applicable drug which are necessary for FDA approval to market such drug in the United States, and any equivalent application submitted to any other health authority.

"Approval Order" has the meaning set forth in Section 10.2.

"Assumed Contracts and Leases" has the meaning set forth in the Recitals.

"Bankruptcy Cases" has the meaning set forth in the Recitals.

"Bankruptcy Code" means title 11 of the United States Code.

"Bankruptcy Court" has the meaning set forth in the Recitals.

"Bidding Procedures Order" means the Bankruptcy Court's Bidding Procedures Order [Docket No. 185].

"Business" has the meaning set forth in the Recitals.

"Closing" has the meaning set forth in Section 4.1.

"Closing Date" has the meaning set forth in Section 4.1.

"Closing Date Payment" has the meaning set forth in Section 3.1.

"Contracts and Leases" has the meaning set forth in the Recitals.

"Cure Amounts" means, with respect to any of the Assumed Contracts and Leases, the amount required to be paid under Section 365 of the Bankruptcy Code to effectuate the assumption and assignment of such executory contract or unexpired lease by the Sellers to the Purchaser, as determined by the agreement of the parties to such executory contract or lease or by order of the Bankruptcy Court.

"Deposit" has the meaning set forth in Section 3.2.

"Distributor A/R" has the meaning set forth in Section 2.2(l).

"DMF" mean a Drug Master File submitted to the FDA pursuant to 21 C.F.R. § 314.420, or the equivalent application or filing submitted to any equivalent agency or Governmental Entity outside the United States of America (including any supra-national agency such as the EMA), and all supplements, amendments, variations, extensions and renewals thereof that may be submitted with respect to the foregoing.

"Employees" means the employees of the Sellers as of the date of this Agreement, a list of which shall be provided to Purchaser upon request pursuant to Section 7.6.

"Environmental Laws" means any and all applicable Laws which (a) regulate or relate to the protection or clean-up of the environment, the use, treatment, storage, transportation, handling, disposal or release of Hazardous Substances, the preservation or protection of waterways, groundwater, drinking water, air, wildlife, plants or other natural resources, or the health and safety of persons or property, including protection of the health and safety of employees or (b) impose liability or responsibility with respect to any of the foregoing, including the Comprehensive Environmental Response, Compensation and Liability Act (42 U.S.C. § 9601 *et seq.*), or any other Law of similar effect.

"Excluded Assets" has the meaning set forth in Section 2.3.

"Excluded Liabilities" has the meaning set forth in Section 2.5.

"Execution Date" has the meaning set forth in the Preamble.

"Facility Lease" has the meaning set forth in the Recitals.

"FDA" has the meaning set forth in the Recitals.

"FDA Fees" means any annual fees or other amounts owed under the Prescription Drug User Fee Act and Generic Drug User Fee Amendments or similar state or federal Laws.

"FDCA" means the Federal Food, Drug and Cosmetic Act of 1938, as amended.

"Fifth Street Property" has the meaning set forth in the Recitals.

"Fourth Street Property" has the meaning set forth in the Recitals.

"Furlough" means the temporary pause of operations of the Sellers in early August 2020.

"Governmental Authorizations" has the meaning set forth in Section 2.2(e).

"Governmental Entity" has the meaning set forth in Section 2.2(e).

"Hazardous Substances" means any noxious, toxic, or hazardous substance, material or waste, and any contaminant, chemicals, pollutant or constituent thereof including petroleum, or petroleum products, asbestos or any asbestos containing material, or lead containing paint or

29

coating material.

"HIPAA" means the Health Insurance Portability and Accountability Act of 1996, as amended and supplemented by the Health Information Technology for Clinical Health Act of the American Recovery and Reinvestment Act of 2009.

"IND" means an Investigational New Drug Application submitted to the FDA pursuant to 21 C.F.R. Part 312 (as amended from time to time) with respect to the Products, or the equivalent application or filing submitted to any equivalent agency or Governmental Entity outside the United States of America (including any supra-national agency such as the EMA), and all supplements, amendments, variations, extensions and renewals thereof that may be submitted with respect to the foregoing.

"Indebtedness" means with respect to any person, all obligations for borrowed money.

"Industrial Drive Property" has the meaning set forth in the Recitals.

"Intangible Rights" has the meaning set forth in Section 2.2(a).

"Inventory" has the meaning set forth in Section 2.2(h).

"Law" means any law (including common law), statute, requirement, code, rule, regulation, order, ordinance, judgment or decree or other pronouncement of any Governmental Entity.

"Liens" has the meaning set forth in Section 2.1.

