**SIGNED this 29th day of October, 2021**

*Shelly D. Rucker*
Shelley D. Rucker
CHIEF UNITED STATES BANKRUPTCY JUDGE

_____

## IN THE UNITED STATES BANKRUPTCY COURT FOR
## THE EASTERN DISTRICT OF TENNESSEE

| | | |
|---|---|---|
| In re: | ) | |
| **Neopharma, Inc.,** | ) | **No. 2:20-bk-52015-SDR** |
| | ) | **Chapter 11** |
| Debtor; | ) | |
| | ) | |
| | ) | |
| In re: | ) | |
| **Neopharma Tennessee LLC,** | ) | **No. 2:20-bk-52016-SDR** |
| | ) | **Jointly Administered** |
| Debtor. | ) | |
| | ) | |

### MEMORANDUM OPINION

## I.    INTRODUCTION

When debtors Neopharma, Inc. and Neopharma Tennessee, LLC sought Chapter 11

protection in late December 2020, they presented the Court with a dire scenario that needed

urgent action.  An antibiotic factory leased by Neopharma Tennessee, LLC and operated by

Neopharma, Inc. in Bristol, Tennessee had fallen on hard times because of global competition

from manufacturers of generic drugs.  Several changes of ownership and infusions of cash—

including most recently loans or grants from the federal Paycheck Protection Program ("PPP")

1

and Coronavirus Aid, Relief, and Economic Security Act ("CARES Act")—failed to stanch the

financial bleeding.  Manufacturing operations ended on August 10, 2020, but some payroll,

utility, and other logistical expenses had to continue to maintain certain post-marketing

requirements from the federal Food and Drug Administration ("FDA").  Failure to maintain these

requirements would have required a recall of all Neopharma products then available in the

pharmaceutical market.  This was the context in which Mark Dessauer and the firm of Hunter,

Smith and Davis, LLP ("HSD") were asked by Neopharma agent David Argyle and potential

investor Jefferson Gregory to file bankruptcy petitions for the related debtors in late October

2020.

On November 2, 2020, HSD sent proposed retention agreements to represent Neopharma,

Inc. and Neopharma of Tennessee, LLC to Mr. Argyle.  Mr. Argyle signed the retention

agreements on December 18, 2020, as Chief Restructuring Officer of the companies.  (Doc. No.

293-1, Dessauer Dec. Exs. 4, 16.)  Between the filing date of December 22, 2020 and January 28,

2021, the date of appointment of a Chapter 11 Trustee, Mr. Dessauer and HSD handled several

matters for the debtors, including the filing of the two Chapter 11 petitions; moving for joint

administration of the cases of Neopharma, Inc. and Neopharma Tennessee, LLC; fending off a

motion to dismiss the case by prior management; proposing a sale of the debtors' assets for $2

million and the assumption of a lease with the Industrial Development Board of the City of

Bristol, Tennessee; and obtaining interim authorization for post-petition financing on an

emergency basis.  Those efforts did not result in a successful sale or even a successful post-

petition loan, and a trustee was appointed when it was discovered that the Chief Restructuring

Officer of the debtors was also the individual who controlled the buyer and post-petition lender.

At the same time, the parties learned that this buyer/lender did not even have the funds to

2

consummate the transactions.  Almost immediately following this disclosure, the parties agreed

to the appointment of a trustee.  Mr. Dessauer and HSD subsequently filed an application

requesting fees of $49,982.50 and expenses of $5,327.70 for the work that they performed during

the roughly six-week period in which the debtor was in possession.  (Doc. No. 204.)

The Chapter 11 Trustee, Gary Murphey, has filed an objection to the application.  (Doc.

No. 274, "Objection.")  The Chapter 11 Trustee does not object to the hourly rate or to the time

spent, which is itemized in an exhibit to the application.  Rather, the Chapter 11 Trustee objects

to the entire application on principle because of HSD's entanglement with an insider and what he

alleges were conflicts of interest in the representation of the debtors.  In short, and as will be

explained below, the Chapter 11 Trustee believes that HSD filed the two petitions; proposed an

asset sale to a corporate entity formed by HSD and owned by an insider; and proposed faulty

post-petition financing, all for the benefit of Mr. Argyle, who is that insider.  He contends that

these actions were taken to the detriment of the estate.  "The actions HSD took on behalf of

insiders nearly led the estates to administrative insolvency and ultimately resulted in the

appointment of the Chapter 11 Trustee.  Once appointed, the Chapter 11 Trustee and the

Committee [of Unsecured Creditors] obtained post-petition financing to pay utilities and keep the

Debtors' estates administratively solvent.  The Chapter 11 Trustee and the Committee also ran a

successful sales and marketing process, which led to a robust auction and a Successful Bid with a

purchase price of $8.5 million in cash plus assumption of significant liabilities."  (Objection at

2.)

Mr. Dessauer and HSD have filed a reply in support of the application.  (Doc. No. 293,

Reply.)  HSD argues that its services were reasonably performed for the benefit the estate based

on the best available information at the time and should not be criticized from the perspective of

20/20 hindsight.  Mr. Dessauer and HSD also emphasize that they never held an interest adverse

to the estate and that their connections with the debtors and any insiders were limited and were

properly disclosed to the Court and parties in interest or were a matter of public record.  Mr.

Dessauer filed a declaration with exhibits (Doc. No. 293-1, "Declaration") in support of his

application and in response to the Trustee's objection.  The Declaration recounts the

circumstances leading to Mr. Dessauer's representation of the debtors and the limits of his

involvement with Mr. Argyle and the would-be buyer, American Antibiotics Initiative, Inc.

("American").