"Material Adverse Change" means any state of facts, change, event, effect, condition, change or occurrence that is, has, or reasonably expected to have, a material adverse effect on the Pharmaceutical Business, the ability of the Sellers to consummate the transactions contemplated hereby, or the business, financial condition or results of operations of the Sellers taken as a whole, other than any state of facts, change, event, effect or occurrence resulting from (i) economic, financial market or geopolitical conditions in general (including the cost and availability of debt or equity financing), unless such conditions have a disproportionate effect on the Business or the Purchased Assets, (ii) changes in law or applicable accounting regulations or principles or interpretations thereof, (iii) conditions in the healthcare or pharmaceutical industry generally, (iv) any outbreak or escalation of hostilities or war or any act of terrorism, (v) any weather condition, earthquake or natural disaster, (vi) epidemic, pandemic or disease outbreaks (including the COVID-19 virus), public health emergencies (as declared by an applicable Governmental Authority) or quarantine restrictions implemented by any applicable Governmental Authority, whether negatively affecting the Business specifically or negatively affecting economic conditions generally, (vii) the execution of this Agreement, the announcement of this Agreement and the Transaction (including any action or inaction as a result thereof by the employees, customers, vendors or competitors of the Sellers), (viii) actions taken or consented to by Purchaser pursuant to this Agreement, and (ix) Sellers' status as a debtor in bankruptcy and ordinary course or typical events taking place during the bankruptcy.

"NDA" means a New Drug Application for a drug submitted to the FDA pursuant to 21 C.F.R. Part 314 (as amended from time to time), and all amendments or supplements thereto,

77151867.5
77151867.7

including all documents, data and other information concerning the applicable drug which are necessary for FDA approval to market such drug in the United States, and any equivalent application submitted to any other health authority.

"NDC" means the unique, three-segment National Drug Code issued by the FDA that serves as a universal product identifier for pharmaceuticals, or the equivalent in countries outside of the United States.

"Neopharma" has the meaning set forth in the Preamble.

"Neopharma Bankruptcy Case" has the meaning set forth in the Recitals.

"Neopharma LLC" has the meaning set forth in the Preamble.

"Neopharma LLC Bankruptcy Case" has the meaning set forth in the Recitals.

"Outside Closing Date" has the meaning set forth in Section 11.1(c).

"Parties" has the meaning set forth in the Preamble.

"Permitted Encumbrances" means the following:  (a) any matters shown of record on the Title Commitment pursuant to Section 7.8, subject to resolution as set forth on Schedule 7.8 attached hereto, (b) encumbrances for Taxes not yet due and payable or which are being contested in good faith, (c) all existing utility, access or other easements or rights of way of record or other matters of record affecting the Real Property or the Facility Lease Premises or any part thereof, (d) Laws regulating the use or enjoyment of the Real Property or the Facility Lease Premises, (e) zoning and building Laws, (f) any liens securing obligations which are Assumed Liabilities, (g) any other encumbrances encumbering any of the Purchased Assets other than the Real Property or the Facility Lease Premises which, either individually or in the aggregate, do not interfere with the use of the Purchased Assets in a manner consistent with the current use thereof by Sellers or their Affiliates, (h) with respect to Facility Lease Premises, encumbrances which encumber only the fee interest in such property or, in the case of subleased Facility Lease Premises, any leasehold estate superior to that of Sellers, which, either individually or in the aggregate, do not violate the terms of the Facility Lease, and (i) any encumbrances created by or consented to by Purchaser.

"Permitted Liens" has the meaning set forth in Section 2.1.

"Pharmaceutical Business" has the meaning set forth in the Recitals.

"Products" has the meaning set forth in the Recitals.

"Proposed Transaction" has the meaning set forth in the Recitals.

"Purchase Price" has the meaning set forth in Section 3.1.

"Purchased Assets" has the meaning set forth in the Recitals.

"Purchaser" has the meaning set forth in the Preamble.

31

"<u>Real Property</u>" has the meaning set forth in the Recitals.

"<u>Regulatory Authority</u>" means any national, supranational, state or local governmental authority, including the FDA, with responsibility for granting any Regulatory Authorizations with respect to the Products.

"<u>Regulatory Authorizations</u>" means any approvals, clearances, authorizations, registrations, certifications, licenses or permits granted by any Regulatory Authority.

"<u>Tax</u>" or "<u>Taxes</u>" means any and all U.S. federal, state, local and non-U.S. taxes, assessments, levies, duties, tariffs, imposts and other similar charges and fees imposed by any Governmental Entity, including income, franchise, windfall or other profits, gross receipts, property, sales, use, net worth, capital stock, payroll, employment, social security, workers' compensation, unemployment compensation, excise, withholding, ad valorem, stamp, transfer, value-added, occupation, environmental, disability, real property, personal property, registration, alternative or add-on minimum, or estimated tax, including any interest, penalty, additions to tax and any additional amounts imposed with respect thereto.

"<u>Tax Return</u>" means any report, return, certificate, claim for refund, election, estimated Tax filing or declaration filed or required to be filed with any Governmental Entity with respect to Taxes, including any schedule or attachment thereto, and including any amendments thereof.

"<u>Taxing Authority</u>" means any federal, state, local or foreign Governmental Entity or authority responsible for the imposition, collection or administration of any Tax.

"<u>Title Policy</u>" has the meaning in <u>Section 8.6(i)</u>.

"<u>Transferred Employees</u>" means each Employee (and any former employee who would be an Employee except for, as a result of the Furlough, having ceased employment or been furloughed) with respect to whom the Purchaser has offered employment and such Employee has accepted such employment extended by the Purchaser.

"<u>Trustee</u>" has the meaning set forth in the Recitals.

"<u>VDR</u>" means the virtual data room maintained for this transaction by Province.

77151867.5
77151867.7