The Court held a hearing on the fee application and objection on May 11, 2021.  Counsel

for the Chapter 11 Trustee, the Unsecured Creditors Committee (the "Committee"), and HSD

appeared.  HSD relied on the Declaration and the exhibits attached to it as evidence that the work

was necessary and beneficial and that no conflicts existed.  The Chapter 11 Trustee relied on the

pleadings in the case and offered no additional testimony or documentary evidence in support of

his objection.  The Committee argued in support of the objection but provided no additional

proof.  The United States Trustee did not object to the application.

This Court has jurisdiction to hear and determine this contested matter pursuant to 28

U.S.C. §§ 157(b) (2)(A) and 1334.  This matter is a core proceeding.  For the reasons below, the

Court grants the application but bars HSD from filing a further application for any services

rendered after January 28, 2021.

## II.    BACKGROUND AND FINDINGS OF FACT

### A.  *The relationship between HSD and the debtors begins*

Mr. Dessauer was first contacted about representing the debtors in October 2020 by two

people, David Argyle and Jefferson Gregory.  Mr. Argyle represented himself to be the "owners'

representative" and later as the debtors' Chief Restructuring Officer.  Mr. Argyle filed a

4

declaration with the Court in which he testified that he was requested to go to Bristol, Tennessee

as the agent of the debtors' owner to evaluate the status of the debtors' Bristol facility.  (Doc.

No. 46 at 2.)  Mr. Gregory was affiliated with an unrelated company, Constitutional Antibiotics,

Inc. ("Constitutional") and was looking to partner with the debtors' owners to acquire the assets.

      According to Mr. Dessauer's Declaration, Mr. Argyle provided the following background

to Mr. Dessauer.  A company named Canadian Pharma International, Ltd. ("Canadian")

purchased the stock of the debtors from Neopharma International Holdings, Ltd.

("International") and became its sole shareholder in July 2020.[1]  Canadian's directors were Tamir

Soliman and Dominic Traynor.  (The Declaration does not expressly state who the equity holders

in Canadian were.)  Messrs. Soliman and Traynor hired Mr. Argyle to relocate to Bristol,

Tennessee, to investigate financial and other irregularities that had been occurring at the debtors

prior to the acquisition and since July 2020.  Mr. Argyle soon discovered two companies in

turmoil.  The debtors had run out of enough funds even to keep the electricity on, but they still

had the prospects of being able to pay all creditors if the assets could be sold quickly with the

operational team kept intact.  Canadian, though owner for only a few months, quickly decided

that "a sale through a chapter 11 proceeding was the only means by which the assets could be

transferred free and clear, including the financial irregularities that they described to me had

occurred under prior ownership of Neopharma."  (Declaration at 4 ¶ 6.)  Mr. Argyle sought

HSD's help to explore asset sale options for the debtors.  The sale option first presented involved

Mr. Gregory, who had formed a company called Constitutional Antibiotics, Inc.

---

[1] Former corporate officers of International have disputed whether Canadian ever actually became the
sole owner.  The interested parties so far have deferred a resolution of that dispute.  For purposes of this
opinion only, the Court finds that Canadian was in control of the debtors at all times relevant to the issues
in this matter.

("Constitutional") to partner with Canadian, represented by Argyle, to purchase the debtors'

assets for $5 million plus assumption of the facility lease. (*Id.*)

On November 2, 2020, Mr. Dessauer sent an engagement agreement to Mr. Argyle to

represent Neopharma, Inc. and Neopharma Tennessee, LLC. (*Id.* at 5, ¶ 10.) "It was never

contemplated that I or HSD would represent Mr. Argyle in his personal capacity, work for his

benefit or work for any other company in which he had an interest. This type of representation

was never discussed with Mr. Argyle nor was it ever intended." (*Id.*) Mr. Dessauer understood

that it was Mr. Argyle's desire that HSD represent the debtors in the bankruptcy cases and be

their bankruptcy counsel. (*Id.*)

The pre-petition attempts to consummate a deal with Constitution failed. During

negotiations in November and December, Constitutional reduced its initial $5 million offer to $4

million, then $2 million, then $1 million. The reasons for the reductions appear to be unrelated

to any demands made by Mr. Argyle for himself or the management team's personal benefit.

The Declaration gives the impression that the reductions were prompted by Constitutional's

desire to obtain the debtors' assets for a lower cash price. Mr. Argyle, on behalf of the debtors,

rejected the $1 million dollar offer as insufficient. (*Id.* at 7–10, ¶¶ 15–19.)

Mr. Dessauer believed that the rejection of the Constitutional offer meant that the debtors

did not even have enough resources to file a bankruptcy. Then on December 10, 2020, Mr.

Argyle sought HSD's help with an alternative sale proposal. Mr. Argyle wanted to form a new

company, American, and told Mr. Dessauer that American consisted of investors willing to make

a $5 million commitment—$2 million to acquire the debtors' assets and $3 million for operating

capital. Mr. Argyle expressly asked Mr. Dessauer to represent American, but Mr. Dessauer "told

him no" and that American would have to retain its own counsel. (Declaration at 11, ¶ 21.) Mr.

6

Dessauer did, however, agree to prepare American's organizational documents to expedite a sale of the debtors' assets "due to the immediate financial problems facing Neopharma." (*Id.*)

Unsigned copies of the American formation documents are attached as an exhibit to the Declaration. (Declaration, Ex. 11, ¶ 22.) The documents show that Mr. Dessauer acted as the sole incorporator of American. The document titled "Action Taken in Lieu of Incorporator's Meeting" states that "One Thousand Five Hundred (1,500) shares of Common Capital Stock of the Corporation shall be the amount required to be subscribed before the Incorporator shall turn over the affairs of the Corporation to the subscribers to the Capital Stock." (*Id.*) The document continues in paragraph 3 to provide that "[t]he attached subscription(s) for Capital Stock, the same being the required amount of Capital Stock, are accepted and inserted in the record book of the Corporation." (*Id.*) The unsigned subscription agreements dated December 11, 2020, show that ownership of the new company based on 1,000 shares would be held by Michael Johnson (40%), Dominic Traynor (40%) and David Argyle (20%). (*Id.*) The subscription agreements provide for the issuance of a total of 1,000 shares rather than 1,500, and no explanation is provided for the whether the additional 500 shares authorized were ever issued. The documents name Michael Johnson as the sole director and president. Mr. Argyle is named as secretary. A signed copy of Mr. Argyle's subscription agreement for 200 shares is included in another exhibit. (Declaration, Ex. 12, Doc. No. 293-1 at 267.)

Mr. Dessauer then negotiated an asset purchase agreement, on behalf of the debtors, with American. The negotiations concluded on or around December 16, 2020, the date the asset purchase agreement was signed. The record does not disclose who participated in those negotiations. Based on a review of the itemized time records accompanying the application, Mr. Argyle is the only party mentioned in those time entries who was affiliated with American. The

itemized time records do not reflect the name of counsel who participated in the preparation of the asset purchase agreement after the cases were filed.  The Declaration indicates that Mr. Traynor was involved at some point prior to execution, albeit through Mr. Argyle.  (Doc. No. 293-1 at 12 ¶ 24.)  The Declaration also mentions an attorney from Elizabethton, Tennessee who represented that he was being retained to represent American and to whom Mr. Dessauer sent copies of the corporate formation documents (Declaration at 12, ¶ 26), but he is not mentioned in the time records.

### B.  HSD initiates the Chapter 11 cases

On December 10, 2020, Mr. Dessauer received corporate resolutions from Mr. Traynor making Mr. Argyle the sole director of the debtors and authorizing him to move forward with the bankruptcy filing.  (Declaration, Ex. 13.)  Mr. Argyle explained to Mr. Dessauer that the debtors' directors wanted him to be the sole director because he was "present in Bristol in the facility and was in the best position to make day to day decisions once the bankruptcy cases were filed."  (*Id.* at 13 ¶ 28.)  Mr. Dessauer was also informed that "the directors of Neopharma were tied up on other projects and did not have the time necessary to devote to Neopharma once the bankruptcy cases were filed."  (*Id.*)

By mid-December there was increased urgency to get the case filed prior to December 23, 2020.  That date was the deadline to pay Bristol Tennessee Essential Services ("BTES") for electrical services and to avoid termination of service.  On that date, the amount owed to BTES would exceed the bond that had been provided for services.  A bankruptcy filing would allow BTES to secure payment in full for its pre-petition services and would give the debtors 30 days under 11 U.S.C. § 366 to negotiate payment terms for post-petition service.  (Id. at 14–15 ¶ 32.)  Additionally, Mr. Dessauer received information indicating that Mr. Gregory of Constitutional, who had been rejected in his attempt to buy the company, was encouraging BTES to turn off the

electricity.  A shutoff would force the debtors into an immediate Chapter 7 liquidation, which would let Constitutional obtain the assets at a deep discount.  (Id. at 15, ¶ 33.)

On December 18, 2020, Mr. Argyle signed the resolution as the sole director of the debtors to authorize the filing of the Chapter 11 cases.  (*Id.* at 14 ¶ 31.)  Skeletal petitions were filed on December 22, 2020.  The creditor matrix was filed the following day, on December 23, 2020.

On December 23, 2020, Mr. Dessauer also filed a motion for joint administration to be heard on an expedited basis.  (Doc. Nos. 6, 7.)  Following a hearing on December 29, 2020, the Court issued an order on January 4, 2021, preliminarily authorizing the joint administration. (Doc. No. 22.)  During the hearing on the motion for joint administration, the Court expressed concern about whether there were any conflicts between the two debtors, given that no schedules or statements of financial affairs had been filed with the skeletal petitions based on Bankruptcy Rule 1015.  Mr. Dessauer stated that he was unaware of any potential conflict but admitted that information was still being gathered.  In addition to addressing the potential for conflicts between the two debtors and the challenge to ownership of the debtors, Mr. Dessauer explained that the debtors intended to file a motion to sell substantially all assets in the near future and would seek to have that motion heard on February 1, 2021, because of the lack of operating funds.  The Court rejected such an expedited schedule. The Committee of Unsecured Creditors had not been formed yet.  The schedules and statement of financial affairs were not filed, and an extension to do so had been sought and obtained by the debtors.  In response, Mr. Dessauer acknowledged that a date later in February might work better, to allow the schedules to be filed and to allow the first meeting to take place.

A number of other interested parties appeared at the hearing, including a representative of former corporate officer Mallikarjuna Desireddy; and counsel for McKesson Corporation

("McKesson"), a large unsecured creditor.   Counsel for McKesson questioned Mr. Dessauer about whether the proposed sale was to an insider.  Mr. Dessauer stated that the equity of American was "yet to be determined" but disclosed that the organizers of the purchaser were affiliated with Canadian.  (Court Digital Audio 12/29/2020 at 11:37 AM.)

The schedules and statements of financial affairs were filed on January 22, 2021.  (Doc. Nos. 92–100.)  The first meeting of creditors began on January 25, 2021 (Doc. No. 111) and ultimately concluded on July 1, 2021 (Doc. No. 343).

### C.  The Sale and Financing Motion

On January 7, 2021, the debtors filed the Motion to Approve the Sale of Substantially All of the Debtors Assets Free and Clear of Liens, Claims, Encumbrances and Other Interests, Approve the Assumption and Assignment of Facility Lease and Tax Agreement, and Authorizing Rejection of Certain Executory Contracts (the "Sale Motion").  (Doc. No. 26.)  The Sale Motion was originally scheduled to be heard on February 16, 2021.  The exhibits attached to the Sale Motion included the asset purchase agreement dated December 16, 2020, between the debtors as the seller and American as the purchaser for a purchase price of $2,000,000 plus the assumption of the Facility Lease.  Michael Johnson signed as the president of American.  Mr. Argyle signed for the debtors as CRO.  (Doc. No. 26-1 at 23.)  Other exhibits attached were the Facility Lease (Doc. No. 26-2); the Tax Agreement with the City of Bristol, TN (Doc. No. 26-3); the Quitclaim Deeds to Neopharma (Doc. Nos. 26-4 and 26-5); the Memorandum of Facility Lease (Doc. No. 26-6); and the Stock Purchase Agreement between Canadian and the debtors' previous owner, International, dated July 24, 2020 (Doc. No. 26-7).  Dominic Traynor had signed the Stock Purchase Agreement with International as a director of Canadian.  Mr. Argyle's name does not appear on any of the documents evidencing Canadian's acquisition from International.  These

documents support Mr. Dessauer's understanding that there were other directors in Canadian and the existence of other parties in interest in American.

The Sale Motion recited the events leading up to execution of the asset purchase agreement and the failure to reach an agreement with Constitutional; it then described how "[c]ertain principals of [Canadian] and others then formed [American] to proceed with the acquisition under the terms of the [December 16, 2020 asset purchase agreement between the debtors and American]." It stated that "[n]one of the founders or principals of [American] are associated with [Constitutional]." (Doc. No. 26 at 10, ¶ 27.) The Sale Motion does not specify the names of the principals of Canadian and "the others" who were associated with American. As of January 25, 2021, the statement that there were multiple principals of Canadian and others involved in American was no longer accurate. According to Mr. Argyle's testimony at the first meeting of creditors, on that date, the only principal of Canadian was David Argyle, and there were no other investors in American who planned to move forward with the acquisition. The Chapter 11 Trustee's objection implies that HSD misrepresented the identity of the purchaser or intentionally hid the extent of Mr. Argyle's involvement on both sides of the sale, but the Declaration does not show that HSD had any information other than what it represented in the Sale Motion at the time the Sale Motion was filed. To the contrary, the corporate documentation prepared by and provided to Mr. Dessauer supports his understanding that there were others involved in both Canadian and American.

The Trustee's Objection to the pending application also contends that the Sale Motion was filed for Mr. Argyle's benefit, not the estate's benefit. The Sale Motion recited that the asset purchase agreement would provide numerous benefits to the estate. It contended that the purchase price of $2 million would pay the administrative expenses and priority claims of the

two debtors and a distribution to unsecured creditors.  Another contention was that the sale

would provide employment for 45 people immediately and possibly another 75–100 people later.

A third contention was that the assumption of the FDA post-marketing obligations would help

avoid a drug recall.  In addition, the asset purchase agreement provided for the assumption of the

facility lease with the Industrial Development Board of the City of Bristol, Tennessee.

Further, to the estate's benefit, the Court notes that the Sale Motion did not foreclose

competitive bidding.  The Sale Motion provided that notice of the sale would be provided to all

creditors and parties in interest and that all those parties would have an opportunity to object to

the proposed sale on "any appropriate grounds." (Sale Motion, Doc. No. 26 at 18 ¶ 55.)

The asset purchase agreement does contain provisions that are troublesome in the context

of whether the sale was really for Mr. Argyle's benefit.  The asset purchase agreement provided

that there would be a breakup fee of $250,000 if the Court approved the sale of the assets to

another party, and the Sale Motion sought approval of that amount as an administrative expense.

The asset purchase agreement also required an escrow deposit of $20,000 to be paid to an escrow

account within seven days of the execution of the agreement to be held as part of a Holdback

Amount to protect the purchaser from any damages from breach of representations, warranty, or

covenants.  (Doc. No. 26-1 at 5.)  The deposit was never paid by American.  There may have

been some confusion about whether the deposit had to be paid because the purchaser was

allowed to pay the "Holdback Amount" 90 days following the Closing Date. (*Id.*)  There was an

escrow agreement executed by Michael Johnson for American and David Argyle for the debtors

that was filed with the Sale Motion, but it does not provide any insight on whether there was an

understanding that the deposit could be deferred until after closing.  (*Id*. at 30–34.)  The Sale

Motion and Dessauer Declaration are silent about why the breakup fee was necessary for

American and whether the debtors ever made a demand on American to pay the escrow prior to

the appointment of the Chapter 11 Trustee.  Assuming that the breakup fee and the failure to

obtain the escrow deposit are evidence that American was receiving favorable treatment, this

status only lasted from the date the Sale Motion was filed on January 7 to January 28, when the

Stipulation to Appoint a Trustee was filed and the Trustee determined to market the property.

The Court also notes that the breakup fee offered to the Trustee's stalking-horse bidder was an

amount up to 5% of the cash price.  The bidding procedures also required a good-faith cash

deposit equal to 10% of the purchase.  (Bid Procedures Order, Doc. No. 185, at 2, 23.)

Five days after the Sale Motion was filed, on January 12, 2021, HSD filed its application

to be employed as Neopharma's counsel.  (Doc. No. 47.)  The application requested that the

employment relate back to the date of the filing as provided in E.D. Tenn. LBR 2014-1.  Because

the application was filed more than seven days after the filing of the petition, the local rule

required that 1) all creditors and parties in interest be served; 2) the application be noticed as

required by E.D. Tenn. LBR 9013-1; and 3) the application be set for hearing.  HSD provided the

requisite notice and set the matter for hearing on February 2, 2021, providing the required 21

days' notice of an opportunity to object.  HSD disclosed the fact that corporate organizational

work had been done by the firm for the potential buyer.  No written objections to HSD's

employment were filed, although the issue of that representation would be referenced in a motion

for the immediate appointment of a trustee filed less than two weeks later.

### D.  The Committee forms and seeks a trustee

The Committee was formed on January 14, 2021.  McKesson was named to the

Committee, and its counsel became counsel to the Committee.  On January 26, 2021, the

Committee filed motions for the immediate appointment of a trustee ("Trustee Motion") on an

expedited basis.  (Doc. Nos. 115, 116.)  These actions were taken in response to the testimony of

Mr. Argyle at the meeting of creditors on January 25, 2021.  Mr. Argyle, under oath, revealed

that he was the sole owner and principal of both Canadian and American.  He also admitted he

did not have investors and could not close either the post-petition loan or the sale.  That status

revealed that Mr. Argyle had an "actual, ongoing, and irreconcilable conflict" with the debtors.

(Trustee Motion, Doc. No. 115 at 3.)  In addition to that conflict, the Committee contended that

the debtors failed to insure their properties and were proposing a sale to an insider for below

market value.  The Committee criticized the proposed sale because the assets had not been

marketed and noted that the debtors failed to obtain the escrow deposit proposed in the asset

purchase agreement or to confirm that American had the funds necessary to close either the loan

or the sale.  (*Id.* at 2.)

      With respect to the involvement of HSD, the Committee claimed that counsel also had a

conflict because HSD had represented American and performed services related to the proposed

sale transaction.  (*Id.* at 3.)  The Committee referenced HSD's application to be employed and

HSD's disclosure that it had represented American in its corporate formation so that it could

make a bid for the assets.  It also noted that the fees for those services had been paid from the

debtors' account.[2]  It concluded its allegations about counsel by stating that Committee was

informed that American never retained its own counsel, implying that HSD had continued to

represent American while representing the debtors.  The Chapter 11 Trustee picks up this same

theme in his Objection and also relies on HSD's objection to the sale as evidence that HSD

continued to represent American.  (Doc. No. 274 at 14.)

---

[2] Those payments have been returned to the debtors' account and have been removed from this application.

The Trustee Motion continued with allegations that the debtors failed to market the assets, ignored potential purchasers, misrepresented whether there would be a bankruptcy auction to a bidder, and included a potentially bid-chilling $250,000 breakup fee in the asset purchase agreement.  As to the breakup fee, when questioned at the first meeting, Mr. Argyle testified that American had not incurred any such costs in formulating its bid.  (*Id.* at 4.)  The Committee concluded with the allegation that, despite Court approval of a post-petition loan ten days earlier, American had failed to fund the loan.  Mr. Argyle admitted at the meeting on January 25, 2021 that he was still trying to raise money to fund the post-petition loan, despite his representations earlier in the case that American was the only source for a loan that the debtor could find.  (Doc. No. 31 at 8, 11; *see also* Declaration of David Argyle, Doc. No. 46 at 4 ("American Antibiotics Initiative, Inc. is the only source available to finance [the debtors'] limited operating expenses pending the consideration of the Sale Motion.  Without the interim funding …, the debtor companies will not be in a position to complete the proposed asset sale or continue reorganization efforts.").)

The Court never heard testimony supporting the Committee's allegations because the parties filed a Stipulation Regarding the Appointment of Chapter 11 Trustee on January 28, 2021.  (Doc. No. 127.)  The Stipulation made no findings regarding the allegations of cause to appoint the trustee.  The order proposed by the Stipulation was entered the following day, and it provided that the appointment was based on the parties' stipulation that the appointment of a trustee was in the best interests of the debtors.  (Doc. No. 128.)  Specifically, there was no evidence presented or facts stipulated that HSD's representation of American extended beyond the creation of the corporate entity.

15

Mr. Dessauer has responded to these allegations in his Declaration.  With respect to the allegations regarding HSD representing American, Mr. Dessauer testified that his representation of American was limited to forming a corporation.  Although the itemized time records that HSD prepared do not reflect the names of any other counsel for American in the preparation of the sale documents and post-petition financing motion, Mr. Dessauer provided exhibits which show the existence directors and officers of American, other than Mr. Argyle.  He had an understanding that Dominic Traynor, who is an attorney, was involved in asset purchase agreement negotiations.  The Declaration also references another attorney who called Mr. Dessauer after the filing and represented that he had been retained to represent American.  The allegations and Mr. Argyles' incomplete disclosures about his ownership and the status of funding are a problem, and justified the appointment of a trustee, but there is no evidence that HSD or Mr. Dessauer were aware that anything Mr. Argyle had previously represented was inaccurate until the testimony at the first meeting of creditors.  Mr. Dessauer, testified that the meeting of creditors on January 25, 2021, was when he learned that Mr. Argyle was the sole owner of Canadian and American and that funding was not available to close the proposed sale or fund the post-petition loan.  (Doc. No. 293-1 at 18.)  Mr. Argyle's complete control of American came into focus at the first meeting of creditors, only 35 days after the case had been filed.  After that date, the record does not reflect that HSD obstructed the appointment of a trustee or removing Mr. Argyle from his role as decisionmaker for the debtors.  At that point, there was no denying that the sole director and officer of the debtors had a clear conflict in his role as the only officer of the seller with his actions on behalf of the buyer and lender.  HSD continued to work until January 28, 2021, to transition the case to the Chapter 11 Trustee, and there are no allegations that there were any problems with the transition.

16

The evidence does not support painting HSD with the same conflict brush as Mr. Argyle. The American representation was limited and disclosed.  The actions taken after filing appear to have been taken to preserve value for the estate, with evidence that HSD's representation continued past the creation of the corporate entity.  The harsh allegations about even Mr. Argyle are tempered by the fact that he continued to work at the Bristol facility and assist other buyers with their due diligence with the approval of the Trustee. At the hearing on the Sale Motion, the Trustee testified that Mr. Argyle had conducted himself in a manner consistent with his obligations as an officer of the debtors during the marketing process.  Finally, Mr. Argyle ultimately found an investor in Polymathes Capital Corporation ("PolyCap"), qualified as a bidder, participated in the auction, and was the backup bidder at $8.6 million to the winning bid of $8.7 million (less a breakup fee credit of $200,000).

## III.    DISCUSSION

### A.  *Services were reasonable and beneficial*

Section 330(a)(1)(A) of the Bankruptcy Code authorizes the Court to award, to a professional employed under Section 327, reasonable compensation for actual, necessary services rendered by the attorney.  "[R]easonable compensation for services necessarily implies loyal and disinterested service in the interest of those for whom the claimant purported to act." *Wolf v. Weinstein*, 372 U.S. 633, 642 (1963) (internal quotation marks and citations omitted); *cf. In re Big Rivers Elec. Corp.*, 355 F.3d 415, 432 (6th Cir. 2004) ("The compensation phrase, the Supreme Court has reasoned, suggests that trustees and examiners must remain loyal to all relevant parties in the bankruptcy and must act as fiduciaries in doing so.") (citations omitted). "[T]he text and legislative history of § 330 contemplate a prospective standard for the award of attorney's fees relating to bankruptcy proceedings—one that looks to the necessity or reasonableness of legal services at the time they were rendered.  Under this framework, if a fee

17

applicant establishes that its services were 'necessary to the administration' of a bankruptcy case
or 'reasonably likely to benefit' the bankruptcy estate 'at the time at which [they were]
rendered,' *see* 11 U.S.C. § 330(a)(3)(C), (4)(A), then the services are compensable." *In re
Woerner*, 783 F.3d 266, 276 (5th Cir. 2015) (alteration in the original). "The Code prohibits a
court from awarding fees, however, for: '(i) unnecessary duplication of services; or (ii) services
that were not—(I) reasonably likely to benefit the debtor's estate; or (II) necessary to the
administration of the case.'" *In re Veltri Metal Prod., Inc.*, 189 F. App'x 385, 389 (6th Cir.
2006) (unpublished opinion) (citing 11 U.S.C. § 330(a)(4)(A)). The Code also permits courts to
deny compensation of professionals employed under Section 327 if "at any time during such
professional person's employment under section 327 or 1103 of this title, such professional
person is not a disinterested person, or represents or holds an interest adverse to the interest of
the estate with respect to the matter on which such professional person is employed." 11 U.S.C.
§ 328(c). "[S]imultaneous representation of the buyer and the seller in the same transaction is a
prototypical disqualifying conflict of interest even if it is not invariably disqualifying in all
circumstances." *Rome v. Braunstein*, 19 F.3d 54, 61 (1st Cir. 1994) (citation omitted). A
debtor's attorney who also represents purchasers of property of the estate has a conflict that does
not diminish through the incidental benefit of expediting a sale. *Cf. In re Watson Seafood &
Poultry Co., Inc.*, 40 B.R. 436, 442 (Bankr. E.D.N.C. 1984); *see also In re Unitcast, Inc.*, 214
B.R. 979, 988 (Bankr. N.D. Ohio 1997) (awarding fees to a debtor's attorney only in part, where
the debtor's attorney also represented a secured creditor that created a corporate entity in
contemplation of purchasing assets of the debtor).

In support of his objection, the Chapter 11 Trustee directs the Court to the standards
expressed in *Woerner*. The Court must consider whether HSD's services were necessary to the

administration of a bankruptcy case or reasonably likely to benefit the bankruptcy estate at the time at which they were rendered. *In re Woerner*, 783 F.3d at 276. The work itemized in the fee application consists of filing the petition; pursuing the joint administration of the cases; preparation of the schedules and statement of affairs; preparation of the Sale Motion; preparation of the Financing Motion; responding to the Motion to Dismiss filed by the debtors' previous owner; and preparation for and attendance at the first meeting of creditors.

In this case, there seems to be complete consensus that (1) filing a bankruptcy to avoid a loss of the assets and the legal services required to prepare the appropriate filings was necessary; (2) a sale of the assets to another manufacturer of antibiotics was the best way to preserve value for the creditors of these debtors; (3) to keep the business viable while finding such a purchaser, financing had to be obtained to keep the lights on, literally; and (4) the fight over ownership of the debtors needed to be deferred until after a sale could be conducted. The Court finds that the services to accomplish these tasks were actually performed and were necessary to preserve the business. There is no dispute that the business needed to be sold and critical expenses needed to be funded and that bankruptcy was a reasonable means to accomplish that end. In fact, the Chapter 11 Trustee proceeded with that very plan and obtained a successful result.

Further, the amount of time spent on providing those services has not been challenged, and the Court finds the time spent to be reasonable. The same is true with the hourly rates. If anything, the Chapter 11 Trustee implies that more time should have been spent to market the property and conduct more due diligence on Mr. Argyle's involvement and wherewithal. The Court finds that the ability to spend additional time without the prospect of post-petition funding was not something that HSD believed that the debtors had at the time it was rendering the services.

The primary complaint of the Chapter 11 Trustee and the Committee is that the proposal for a quick sale prior to any significant marketing for a low price is *prima facie* evidence that HSD was filing the case for Mr. Argyle's benefit. Mr. Dessauer has testified that he told Mr. Argyle that he would not be his personal attorney and that any offer that he or his group of investors put forward could be subject to a higher bid. (Dessauer Declaration at 41, ¶¶ 21, 41.) As for the involvement of other counsel for American, Mr. Dessauer believed Mr. Traynor was involved in the negotiations, and after the cases were filed, he also received a call from an attorney who advised him he had been retained to represent American. (*Id.* at 12 ¶ 26.) The Court finds these facts to support Mr. Dessauer's contention that he was not American's counsel for the negotiation of the asset purchase agreement and that Mr. Argyle understood that he needed to get separate counsel because HSD was not representing him.

The Court understands the concerns expressed by the Chapter 11 Trustee; especially in light of Mr. Argyle's disclosures at the first meeting of creditors. Mr. Argyle's conflicts are clearly apparent, but HSD was not representing American or Mr. Argyle. Had the Chapter 11 Trustee provided evidence that Mr. Dessauer had an undisclosed agreement to represent Mr. Argyle or American, or that Mr. Dessauer or his firm took any action to dissuade potential bidders from making an offer, or obstructed disclosures of the debtors' information, or opposed the appointment of a trustee after Mr. Argyle fully disclosed his complete ownership in Canadian and American and his lack of investors, the Court would give more weight to those concerns in its analysis. However, from the first hearing, Mr. Dessauer represented the debtor in such a way that provided the other stakeholders in the estate the ability to participate fully. He backed off setting a sale hearing until the Schedules and Statements of Financial Affairs were provided and Mr. Argyle could be put under oath at the first meeting of creditors. He disclosed the corporate

20

work for American in his initial disclosures.  At the motion for joint administration, he responded to counsel for McKesson that the ownership of the purchaser was not finalized but disclosed that parties affiliated with Canadian would be involved.  Even with those disclosures, there were no objections to his employment by any party.

The Court takes to heart *Woerner*'s requirement of looking at the benefit of the services provided *at the time they were provided*.  783 F.3d at 276 (emphasis added).  When the case was filed, Mr. Dessauer was presented with a business that was out of cash, with millions in liabilities and with unpaid employees who were critical to the future of the business.  The debtors would have faced even greater liabilities if the electricity had been cut off.  One toughly negotiated sale which involved non-insiders had fallen through on Mr. Dessauer's watch, and he had received information that the rejected buyer was trying to ensure that no sale could be consummated by pressuring the electricity supplier.  In that context, Mr. Argyle presented Mr. Dessauer with what appeared to be a substitute buyer that could be a stalking-horse bidder, and a post-petition lender that would allow a bankruptcy sale process to move forward.  Would more due diligence on Mr. Argyle and Canadian, or more marketing, have been better?  Yes.  In hindsight, given the complicated nature of a pharmaceutical case and the valuation of the business and its assets, the disputes between the International's management group and Canadian's, and the shifting ownership in Canadian, more due diligence on the part of HSD might have resulted in the appointment of a trustee a few days earlier.  But Mr. Dessauer faced the impending termination of electrical service, no cash to solve the problem, and the prospect of the complete loss of the value of the business if he did not move forward.  In that context, the Court finds his decision to file the cases and to propose American as a potential buyer to be a service that would reasonably benefit the estate.  The Chapter 11 Trustee would have the Court compare the ultimate sale result

against the proposed sale as proof the services could not have been for the estate's benefit.  The

Court finds that the appropriate analysis is to compare what would have happened if no action

had been taken compared with the offer made by American.  The choice to move forward with

the bankruptcy and to propose a sale allowed the Chapter 11 process to work.  The Chapter 11

Trustee and the Committee were correct that the assets needed to be marketed to realize their

value and that funds needed to be obtained to allow that process to proceed.  They were also

correct that the process needed to be led by someone who was conflict-free.  With a trustee at the

helm, a successful sale was achieved, but at the cost of a post-petition loan of $1,000,000 (Doc.

No. 157 at 9) and fees and expenses that have been approved for services by multiple firms at the

cost of over $1,000,000 to the estate.  The Court must also note that the success of the sale was

achieved in some part because of Mr. Argyle.  Under the direction of the Trustee, he continued to

conduct himself in a manner with prospective buyers during the marketing process that,

according to the Trustee's own testimony at the sale hearing, did not in any way negatively affect

the sale process.  More significantly, Mr. Argyle ultimately did find a partner with whom to

make a bid for the assets, and their participation in the auction is partially responsible for the

$8,500,000 cash sale price.

### B.  HSD remained a disinterested party

The Chapter 11 Trustee's second basis for disallowance of the fees is that HSD was not a

disinterested party.  Section 328(c) of the Code requires the attorney employed to represent the

debtor to be disinterested, and to remain that way.  When that does not happen, the denial of fees

is within the discretion of the Court.  To be disinterested, the attorney may not hold an interest

materially adverse to the interest of the estate or of any class of creditors or equity holders, by

reason of any direct or indirect relationship to, connection with, or interest in the debtor or for

any other reason.  11 U.S.C. § 101(14)(C).  Representing a party who has an adverse interest or

an actual conflict with the debtor makes the attorney "interested" and at risk for having his compensation request denied.

Mr. Dessauer testified that he represented only the debtors except for a limited representation of Mr. Argyle and the parties who wanted to form American. That representation was limited to formation of a corporation that they would use as the entity to make the offer to purchase the assets. The Court finds that this limited representation to form a corporation did not create an adverse interest. At the time of the American representation, American was not a creditor of the debtors, and no actual conflict existed. The debtors wanted to sell their assets, and the creation of a corporation that would make an offer is not adverse until that corporation starts negotiating to make the offer. Therefore, the representation would not have been a disqualifying representation under 11 U.S.C. § 327(c). Using the debtors' funds to pay for the work was inappropriate, and pursuant to an agreed order with United States Trustee, on January 28, 2021, HSD returned the sum of $471.79, the total of the costs and expenses related to the corporate formation, to Neopharma. (Agreed Order, Doc. No. 126.)

At the point when American and the debtors began negotiating the asset purchase agreement, American was adverse to the debtors. The two were buyer and seller, and an actual conflict existed. However, HSD did not represent the newly formed American at that point and never intended to do so. In fact, Mr. Dessauer expressly told Mr. Argyle that he would not represent American in the bankruptcy or a sale of the assets. The Chapter 11 Trustee did not put on any witness to contradict Mr. Dessauer's understanding of HSD's role and who its client was.

The Chapter 11 Trustee contends that there were more connections between HSD and American that should have been disclosed in HSD's application. He points to the fact that Mr. Dessauer filed an objection to the sale on behalf of the debtors on March 30, 2021. (Objection,

Doc. No. 274 at 14; Sale Objection, Doc. No. 245.)  On behalf of the debtors, Mr. Dessauer

adopted the arguments made by Canadian and its separate counsel objecting to a sale of the

assets to the Successful Bidder.  The objection alleged that Canadian should have a say in which

bid was selected because any sale price more than $8,000,000 should produce a dividend for the

equity holders.  Canadian had partnered with PolyCap to participate in the Trustee's auction sale

and had been named as the Backup Bidder.  At the hearing to approve the sale, Mr. Argyle

testified for Canadian and explained how he and some of the members of the management team

at the company would personally benefit from the Trustee's acceptance of the PolyCap bid.

PolyCap had agreed that Mr. Argyle would receive an equity interest in the new company if it

was the successful bidder.  The Court overruled the PolyCap sale objection, but the Chapter 11

Trustee contends that Mr. Dessauer was acting in a manner that was contrary to the interests of

the debtors by filing the objection to the sale.  Counsel for Canadian, and Mr. Dessauer for

Neopharma, argued that the Court should consider the wishes of Neopharma's equity holders if

there were funds to pay the creditors in full.  In essence, equity should get to stay equity and

have the upside of the future of the company if the creditors were paid in full.  The Court was not

convinced that creditors would be paid in full and, therefore, the offer with the greatest cash

recovery for creditors was approved.  That was also the offer supported by the Chapter 11

Trustee and the Committee.

First, the Court does not find HSD's action taken after its representation of the debtor in

possession to be a disqualifying event.  The deal between Mr. Argyle and PolyCap, the investor

he ultimately found to participate with him in bidding for the assets, was struck after the Trustee

was appointed.  The deal could not have been included with the initial disclosures by Mr.

Dessauer or updated during his representation of the debtor in possession.  Second, Mr. Dessauer

is not seeking compensation from the estate for this work; therefore, the Court does not need to exercise its discretion to allow or disallow any amount for those services.  Third, Mr. Dessauer's explanation for this objection is that it was made in the context of all of the parties thinking that the bidding had reached a level where unsecured creditors would be paid in full and equity would have an interest in any excess. The Chapter 11 Trustee provides no other evidence of undisclosed connections between Mr. Argyle or American or PolyCap on one hand and the debtors on the other.

The Court understands the Trustee's suspicions that there were more connections than were disclosed.  Mr. Argyle's admissions at the first meeting of creditors were highly unusual and so clearly a conflict that it is hard to believe that the debtors' counsel was not aware that the buyer and seller in the transaction were all the same person.  Looking back, are there gaps in the proof the Court has that could have led the Court to conclude that HSD's representation was colored by its reliance on, if not representation of, Mr. Argyle?  There are.  Mr. Argyle could have been referred to another corporate attorney, but at a minimum, there should have been an engagement letter addressed to American and to Mr. Argyle, Mr. Johnson and Mr. Traynor.  That letter should have explained in writing the limitations of the representation, *i.e.*, that representation was limited to the formation of a corporation.  Mr. Argyle should have acknowledged that HSD could represent the debtors in a bankruptcy; and if, in the course of that representation, a conflict arose between American and the debtors, then American waived that conflict.  The prospect that HSD, on behalf of the debtors, could take positions contrary to American's interest in the bankruptcy case should have been spelled out.  Tenn. Rules of Professional Conduct 1.7.  The itemized time entries should have included the names of the opposing counsel or officers or directors of Canadian or American referred to in the Dessauer

25

Declaration to demonstrate that there really were arm's-length negotiations with parties other than Mr. Argyle regarding the asset purchase agreement. Finally, in the pleadings filed with the Court, the Court would have liked an explanation for the need for a breakup fee of $250,000 in a sale to an insider-led group; and for the failure to require the payment of the relatively low escrow deposit. Such additional facts would have bolstered Mr. Dessauer's contention that he was only working for the estate and had been consistent in that position throughout his representation. The filing of an objection to a sale advocating for an insider which provided a lower cash recovery did not help the optics of HSD's claim of disinterestedness, especially when separate counsel was already appearing.

The Court has found this to be a difficult case for those reasons, but when the Court weighs the testimony of Mr. Dessauer, supported by the exhibits to his affidavit, the declaration of Mr. Argyle filed early in the case; and lack of evidence contradicting Mr. Dessauer's testimony, the Court concludes that HSD was disinterested during its representation of the debtors and can be compensated for the services that it performed.

The final objection raised by the Trustee is that no compensation should be awarded for any services provided after the appointment of a trustee. HSD's services as counsel for the debtor in possession were terminated under Section 327 of the Bankruptcy Code on January 29, 2021, and HSD is entitled to no further compensation in the case.

## IV.    CONCLUSION

In conclusion, the Court will award HSD its fees and expenses.  The services provided preserved the opportunity to recognize the value of this business.  The Court has found that, in the context of HSD's experience attempting to consummate a sale to Constitutional and the potential for loss of any value for creditors and employees, its actions to file the case and to file the motions for post-petition financing and to sell the debtors' assets were reasonable and appeared to be beneficial to the estate at the time those services were provided.  The Court has also found that HSD has shown that it was disinterested during the period of its representation, and that its objection to the sale does not disqualify it from receiving compensation from the estate for services it provided while the debtors were in possession.

A separate order will follow.

###